UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; ALLSTATE
PROPERTY AND CASUALTY
INSURANCE COMPANY; ESURANCE
INSURANCE COMPANY; and
ESURANCE PROPERTY AND
CASUALTY INSURANCE COMPANY,

C.A. No. _____

**Demand for Jury Trial**

Plaintiffs,

v.

MICHIGAN PAIN MANAGEMENT
PLLC; DEARBORN PAIN
SPECIALISTS, PLC; SOUTHFIELD
PAIN MANAGEMENT, PLLC;
STERLING HEIGHTS PAIN
MANAGEMENT, PLC; PRECISION
MRI OF MICHIGAN LLC d/b/a
PRECISE MRI; ADVANCED
SURGERY CENTER, LLC; NORTH
SHORE INJURY CENTER, INC.;
MEDI TRANSIT INC.; JAMES
PADULA, D.O.; JONATHAN MAFFIA;
WILLIAM GONTE, M.D.; ELIAS
GOLDSTEIN, D.C.; ALBERT
JEROME, D.C.; FRANCES MADDEN,
M.D.; FATINA MASRI, M.D.;
HAITHAM MASRI, M.D.; ALI FARAJ;
JAMES DEWEESE; and NATHAM
KARRUMI, D.C.,

Defendants.

<u>**COMPLAINT**</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

**I.   <u>INTRODUCTION</u>**

1.   This is a case about medical clinics, an ambulatory surgery center, a chiropractic clinic, a magnetic resonance imaging ("MRI") facility, a non-emergency medical transportation company, and the physicians, owners, managers, agents, and representatives of the same who abused the unlimited benefits under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking reimbursement under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.   Defendants Michigan Pain Management PLLC ("Michigan Pain"), Dearborn Pain Specialists, PLC ("Dearborn Pain"), Southfield Pain Management, PLLC ("Southfield Pain"), Sterling Heights Pain Management, PLC ("Sterling

Heights Pain") (collectively, the "pain management clinics"); Precision MRI of Michigan LLC d/b/a Precise MRI ("Precise MRI"); Advanced Surgery Center, LLC ("Advanced Surgery"); North Shore Injury Center, Inc. ("North Shore"); Medi Transit Inc. ("Medi Transit"); James Padula, D.O. ("Padula"); Jonathan Maffia ("Maffia"); William Gonte, M.D. ("Gonte"); Elias Goldstein, D.C. ("Goldstein"); Albert Jerome, D.C. ("Jerome"); Frances Madden, M.D. ("Madden"); Fatina Masri, M.D. ("Fatina Masri"); Haitham Masri, M.D. ("Haitham Masri"); Natham Karrumi, D.C. ("Karrumi"); Ali Faraj ("Faraj"); and James Deweese ("Deweese") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.     The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had allegedly been involved in motor vehicle accidents.

4.     The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were not actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were rendered.

5.     To achieve their fraudulent objective, the defendants unlawfully and improperly solicited patients to undergo unnecessary treatment and services.

6.     The treatment, when provided, was done as part of a predetermined protocol consisting of unreasonable and unnecessary physical therapy, chiropractic, injections and other procedures, medications, application of P-Stim devices, diagnostic testing, and MRI.

7.     The defendants also engaged in several fraudulent billing practices, including unbundling services so as to inflate the amount charged and upcoding office visits in order to charge Allstate for more services than were actually provided.

8.     The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including MRIs, office visits, diagnostic testing, and procedures.

9.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient, but rather was performed solely to generate profit for the defendants.

10.     Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

11.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

12.     The defendants' fraud is confirmed by their own employees, including one who testified:

> [To]wards the end of my employment there, shortly before I left, I eventually told Mr. Maffia that I had caught onto his game, and I told him that I knew what he was doing and that it was wrong, and that I believed that his practice is very much fraudulent.  And I explained -- he was a little alarmed at first.  And I explained to him why, and I gave him my facts that I got from the time I was working there and showed him some evidence.  And he just pulled me into Dr. Padula's office and had  like an emotional breakdown and was apologizing to me for getting me involved in this.

13.     The insurance fraud scheme perpetrated by the defendants was designed to, and in fact did, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

14.     In fact, the defendants targeted auto insurers like Allstate for the sole purpose of generating profit, according to former employees: "Their goal is to get as much money as they can, and it doesn't matter how they have to do it.  And I've had this conversation with Mr. Maffia before about why he only handles car insurances and not personal insurance."

15.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract applicable in the State of Michigan was the platform upon which the defendants perpetrated their fraudulent scheme.

16.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

17.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, North Shore, and Medi Transit in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

18.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services and treatment that were not reasonably necessary; (3) the defendants billed Allstate for unlawful services and treatment that resulted from illegal solicitation; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical

6

documentation through interstate wires and the U.S. Mail demanding payment from Allstate.

19.    As a result of the defendants' fraudulent acts, Allstate has paid in excess of $3,501,685 to them related to the patients at issue in this Complaint.

## II.    PARTIES

### A.    PLAINTIFFS

20.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

21.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Wisconsin.

22.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

23.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their respective principal places of business in San Francisco, California.

24.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

B.    DEFENDANTS

1.    **Michigan Pain Management PLLC**

25.    Michigan Pain Management PLLC is a professional limited liability company organized under the laws of the State of Michigan.

26.    Michigan Pain is owned and controlled by defendant Padula, and Padula is responsible for all actions of Michigan Pain described throughout this Complaint.

27.    Defendants Maffia, Gonte, Goldstein, Jerome, Madden, Fatina Masri, Haitham Masri, Deweese, Karrumi, Precise MRI, Advanced Surgery, and North Shore also participated in the control and operation of Michigan Pain.

28.    Michigan Pain's principal place of business is located in Royal Oak, Michigan.

29.    Michigan Pain billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 1.

2.    **Dearborn Pain Specialists, PLC**

30.    Dearborn Pain Specialists, PLC is a professional limited liability company organized under the laws of the State of Michigan.

31.     Dearborn Pain is owned and controlled by defendant Padula, and Padula is responsible for all actions of Dearborn Pain described throughout this Complaint.

32.     Defendants Maffia, Gonte, Goldstein, Jerome, Fatina Masri, Haitham Masri, Karrumi, Precise MRI, and Advanced Surgery also participated in the control and operation of Dearborn Pain.

33.     Dearborn Pain's principal place of business is located in Dearborn, Michigan.

34.     Dearborn Pain billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3.     Southfield Pain Management, PLLC

35.     Southfield Pain Management, PLLC is a professional limited liability company organized under the laws of the State of Michigan.

36.     Southfield Pain is owned and controlled by defendant Gonte, and Gonte is responsible for all actions of Southfield Pain described throughout this Complaint.

37.     Defendants Padula, Maffia, Goldstein, Jerome, Fatina Masri, Haitham Masri, Karrumi, Michigan Pain, Precise MRI, and Advanced Surgery also participated in the control and operation of Southfield Pain.

38.     Southfield Pain's principal place of business is located in Southfield, Michigan.

39.     Southfield Pain billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.     Sterling Heights Pain Management, PLC

40.     Sterling Heights Pain Management, PLC is a professional limited liability company organized under the laws of the State of Michigan.

41.     Sterling Heights Pain is owned and controlled by defendant Padula, and Padula is responsible for all actions of Sterling Heights Pain described throughout this Complaint.

42.     Defendants Maffia, Goldstein, Jerome, Madden, Karrumi, and Precise MRI also participated in the control and operation of Sterling Heights Pain.

43.     Sterling Heights Pain's principal place of business is located in Sterling Heights, Michigan.

44.     Sterling Heights Pain billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.      **Precision MRI of Michigan, LLC d/b/a Precise MRI**

45.      Precision MRI of Michigan, LLC d/b/a Precise MRI is a limited liability company organized under the laws of the State of Michigan.

46.      Precise MRI is owned and controlled by defendant Karrumi, and Karrumi is responsible for all actions of Precise MRI described throughout this Complaint.

47.      Defendants Padula, Maffia, Gonte, Goldstein, Jerome, Madden, Michigan Pain, Dearborn Pain, Southfield Pain, and Sterling Heights Pain also participated in the control and operation of Precise MRI.

48.      Precise MRI's principal place of business is located in Lathrup Village, Michigan.

49.      Precise MRI billed Allstate at excessive rates for unlawful and unnecessary diagnostic services in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.      **Advanced Surgery Center, LLC.**

50.      Advanced Surgery Center, LLC is a limited liability company organized under the laws of the State of Michigan.

51.      Advanced Surgery is owned and controlled by defendants Fatina Masri and Haitham Masri, who are responsible for all actions of Advanced Surgery described throughout this Complaint.

52.    Defendants Padula, Maffia, Gonte, Goldstein, Jerome, Madden, Karrumi, Michigan Pain, Dearborn Pain, Southfield Pain, and Precise MRI also participated in the control and operation of Advanced Surgery.

53.    Advanced Surgery's principal place of business is in Dearborn, Michigan.

54.    Advanced Surgery billed Allstate for services that were not rendered, were unlawful and medically unnecessary (to the extent services were provided at all), and were billed at unreasonable rates in relation to several patients at issue herein, including the patients set out in Exhibit 6.

## 7.    North Shore Injury Center, Inc.

55.    North Shore Injury Center, Inc. is a non-profit corporation organized under the laws of the State of Michigan.

56.    North Shore is owned and controlled by defendant Deweese, and Deweese is responsible for all actions of North Shore described throughout this Complaint.

57.    Defendants Padula, Maffia, Jerome, Goldstein, Gonte, Faraj, Michigan Pain, and Medi Transit also participated in the control and operation of North Shore.

58.    North Shore's principal place of business is in Royal Oak, Michigan.

59.    North Shore billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was

rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 7.

### 8.   Medi Transit Inc.

60.    Medi Transit Inc. is a for-profit corporation organized under the laws of the State of Michigan.

61.    Medi Transit is owned and controlled by defendant Faraj, and Faraj is responsible for all actions of Medi Transit described throughout this Complaint.

62.    Defendants North Shore, Gonte, and Deweese also participated in the control and operation of Medi Transit.

63.    Medi Transit's principal place of business is located in Dearborn, Michigan.

64.    Medi Transit billed Allstate for transportation services that were unlawful and medically unnecessary (to the extent services were rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 8.

### 9.   James Padula, D.O.

65.    James Padula is a resident and citizen of the State of Florida.

66.    At all times relevant to this Complaint, Padula owned and controlled Michigan Pain, Dearborn Pain, and Sterling Heights Pain, and participated in the control and operation of Southfield Pain, Precise MRI, Advanced Surgery, and North Shore.

67.     As the owner and manager of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore, Padula was responsible for the unlawful, medically unnecessary, and unreasonably charged services allegedly rendered to the patients at issue in this Complaint, including the patients listed in Exhibits 1 through 7.

### 10.   **Jonathan Maffia**

68.     Jonathan Maffia is a resident and citizen of the State of Michigan.

69.     At all times relevant to this Complaint, Maffia participated in the control and operation of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore.

70.     As a manager of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore, Maffia was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint (to the extent treatment was rendered at all), including the patients listed in Exhibits 1 through 7.

### 11.   **William Gonte, M.D.**

71.     William Gonte, M.D. is a resident and citizen of the State of Michigan.

72.     At all times relevant to this Complaint, Gonte owned and controlled Southfield Pain, and participated in the control and operation of Michigan Pain, Dearborn Pain, Precise MRI, Advanced Surgery, North Shore, and Medi Transit.

73.     As an owner and manager of Southfield Pain, Michigan Pain, Dearborn Pain, Precise MRI, Advanced Surgery, North Shore, and Medi Transit, Gonte rendered and caused to be rendered (to the extent treatment was rendered at all) medically unnecessary and unlawful treatment and services to several of the patients at issue in this Complaint, including the patients listed in Exhibits 1 through 3 and 5 through 8.

### 12.     Elias Goldstein, D.C.

74.     Elias Goldstein, D.C. is a resident and citizen of the State of Florida.

75.     At all times relevant to this Complaint, Goldstein participated in the control and operation of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore.

76.     As a manager of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore, Goldstein was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint (to the extent treatment was rendered at all), including the patients listed in Exhibits 1 through 7.

### 13.     Albert Jerome, D.C.

77.     Albert Jerome, D.C. is a resident and citizen of the State of Florida.

78.     At all times relevant to this Complaint, Jerome participated in the control and operation of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore.

79.     As a manager of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, and North Shore, Jerome was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint (to the extent treatment was rendered at all), including the patients listed in Exhibits 1 through 7.

### 14.     Frances Madden, M.D.

80.     Frances Madden, M.D. is a resident and citizen of the State of Michigan.

81.     At all times relevant to this Complaint, Madden participated in the control and operation of Michigan Pain, Sterling Heights Pain, Precise MRI, and Advanced Surgery.

82.     As a manager of Michigan Pain, Sterling Heights Pain, Precise MRI, and Advanced Surgery, Madden rendered and caused to be rendered medically unnecessary and unlawful treatment (to the extent treatment was rendered at all) and services to several of the patients at issue in this Complaint, including the patients listed in Exhibits 1, 4, 5, and 6.

### 15. <u>Fatina Masri, M.D.</u>

83.     Fatina Masri, M.D. is a resident and citizen of the State of Michigan.

84.     At all times relevant to this Complaint, Fatina Masri was an owner and manager of Advanced Surgery and participated in the control and operation of Michigan Pain, Dearborn Pain, and Southfield Pain.

85.     As an owner and manager of Advanced Surgery, Michigan Pain, Dearborn Pain, and Southfield Pain, Fatina Masri was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to patients at issue in this Complaint (to the extent treatment was rendered at all), including the patients listed in Exhibits 1, 2, 3, and 6.

### 16. <u>Haitham Masri, M.D.</u>

86.     Haitham Masri, M.D. is a resident and citizen of the State of Michigan.

87.     At all times relevant to this Complaint, Haitham Masri was an owner and manager of Advanced Surgery and participated in the control and operation of Michigan Pain, Dearborn Pain, and Southfield Pain.

88.     As an owner and manager of Advanced Surgery, Michigan Pain, Dearborn Pain, and Southfield Pain, Haitham Masri was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to patients at issue in this Complaint (to the extent treatment was rendered at all), including the patients listed in Exhibits 1, 2, 3, and 6.

### 17.   **Ali Faraj**

89.   Ali Faraj is a resident and citizen of the State of Michigan.

90.   At all times relevant to this Complaint, Faraj was the owner and manager of Medi Transit and participated in the control and operation of North Shore.

91.   As an owner and manager of Medi Transit and North Shore, Faraj was responsible for the unlawful, medically unnecessary, and unreasonably charged transportation services and treatment rendered to the patients at issue in this Complaint (to the extent transportation services were rendered at all), including the patients listed in Exhibits 7 and 8.

### 18.   **James Deweese**

92.   James Deweese is a resident and citizen of the State of Florida.

93.   At all times relevant to this Complaint, Deweese was the owner and manager of North Shore and participated in the control and operation of Michigan Pain and Medi Transit.

94.   As the owner and manager of North Shore, Michigan Pain, and Medi Transit, Deweese was responsible for the unlawful, medically unnecessary, and unreasonably charged services rendered to the patients at issue in this Complaint (to the extent treatment was rendered at all), including the patients listed in Exhibits 1, 7, and 8.

### 19.    **Natham Karrumi, D.C.**

95.    Natham Karrumi, D.C. is a resident and citizen of the State of Michigan.

96.    At all times relevant to this Complaint, Karrumi was the owner and manager of Precise MRI and participated in the control and operation of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, and Advanced Surgery.

97.    As the owner and manager of Precise MRI, Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, and Advanced Surgery, Karrumi was responsible for the unlawful, medically unnecessary, and unreasonably charged diagnostic services and treatment rendered to patients at issue in this Complaint, including the patients listed in Exhibits 1 through 6.

## III.    **JURISDICTION AND VENUE**

98.    Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

99.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1967.

100.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are citizens of the State of Illinois for purposes of 28 U.S.C. § 1332.

101.   Esurance Insurance Company and Esurance Property and Casualty Insurance Company are citizens of the States of Wisconsin and California for purposes of 28 U.S.C. § 1332.

102.   Michigan Pain is a professional limited liability company organized under the laws of the State of Michigan.

103.   Padula, the sole member of Michigan Pain, is a citizen of and resides in Florida.

104.   Thus, Michigan Pain is a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

105.   Dearborn Pain is a professional limited liability company organized under the laws of the State of Michigan.

106.   Dearborn Pain's principal place of business is located in Dearborn, Michigan.

107.   Padula, the sole member of Dearborn Pain, is a citizen of and resides in Florida.

108.   Thus, Dearborn Pain is a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

109.   Southfield Pain is a professional limited liability company organized under the laws of the State of Michigan.

110.   Gonte, the sole member of Southfield Pain, is a citizen of and resides in Michigan.

111.   Thus, Southfield Pain is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

112.   Sterling Heights Pain is a professional limited liability company organized under the laws of the State of Michigan.

113.   Padula, the sole member of Sterling Heights Pain, is a citizen of and resides in Florida.

114.   Thus, Sterling Heights Pain is a citizen of the State of Florida for purposes of 28 U.S.C. § 1332.

115.   Precise MRI is a limited liability company organized under the laws of the State of Michigan.

116.   Karrumi, the sole member of Precise MRI, is a citizen of and resides in Michigan.

117.   Thus, Precise MRI is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

118.   Advanced Surgery is a limited liability company organized under the laws of the State of Michigan.

119.   All members of Advanced Surgery are citizens of and reside in Michigan.

120.   Thus, Advanced Surgery is a citizen of the State of Michigan for the purposes of 28 U.S.C. § 1332.

121.   North Shore is a non-profit corporation organized under the laws of the State of Michigan.

122.   North Shore's principal place of business is located in Royal Oak, Michigan.

123.   Thus, North Shore is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

124.   Medi Transit was incorporated under the laws of the State of Michigan.

125.   Medi Transit's principal place of business is in Dearborn, Michigan.

126.   Thus, Medi Transit is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

127.   Padula is a resident and citizen of the State of Florida.

128.   Maffia is a resident and citizen of the State of Michigan.

129.   Gonte is a resident and citizen of the State of Michigan.

130.   Goldstein is a resident and citizen of the State of Florida.

131.   Jerome is a resident and citizen of the State of Florida.

132.   Madden is a resident and citizen of the State of Michigan.

133.   Fatina Masri is a resident and citizen of the State of Michigan.

134.   Haitham Masri is a resident and citizen of the State of Michigan.

135.   Faraj is a resident and citizen of the State of Florida.

136.   Deweese is a resident and citizen of the State of Florida.

137.   Karrumi is a resident and citizen of the State of Michigan.

138.   Further, the amount in controversy as to each defendant, exclusive of interest and costs, exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

139.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   MICHIGAN'S NO-FAULT ACT

140.   Allstate underwrites automobile insurance in Michigan.

141.   Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

142.   Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Id.

143.   "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product

or service, or if the product or service itself is not reasonably necessary." <u>Nasser v. Auto Club Ins. Ass'n</u>, 435 Mich. 33, 49 (1990).

144.   A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and the charge for the service is reasonable.  <u>Id.</u>

145.   Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

146.   The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident.  Mich. Comp. Laws § 500.3157.

147.   "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  <u>Cherry v. State Farm Mut. Auto. Ins. Co</u>., 195 Mich. App. 316, 310 (1992).

148.   The Michigan No-Fault Act further provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect

fraudulent or so excessive as to have no reasonable foundation." Mich. Comp. Laws § 500.3148(2).

149. As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting and causing to be submitted bills to Allstate seeking reimbursement for services and treatment that were not actually provided, were not lawfully rendered, and were not reasonably necessary for the care, recovery, or rehabilitation of the defendants' patients.

## V.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD

### A.   THE DEFENDANT PAIN MANAGEMENT CLINICS

150. Prior to Michigan Pain's formation in Michigan, an entity named Michigan Pain Management LLC was formed in Florida by Jerome on or about February 25, 2014, with corporate paperwork that identified Jerome, Maffia, Goldstein, and Padula as its managers.

151. On or about March 27, 2014, Jerome filed articles of organization in Michigan for defendant Michigan Pain Management PLLC.

152. On or about April 17, 2014, a second Florida entity named Michigan Management LLC was formed by Jerome, with Maffia and Goldstein listed as authorized managers on its first annual report.

153. Padula is an osteopath who practices interventional pain management, primarily in Florida.

154.   According to Padula, he chose to open a practice in Michigan at the suggestion of his friend, defendant Jerome.

155.   Padula has claimed in testimony that he is the sole owner of Michigan Pain.

156.   In fact, Michigan Pain is controlled by Maffia, Jerome, Goldstein, and Padula, with Padula, the only licensed physician in Michigan and therefore the only member of the group legally qualified to own a physician practice, serving as figurehead.

157.   Jerome and Goldstein are chiropractors in Florida.

158.   Jerome held a license to practice chiropractic in Michigan from February 10, 2014 to November 30, 2014, but it lapsed.

159.   Goldstein has never been licensed to practice chiropractic in Michigan.

160.   Maffia is a layperson who has no medical education or training.

161.   Maffia, Jerome, and Goldstein control and profit from Michigan Pain through Michigan Management LLC, which was paid a monthly fee for "administrative" services.

162.   According to testimony by the former office manager of Michigan Pain, Maffia represented himself to her as the owner of Michigan Pain.

163.   In addition to being legally improper for Maffia, Jerome, and Goldstein to operate a physician practice in Michigan, Jerome and Goldstein have lengthy

disciplinary histories that render them unqualified and are evidence of repeated efforts to manipulate the healthcare system to maximize charges submitted to insurers.

164.   Goldstein has been convicted of five (5) counts of insurance fraud and grand theft, and sentenced to 90 days in jail for billing patients' insurance companies for services that were not rendered.

165.    In addition to his criminal convictions for insurance fraud, Goldstein has been fined two (2) separate times by the Board of Chiropractic in Florida for false or misleading advertisements related to his practice.

166.   Jerome has entered into two (2) stipulated dispositions with the Florida Board of Chiropractic related to his conduct as a chiropractor in the state.

167.   The first stipulated disposition related to false advertisements for free chiropractic consultations and false claims that a treatment offered was 86-89% effective in reducing or eliminating chronic pain.

168.   The second stipulation related to Jerome's alleged failure to alter a patient's treatment plan and to properly diagnose or reassess a patient's injuries in the face of evidence of deterioration of the patient's condition which, according to the complaint, may have contributed to the patient's death.

169.   When Padula, Maffia, Jerome, and Goldstein sought to expand their practice in Michigan, they recruited defendant Gonte to serve as the paper owner of Southfield Pain.

170.   Southfield Pain was identified by employees of Michigan Pain as another location of Michigan Pain.

171.   Michigan Pain also filed documents with state regulators identifying Michigan Pain as the entity registering fluoroscopy machines used at Southfield Pain's location.

172.   Each of the defendant pain management clinics uses the same fraudulent business practices that were instituted and overseen by Padula, Maffia, Gonte, Jerome, and Goldstein, including billing for services not rendered, unlawful solicitation, provision of unlawful and unlicensed equipment and services, and provision of excessive and medically unnecessary treatment, testing, and equipment.

173.   The defendants executed their fraudulent scheme by hiring other unscrupulous physicians with histories of fraud who would acquiesce to their demands for aggressive and unnecessary testing and treatment for all patients of the pain management clinics.

174.   Defendant Gonte has a history of disregard for boundaries of proper medical practice, including a consent order with the Michigan Board of Medicine

through which he agreed to probation and a $7,500 fine related to unethical prescription practices.

175.   Gonte is also identified as a participant in the fraudulent conduct of convicted felon Robert Gross ("Gross") in <u>United States of America v. Robert A. Gross</u>, 2:17-cr-20790 (E.D. Mich. 2017).

176.   According to Gross's plea agreement, Gross defrauded a number of creditors in concert with, and for the benefit of, two (2) unindicted co-conspirators identified as "Person A" and "Person B" between 2013 and 2016, a period of time that substantially overlaps with the fraudulent conduct committed by Gonte that is the subject of this Complaint.

177.   "Person A" was later identified as defendant Gonte in a decision dated September 26, 2018.  *See* <u>id</u>. at Docket No. 22.

178.   According to Gross's plea, Gonte, in concert with Gross and "Person B," sought fraudulent loans from their victims, including by preparing a forged deed purporting to transfer Gonte's father's condominium to Gonte, which was then used as collateral on a loan.

179.   The fraudulent loans Gross, Gonte, and Person B procured from their victims totaled more than $3,000,000.

180.   These debts created substantial motivation for Gonte to engage in similar conduct to defraud Allstate by taking advantage of Michigan's No-Fault Act

to make as much money as quickly as possible, regardless of medical necessity or whether the services were actually performed.

181.   Defendant Madden was hired by Michigan Pain in July 2015, just two (2) months after reaching a settlement with the federal government for participating in an illegal kickback scheme. *See* Exhibit 9.

182.   On May 17, 2015, Madden entered into a settlement agreement with the United States government whereby she agreed to pay $150,000 and was barred from submitting any claims to Medicare, Medicaid, and all other federal healthcare programs for a period of three (3) years following allegations that she referred patients for "physical therapy, electrodiagnostic testing, and/or home health care services . . . to [her employer's] Companies in exchange for illegal remuneration and/or kickbacks . . . ." Id.

183.   The defendants also hired Johnny Trotter, M.D. ("Trotter"), who was at the time under indictment (and had been since May 8, 2014) for multiple felony healthcare fraud charges involving a scheme to submit fraudulent claims to Medicare for office visits and services that were not actually provided. *See* Exhibit 10.

184.   In April 2017, Trotter was convicted of one (1) count of conspiracy to commit health care and wire fraud (18 U.S.C. § 1349) and three (3) counts of health care fraud (18 U.S.C. § 1347) and was sentenced to fifteen (15) years in prison and ordered to pay $9,199,946 in restitution.

185.   Trotter began working with the pain management clinics in 2016, and continued treating patients at Dearborn Pain and Southfield Pain until his conviction.

186.   The former Michigan Pain office manager confirmed that Maffia, Goldstein, and Jerome were actually directing patient care and gave orders to the physicians they hired:

> Q. When you say that Mr. Maffia told the doctors what to do, explain that?
>
> A. He was very – I'm sorry if this is politically incorrect, but he was very controlling when it came to the office. It almost appeared like the doctors, Dr. Padula was pretty much -- he was ordered by John – I'm sorry, Mr. Maffia to do –
>
> Q. You can call him John.
>
> A. […] So John would tell him you have this many patients on this day.
>
> Q. He would tell Dr. Padula this?
>
> A. Correct. He would tell Dr. Padula you have this many patients on this day. And then the next day he would tell Dr. Padula for the next day you need to be at the surgery center at 9:00, you're performing ten surgeries, or you need to give this patient a back brace. This patient needs a P-STIM.
>
> Q. And you would hear these conversations?
>
> A. Yes.

187.   Maffia's control over patient care at Michigan Pain included directing the prescription of controlled substances to patients.

188.   Former employees of the defendants testified that patients stated they were "promised" pain medications, and would frequently become agitated when their prescriptions were not filled as promised:

> Q.  What do you mean when you say the patients were promised medication?
>
> A.  They were promised prescription medications. So… for example, I had a patient who stated that she was promised a prescription of Dilaudid if she agreed to have surgery. And when they didn't get their prescriptions on time like they were promised, or if they didn't get them when they were supposed to, they would come into the office very upset and very angry…

189.   According to Michigan Pain's former office manager, Maffia instructed her to inform patients that they would get their pain medication:

> Q.  …[W]ere you given instructions by the doctors to tell patients that if they agreed to have their surgery they would get a prescription?
>
> A.  The doctors never instructed me to tell them that, to tell anybody that. Mr. John Maffia would tell me to -- not specifically tell me which prescriptions they would receive, but he did tell me to let the patients know that they would get their pain medication.
>
> Q.  Why would he tell -- why would he be the one telling you what to tell patients regarding their pain medications?
>
> A.  He said because -- well, it's what I was told and what I observed. That [Maffia] was -- he was the manager of this place, so he was like the CEO of this company. And he would work it out with the doctor that this person got their medication.

190.   In addition to directing controlled substance prescriptions, Maffia, Goldstein, and Jerome directed that individual patients receive injections at Michigan Pain:

> Q.  Okay. Do you have any personal knowledge of Dr. Padula actually performing any treatment that John Maffia dictated? Meaning, did you watch something happen for a patient where John Maffia said, Dr. Padula, you need to do this particular treatment, and Dr. Padula then actually went and did it?
>
> A.  I was not physically present in the room. But I can say that I can recall a time where John Maffia had spoke [sic] with a patient outside of the lobby area and had talked to… the patient and… then come back in, after hearing from the patient, and spoke with [Goldstein] and [Jerome]. And then at that point they… decided that the patient would benefit from an injection.

191.   Former employees described how Maffia, Goldstein, and Jerome worked in concert with the owner of a local ambulatory surgical center named Michael Angelo ("Angelo") to direct and control patient treatment to maximize charges to insurers.

192.   Angelo has been implicated in multiple schemes involving solicitation of victims of motor vehicle accidents in Michigan, and has ownership interests in the medical facilities to which patients he solicits are referred.

193.   One now-imprisoned associate of Angelo explained the nature of Angelo's scheme to Allstate:

> The *quid pro quo* ultimately came down to patients that were sent to [an attorney who worked with Angelo] would be represented by [that attorney], and then those patients were distributed to chiropractors,

physical therapists, primary care physicians, pain management physicians, and surgeons all of whom would… in some way benefit Michael Angelo and his company, which would be to either have some kind of side arrangement where there was an exchange of money directly, or that it would be performed in a certain surgery center.

194.   The former office manager testified that she was tasked with scheduling procedures for Michigan Pain patients at Angelo's surgery center by Maffia, Jerome, and Angelo, none of whom possess a license to practice medicine in Michigan.

195.   Angelo contacted Michigan Pain directly and instructed its employees to schedule patients at his surgery center when "conflicts" would arise between Angelo and Maffia:

> A. [Angelo] and John Maffia would have conflicts about if the patients weren't seen by a certain person or weren't referred to a certain company – I'm sorry, business practice, they would butt heads.
>
> Q. How do you know this?
>
> A. Because I witnessed it and I received phone calls from Michael Angelo.

196.   Former employees testified that Angelo's arguments with Maffia frequently regarded scheduling, money, and "partnership."

197.   Michigan Pain's former office manager also testified that Maffia, Angelo, and Jerome all directed Michigan Pain patients to receive both a back brace and a P-Stim device as part of their protocol with Michigan Pain, and each of the

patients receiving P-Stims were to be scheduled for the application of the device at

Angelo's surgery center:

> A. Because I was told by John Maffia and Al Jerome that -- I believe
> Michael Angelo said this too, in a text message that every patient
> needed a back brace and a P-STIM.
>
> Q. So all three of those individuals that you just mentioned all said
> that to you at different times?
>
> A. Yes.
>
> Q. Why are they telling you?
>
> A. Because I was the one that had to make the scheduling
> appointments for them. So I would have to call them and get
> them over to the surgery center to get P-STIMs.
>
> Q. So all the patients who were getting P-STIMs were going to the
> surgical center?
>
> A. Correct.

198.   Padula testified that he eventually decided he did not like the staff at

Angelo's surgery center, and the defendants instead moved their operation to

defendant Advanced Surgery, including by opening Dearborn Pain in the same

building as Advanced Surgery.

199.   In addition to *quid pro quo* arrangements with patient solicitors like

Angelo, the defendants made cash payments for patient referrals.

200.   The former Michigan Pain office manager testified that Maffia offered to pay her $250 for every patient she brought to Michigan Pain, and that Maffia wrote her a check for $250 for a patient referral that he called a "holiday bonus":

> Q. Did you ever do that? Did you ever refer a patient to the clinic, to Michigan Pain Management?
>
> A. I did refer patients to Michigan Pain Management.
>
> Q. Did he pay you?
>
> A. I received one check in the amount of $250.00, which was for the referral, but he told me that it was -- he told me, because when he filled out the check, that he was going to write on my check that it was a holiday bonus.

201.   The defendants intentionally targeted auto insurers, and Maffia cultivated relationships with personal injury attorneys in order to further facilitate the flow of No-Fault insurance claims into the clinic.

202.   Maffia's arrangements with personal injury attorneys included having patients misrepresent the extent and nature of injuries for the purpose of fraudulently enhancing claims for No-Fault insurance benefits with the assistance of attorneys.

203.   For example, Maffia, in concert with local attorneys, suggested that Michigan Pain's former office manager make a claim for insurance benefits for injuries unrelated to a prior motor vehicle accident she had in 2012.

204.   The former office manager of Michigan Pain testified that Maffia directed her to physical therapy and MRI appointments for non-existent injuries and

Maffia's attorneys instructed her on how to avoid detection by insurance investigators:

> Q. You were supposed to present as a normal patient and see what happens?
>
> A. I was supposed to -- because John Maffia told me, hey, you were in a car accident, go see my friend at [Attorney's office]. So he took me there and we went there.  I met with them, and they told me very specific things like don't carry groceries out of your car, more than two in one hand… They said when you walk -- when you're out in public, make sure you're not jumping around because they could send an insurance investigator to your house to see whether you're actually hurt or not. I was like so you want me to pretend I'm hurt?

205.    Maffia, Jerome, and Goldstein's improper and unlawful influence over the medical treatment allegedly provided by the defendant pain management clinics focused on the maximization of claims paid by insurers.

206.    According to former employees, the goal of the defendants was not to treat patients, but to make as much money as they could:

> … Their goal is to get as much money as they can, and it doesn't matter how they have to do it. And I've had this conversation with Mr. Maffia before about why he only handles car insurances and not personal insurance. Because a lot of people would come in thinking they needed to bring personal insurance in, and it was no, you only need car insurance.

207.    This emphasis on making money by any means possible was further described by the former Michigan Pain office manager in terms of Michigan Pain scheduling as many patients as possible for treatment, even to the point of the office

manager being told by Maffia to pressure patients to return to Michigan Pain for treatment:

> I mean if [Maffia] wants 30 patients scheduled in one day and I can't get all 30 patients in because not all 30 patients are answering or they're not home or they can't be there for transportation, whatever it is, he would yell at me for not pushing them to come in.

208.   In addition to the above, the scheme perpetrated by the defendant pain management clinics involved the fraudulent production of medical records for the purpose of creating the appearance of legitimate medical treatment in the records submitted to insurers.

209.   Former employees observed records being filled with information that could not possibly be true, because the defendant clinic lacked the ability to take the diagnostic readings published in the medical records:

> Q. What about like blood pressure monitor, cuffs and stuff like that?
>
> A. We had no -- we had nothing like that. Which is another thing that I found very strange. There was never anybody's blood pressure being taken, and their heart rate slash pulse was never checked. And when I would receive the dictated reports that I would have to send over to billing, I would notice that there was blood pressure numbers listed on the reports. And I asked Mr. Maffia one day why does this person's blood pressure say 120 over 80. I said Dr. Padula doesn't even take their blood pressure, like this is all made up.

210.   Sterling Heights Pain was the last of the defendant pain management clinics to be organized, on December 8, 2016, and like Michigan Pain and Dearborn Pain, its corporate paperwork represents that Padula is the owner.

211. The participation of the defendant pain management clinics in a common scheme is reflected not just by the common ownership, but also by the interchangeability of physicians at each location.

212. For example, defendant Gonte allegedly evaluated and treated patients at Dearborn Pain and Southfield Pain.

213. Convicted felon Trotter allegedly evaluated and treated patients at Michigan Pain, Dearborn Pain, and Southfield Pain.

214. Padula allegedly evaluated and treated patients at all of the clinic locations, and other physicians hired by the defendants also regularly moved between offices.

215. In addition to using the same fraudulent business practices to maximize their own claims for reimbursement, described above and throughout this Complaint, the defendant pain management clinics also referred patients to providers for excessive and unnecessary additional testing and treatment, including defendants Precise MRI, Advanced Surgery, and North Shore.

**B.   PRECISE MRI**

216. A central feature of the defendant pain management clinics' predetermined protocol of treatment and testing was the referral of nearly all patients for medically unnecessary MRIs, most frequently to defendant Precise MRI.

217.   Precise MRI performed excessive and medically unnecessary MRIs for the diagnosis of soft-tissue injuries, intentionally over-read MRI scans, unlawfully obtained patients through the use of referral agreements veiled as "marketing" contracts, and submitted charges at unreasonable rates.

218.   Precise MRI is ostensibly owned and managed by defendant Karrumi, but is in reality controlled by Maffia, the defendant pain management clinics, and the individuals and physicians who control patient treatment, as described above.

219.   A healthcare provider reported to Allstate that he was offered a "marketing" agreement with Precise MRI by defendant Maffia and given a check for $2,000 as an upfront payment with the expectation that he would make patient referrals to Precise MRI, for which he would receive additional compensation.

220.   Like the pain management clinics, Precise MRI also has a close relationship with an individual who has a history of defrauding healthcare payors.

221.   When Precise MRI applied for a Certificate of Need ("CON") to acquire an MRI route host site, it retained the services of a consultant named Phillip Young ("Young"), who in 2012 entered into an agreement settling a False Claims Act *qui tam* action alleging that he paid kickbacks to physicians in exchange for MRI referrals.

222.   Precise MRI continues to lease the MRI equipment used at its facility from Young.

223.   The illegal kickbacks paid by Precise MRI incentivize physicians to refer patients for an excessive number of MRIs, often at the outset of treatment in disregard for established standards of care.

224.   As discussed further below, Precise MRI had an obligation to evaluate the medical necessity of MRIs ordered from its facility, which it intentionally failed to do in order to submit charges to Allstate for imaging that it knew could not be medically necessary.

225.   In addition to paying kickbacks to induce referrals, Precise MRI also contracted with radiologists whom the referring defendant pain management clinics knew would over-read MRIs to justify additional treatment to generate additional insurance claims.

### C.   ADVANCED SURGERY

226.   Advanced Surgery is an ambulatory surgical center owned by defendants Haitham Masri and Fatina Masri.

227.   Advanced Surgery was used by the defendant pain management clinics and other providers to perform medically unnecessary injections and other procedures.

228.   Fatina Masri and Haitham Masri's scheme has been described as a "medical mall" involving multiple types of medical providers housed in the same building, including defendants Advanced Surgery and Dearborn Pain.

229.   Fatina Masri and Haitham Masri pressured providers and tenants, including Dearborn Pain, to perform surgeries within its surgical suites even when medically unnecessary to do so, thereby allowing Advanced Surgery to bill insurance companies for facility fees.

230.   For example, Fatina Masri and Haitham Masri imposed a lease term on Dearborn Pain prohibiting it from operating a fluoroscope, thus requiring procedures that could otherwise be performed in Dearborn Pain's office to be performed in Advanced Surgery's surgical suites.

231.   Padula testified that he was informed of the fact that fluoroscopic procedures would have to be performed within Advanced Surgery by Maffia:

> Q. And what's your understanding of what's behind the decision to remove the fluoroscope then from Dearborn Pain Specialists offices?
>
> A. As I said, it was a conflict in our lease.
>
> Q. I see.  And so who alerted you of that conflict? . . .
>
> A. The management company, I think [Maffia] advised me that we could not have a fluoroscope here because of our lease and that we would be doing our procedures downstairs at Advanced Surgery Center.

232.   After forcing medically unnecessary procedures to be performed in its facility, Advanced Surgery charged fees at rates that were unreasonable and without any valid basis.

233.   Like the defendant pain management clinics, Advanced Surgery also billed Allstate for services that were not actually performed.

42

234.   Like many of the owners, physicians, and associates of the defendants, Haitham Masri has an extensive disciplinary history, including as the subject of at least two (2) professional disciplinary actions by the Michigan Board of Medicine involving improper alteration of patient records.

### D.   NORTH SHORE AND MEDI TRANSIT

235.   Another aspect of the defendants' scheme to defraud was to refer patients for excessive and medically unnecessary physical therapy treatment, including to defendant North Shore.

236.   North Shore is a "non-profit" chiropractic and physical therapy clinic incorporated on or about July 13, 2012.

237.   North Shore is located within the same building as Michigan Pain.

238.   North Shore's CEO is defendant Deweese, a lay person without formal education or training in healthcare services.

239.   Similar to defendant Maffia, Deweese's professional background is as a marketer developing referral relationships between patients claiming to have been injured in motor vehicle accidents and personal injury attorneys in Florida.

240.   North Shore has a board of directors with three (3) members, two (2) of whom are defendants Deweese and Gonte.

241.   In addition to his role as a director of North Shore, Gonte has purportedly evaluated patients at North Shore's offices, and regularly provided the

physical therapy prescriptions that are required for it to perform treatment, as discussed further below.

242.   Deweese is also associated with various entities in Florida that combine "marketing" efforts with healthcare and legal services, including an entity called Millennium Mobile Marketing, LLC, which Deweese controls with defendant Faraj.

243.   Faraj is the owner of defendant Medi Transit, a transportation company that bills for medically unnecessary transportation services to North Shore patients.

244.   Medi Transit's ability to submit bills to insurers for medical transportation is wholly dependent upon the patient first being given a disability certificate from a physician indicating that the patient is medically disabled from driving himself or herself.

245.   The defendant pain management clinics and North Shore provide disability certificates to patients as a matter of course, and nearly all patients of the defendants are medically disabled from driving at some point during the course of their treatment with the defendants.

246.   Medi Transit provides medically unnecessary transportation of patients to and from North Shore and other providers solely to inflate claims for No-Fault benefits.

247.   According to the testimony of multiple patients, North Shore employs runners and middlemen who solicit motor vehicle accident victims who are then

picked up by transportation companies, including Medi Transit, and brought directly to North Shore's clinic.

248.   Inside North Shore, representatives from a local law firm, Ponto & Associates, PLLC d/b/a Elia and Ponto ("Elia & Ponto"), signed patients up for representation by the firm for claims for No-Fault benefits.

249.   A representative example of the solicitation relationship between North Shore and Elia & Ponto is patient S.J. (Claim No. TXA-0195872)[1], who shared with Allstate a voicemail received from a representative of Elia & Ponto just days after her motor vehicle accident.

250.   According to S.J., the day after the accident she received a phone call soliciting her for treatment:

> [H]e mentioned that he heard I was in an accident and our law firm can help with your . . . case . . . and he told me we can send you to our location for relief of pain and they can help you for as far as making sure you get your insurance payment.

251.   The solicitor arranged transportation for S.J., informing her that the transportation company would know her name and take her directly to a facility for treatment.

---

[1] To protect the privacy of its insureds, Allstate refers to each by his or her initials and Allstate claim number.

252. S.J. was picked up by the transportation company, brought directly to North Shore's facility, and immediately began receiving North Shore's predetermined treatment protocol.

253. Following the initial solicitation, S.J. received a voicemail from a representative of Elia & Ponto, who claimed to have received all of S.J.'s information from North Shore, evidencing Elia & Ponto's ongoing participation in patient treatment after the initial unlawful solicitation.

254. Several patients also reported that they were promised monetary compensation of up to $2,000 for agreeing to representation by and treatment recommendations of Elia & Ponto.

## VI. BILLING FOR SERVICES NOT RENDERED

255. The defendants frequently billed Allstate for services that were not actually rendered as part of their scheme.

256. Michigan Pain's former manager confirmed this practice, testifying that "[she] was reading reports, and a lot of the stuff that was in the reports was not actually true, that didn't actually happen."

257. The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

46

258.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for treatment that never occurred are fraudulent.

259.   Therefore, Allstate is not required to compensate the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

260.   In addition to the specific instances of billing for services not rendered set out *infra*, which exemplify the types of fraudulent submissions made relative to the patients at issue in this Complaint, certain categories of charges for services that were never performed that were submitted by the defendant pain management clinics were so pervasive that they are addressed separately below.

A.   **BILLING FOR DISCECTOMIES NOT PERFORMED**

261.   The capstone of the medically unnecessary treatment the defendants pressured patients to undergo was frequently a procedure performed by defendant Padula involving a discogram and percutaneous discectomy.

262.   Each time this procedure was performed, the defendants falsely represented to Allstate that the discectomy allegedly performed was an open surgical procedure rather than the percutaneous procedure actually performed, if performed at all.

47

263.   Padula, Michigan Pain, Dearborn Pain, Advanced Surgery, Haitham Masri, and Fatina Masri submitted charges using Current Procedural Terminology ("CPT") Code 63056, which describes a transpedicular or costovertebral open incision surgical approach, or CPT Code 63075, which describes an anterior or anterolateral open incision surgical approach, for each such procedure allegedly performed.

264.   The procedures actually performed by the defendants were needle-based and visualized by endoscope or fluoroscopy; open surgeries were never performed.

265.   For example, a discectomy procedure performed on patient B.S. (Claim No. 0357772888) on January 12, 2016 at Advanced Surgery was described by Padula as follows: "[t]he striker decompressor was placed into the disc through the needle and under live fluoroscopic guidance for one-minute time, the discectomy was performed."

266.   Although the discectomy allegedly performed by Padula was performed through a needle and did not involve a surgical incision, Michigan Pain submitted a bill to Allstate representing that it had performed an anterior or anterolateral open incision surgical approach.

267.   The defendants falsely represented the nature of the procedures actually performed in an attempt to justify charges to Allstate that were many times higher than the percutaneous procedures actually performed.

268.   According to the former Michigan Pain office manager, the discograms performed by Padula were not only part of Michigan Pain's predetermined treatment protocol, but they were also not the surgical procedures they were represented to be by the bills submitted to Allstate:

> Q. Do you know anything about whether he had some kind of policy in place as to which patients got [a discogram]?
>
> A. If the patient complained of back pain, unless there was some extraordinary reason or exception to their own beliefs, they got a discogram.
>
> Q. How do you know that?
>
> A. That's what I scheduled them for. They would go under a microscope – I'm sorry, not a microscope, a light, and they would go in the back at the surgery center. None of the patients ever actually got real surgery. Like they were never actually operated on as far as like any transfusions or anything like that. It was really just observation that Dr. Padula would do. He would put them under a light with a magnifying glass or something. He could go in and look at it. It was all considered -- it was minimally invasive, like laparoscopic type stuff. Nobody was cut open.

269.   Patients who underwent discectomies were routinely discharged from care just thirty (30) minutes after the completion of the procedures, further

evidencing the minor nature thereof rather than the open-incision surgeries billed to Allstate by the defendants.

270.   Allstate is not required to remit payments to the defendants for procedures that were not actually performed.

## B.   BILLING FOR VIDEO ELECTROENCEPHALOGRAM MONITORING NOT PERFORMED

271.   As part of the defendant pain management clinics' predetermined treatment protocol, patients were frequently subjected to medically unnecessary 72-hour ambulatory electroencephalograms ("EEGs") for complaints of headaches.

272.   These medically unnecessary EEGs were performed on the majority of patients who purportedly reported experiencing headaches after November 2017, regardless of their character or intensity.

273.   Even when patients had no indications of seizure-like activity or headaches, the defendant pain management clinics had patients undergo these medically unnecessary EEGs.

274.   The EEGs allegedly performed by the defendant pain management clinics were billed at many times the usual or customary rates, were medically unnecessary in all cases at issue in this Complaint, and were performed for the sole purpose of generating tens of thousands of dollars in additional charges to Allstate for unnecessary diagnostic testing services.

275.   For every EEG allegedly performed by the defendant pain management clinics at issue in this case, the defendants billed Allstate using CPT Code 95951, which according to the CPT Codebook is for "combined electroencephalographic (EEG) and video recording and interpretation . . . each 24 hours."

276.   This CPT Code *requires* that the patient's behavior is monitored and recorded using visual video equipment throughout the duration of the EEG, with that video being reviewed and interpreted by the neurologist to correlate EEG readings with observed patient behavior.

277.   The defendant pain management clinics ordered these 72-hour video EEGs and billed each one at $9,500 per day, for a total of $28,500 per video EEG. *See* Exhibits 1, 2, and 4.

278.   Despite the pain management clinics' use of the video EEG code for every EEG at issue in this case, not once was a video EEG actually performed.

279.   The use of the video EEG CPT Code made it appear that the studies being performed were more intense than they actually were in order to support the outrageous charges billed to Allstate.

280.   Allstate is not required to remit payments to the defendants for procedures that were not actually performed.

## C.   BILLING FOR EPIDUROGRAMS NOT PERFORMED

281.   The defendant pain management clinics fraudulently added charges for the alleged performance of epidurograms to nearly every bill for fluoroscopically-guided injections.

282.   An epidurogram is a diagnostic study used to assess the area in which an injection may be performed before an injection is performed.

283.   The procedures allegedly performed by the pain management clinics, including by physicians Padula, Madden, and Gonte, do not reflect the performance of epidurograms in connection with the injections allegedly performed.

284.   The CPT Code used by the defendants to submit charges for epidurograms, 72275, expressly directs to "[u]se 72275 only when an epidurogram is performed, images documented, and a formal radiologic report is issued."

285.   The pain management clinics, Padula, Madden, and Gonte, never produced formal radiologic reports of the alleged epidurograms for which they billed.

286.   The add-on charges for epidurograms by the pain management clinics are nothing more than a fraudulent attempt to induce Allstate to remit payment for procedures that were not actually performed.

**D.**   **S**PECIFIC **E**XAMPLES OF **B**ILLING FOR **S**ERVICES **N**OT **R**ENDERED

**1.**   **Patient T.H. (Claim No. 0298794710)**

287.   Patient T.H. was allegedly involved in a motor vehicle accident on September 4, 2013.

288.   T.H. initially sought treatment with Trotter, who was coincidentally her primary care doctor through a different practice, on September 6, 2013.

289.   T.H. was subsequently referred to pain management physicians associated with Angelo, who applied medically unnecessary P-Stim devices that T.H. testified "did nothing" for her pain.

290.   Michigan Pain claims that T.H. presented for an initial evaluation on February 20, 2015 and was purportedly given a medically unnecessary back brace that was charged to Allstate at the unreasonable rate of $1,400, which is discussed *infra*.

291.   Michigan Pain also submitted charges to Allstate totaling more than $4,100 for facet block injections allegedly performed by Padula on February 23, 2015.

292.   However, T.H. provided deposition testimony on March 5, 2015, less than two (2) weeks after her supposed evaluation and injection treatment at Michigan Pain, and she unequivocally testified that she had not yet begun treating with Padula nor had she scheduled an appointment with Michigan Pain:

Q. [] So you've seen Dr. Padula like – have you actually seen Dr. Padula, or you've not been able to –

A. No. I got to make the appointment…

\*\*\*

Q. Do you remember when [Reese James] did the injections, like approximately, like the dates?

A. I want to say, I remember the one on November the 13th because that one, that's the one that hurt pretty bad.

Q. And that would be 2014, correct?

A. Yes.

Q. Okay. And so would that have been the first injection?

A. I think that was the last one.

293.  Padula later testified that the subsequent treatment and procedures allegedly performed by Michigan Pain were justified by the results of the injections he and Michigan Pain falsely claimed to have performed on February 23, 2015, including a three level radiofrequency ablation allegedly performed on April 21, 2015 by Padula.

294.  On April 21, 2015, Michigan Pain also allegedly applied a P-Stim device despite T.H. clearly stating that prior use of such devices did nothing for her pain.

295.   The P-Stim application and radiofrequency ablation were allegedly performed at Advanced Surgery, for which Advanced Surgery billed Allstate more than $17,000.

296.   All of the treatment allegedly rendered to T.H. by Michigan Pain and Advanced Surgery was medically unnecessary, and was based upon the results of an alleged evaluation and injection procedure that was not actually performed.

297.   Padula, Michigan Pain, and Advanced Surgery submitted claims for payment and accompanying medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to T.H. to Allstate through the U.S. Mail and interstate wires, and Allstate relied upon the same in adjusting the claims.

298.   Allstate is not required to pay defendants Michigan Pain and Advanced Surgery for treatment that was medically unnecessary or that was never actually rendered to T.H.

## 2.   Patient R.J. (Claim No. 0476016084)

299.   Patient R.J. was involved in an alleged motor vehicle accident on September 20, 2017.

300.   Despite the fact that R.J.'s alleged accident did not occur until September 20, 2017, a clinic controlled by Angelo submitted a record that was generated on September 19, 2017.

301.   As described above, the former Michigan Pain office manager testified that Angelo and Maffia were involved with coordinating patient referrals and fraudulent treatment at Michigan Pain.

302.   R.J. allegedly began his treatment with the defendant pain management clinics on September 21, 2017 at Michigan Pain, where he was allegedly seen by defendant Madden.

303.   Madden applied Michigan Pain's predetermined treatment protocol and prescribed R.J. six (6) different medications, including opioids; physical therapy; disability certificates for household services and driving; and a cane (despite observing that R.J. had no trouble walking).

304.   Following the initial evaluation with Madden, R.J. inexplicably underwent a second initial evaluation with Rabinder Bhatti ("Bhatti") at Dearborn Pain on October 9, 2017.

305.   R.J. later testified during an examination under oath that the first place he treated after the accident was a physical therapy clinic more than one week after the accident.

306.   R.J. further testified that his first evaluation was actually performed at the clinic controlled by Angelo.

307.   Bhatti's initial evaluation failed to acknowledge Madden's alleged evaluation the day after the accident, and states that R.J. lost consciousness and

struck his head on the windshield.  Both of these claims are refuted by the medical records of the hospital from the date of the accident, where R.J. denied hitting his head or a loss of consciousness.

308.   These claims of head injury were fraudulently entered into R.J.'s records for the purpose of making R.J.'s injuries and the accident appear more severe than they were.

309.   Bhatti's recommendations were nearly identical to Madden's, including re-issuing prescriptions and durable medical equipment ("DME"), but Bhatti additionally referred R.J. for multiple MRIs at defendant Precise MRI and allegedly performed comparative range of motion and muscle testing on R.J., which served no actual medical or diagnostic purpose.

310.   R.J. allegedly underwent three (3) MRIs at defendant Precise MRI on October 17, 2017.

311.   On October 23, 2017, Bhatti allegedly performed a sacroiliac injection, normally an in-office procedure, at Advanced Surgery as a result of the lease agreement between Dearborn Pain and Advanced Surgery requiring injections to be performed at Advanced Surgery and which was not in any way based on actual medical necessity.

312.   On November 22, 2017, R.J. was allegedly seen by Bhatti once again, and Bhatti claimed that he had previously ordered a 72-hour EEG test at a November

9, 2017 exam, although there is no evidence that the November 9, 2017 exam ever occurred.

313.   Not one of Bhatti's evaluations prior to November 22, 2017 discuss epileptic seizure-like activity that might justify a referral for an EEG, let alone a 72-hour EEG.

314.   R.J. allegedly underwent a 72-hour ambulatory EEG with EKG monitor from December 4, 2017 at 10:52 AM to December 7, 2017 at 12:29 PM.

315.   Dearborn Pain produced a total of eleven (11) seconds of allegedly recorded brain activity from R.J. to justify the 72-hour EEG.

316.   Dearborn Pain also allegedly performed a re-evaluation and another sacroiliac injection on R.J. on December 6, 2017, which would have been during the performance of the 72-hour EEG with EKG monitor, yet R.J. being covered in electrodes or undergoing the EEG was not mentioned.

317.   All of the charges submitted for the 72-hour EEG by Dearborn Pain described an EEG performed with video monitoring, but no video monitoring was actually performed by Dearborn Pain.

318.   Thus, Dearborn Pain submitted a total of $28,500 for video EEG monitoring that was neither medically indicated nor actually rendered, in addition to being outrageously over-charged as described in further detail *infra*.

319.   R.J.'s treatment with Dearborn Pain subsequently ceased for more than four (4) months until May 15, 2018, when R.J. suddenly allegedly underwent a three-level discogram, two-level discectomy, and three-level stem cell injections, for which Dearborn Pain billed Allstate more than $111,000, and for which Advanced Surgery additionally billed more than $73,000.

320.   None of the procedures allegedly performed on May 15, 2018 were medically necessary, while others were not actually performed at all, for all of the following reasons:

   a.   The diagnostic discogram procedure allegedly performed by Padula claimed that the L3-L4 level was negative for concordant pain; however, Padula proceeded with a subsequent stem cell injection at this level.

   b.   Dearborn Pain and Padula represented that Padula performed a diagnostic discogram, which necessarily requires a radiological component including the creation and interpretation of radiographic images of the injected disc(s). There is no evidence that Dearborn Pain or Padula took CT images of R.J.'s discs, or interpreted those images as required by accepted standards of care in the performance of discograms in order to justify the use of CPT Code 72295, and in fact Advanced Surgery lacks the capability to take CT images at its facility. Thus, no discography took place and a discogram was not actually rendered by Padula or Dearborn Pain relative to R.J.

   c.   Padula allegedly performed a minimally invasive percutaneous discectomy procedure at L4-L5 and L5-S1 subsequent to the "positive" discograms at these levels but Dearborn Pain fraudulently billed Allstate for an open surgical procedure that was not actually rendered.

   d.   Following the percutaneous discectomy, Padula allegedly injected R.J.'s spine with undifferentiated bone marrow at L3-L4, L4-L5, and L5-S1, a procedure that is not scientifically recognized. This procedure

was also wholly redundant with the discectomy allegedly performed concurrently at the same spinal levels (for the alleviation of pain and increase of patient function).

    e.  Dearborn Pain also billed for more than $27,000 in charges related to the performance of intraoperative needle EMG monitoring, for which there is no evidence this monitoring was actually rendered. Dearborn Pain improperly submitted charges for supplies allegedly used for the monitoring, including $1,800 for electrodes and $6,500 for lead wires, hundreds of times more than what these items actually cost.

    f.  Defendant Advanced Surgery billed more than $73,000 for these procedures, including submitting claims using the same fraudulent CPT Codes as Dearborn Pain.

321.  On May 16, 2018, R.J. was allegedly seen for a follow-up appointment at Dearborn Pain, and the associated bill was signed by Bhatti.

322.  According to Padula's deposition testimony taken on June 26, 2018, Bhatti had left Dearborn Pain "five or six" months prior to his deposition, meaning Bhatti could not possibly have been involved in the purported evaluation of R.J. in May 2018.

323.  All of the above-referenced treatment allegedly rendered by the defendants to patient R.J. was not medically necessary, and was performed, if at all, pursuant to a predetermined treatment protocol for the sole purpose of submitting fraudulent bills to Allstate for reimbursement.

324.  Padula, Michigan Pain, Dearborn Pain, Advanced Surgery, and Precise MRI submitted claims for payment and accompanying medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to R.J. to Allstate

through the U.S. Mail and interstate wires, and Allstate relied upon the same in adjusting the claims.

325.   Allstate is not required to pay defendants Michigan Pain, Dearborn Pain, Advanced Surgery, and Precise MRI for treatment that was never rendered to R.J. or for treatment that was medically unnecessary, and Allstate is entitled to repayment of all amounts it paid in reliance on the defendants' fraudulent submissions.

### 3.      Patient R.A. (Claim No. 0380097765)

326.   Patient R.A. was involved in an alleged motor vehicle accident on August 11, 2015.

327.   R.A. began treating with Michigan Pain roughly eight (8) months after the alleged accident, on April 15, 2016.

328.   R.A. treated with Michigan Pain from April 2016 through October 2017, accruing over $120,000 in bills for alleged treatment by Michigan Pain.

329.   Included in the charges submitted by Michigan Pain were three (3) bills for epidurograms that were not actually performed, as Michigan Pain failed to produce epidurogram images or a formal radiological report on any of the dates of service.

330.   On July 26, 2016, R.A. allegedly received a medically unnecessary P-Stim device applied by Madden at Michigan Pain's office, which was never

61

mentioned in subsequent treatment records by any of R.A.'s providers, including Madden.

331.   On August 12, 2016, Michigan Pain submitted a bill for an arthrocentesis procedure that was not documented by Michigan Pain's records.

332.   On September 7, 2016, Michigan Pain billed Allstate $1,400 for a back brace allegedly given to R.A., but there was no documentation regarding a physician order of the brace or delivery of the brace to R.A.

333.   Michigan Pain also billed more than $70,000 for a three-level discogram and discectomy procedure on January 10, 2017, for which Advanced Surgery additionally billed more than $28,000 in facility charges.

334.   Advanced Surgery lacks the capability to actually perform a discogram, as it does not have CT machines on site.

335.   Padula cannot have performed a discogram procedure at Advanced Surgery, as there are no CT machines within the facility, which are required to properly document and visualize the discogram injections for radiological review.

336.   Michigan Pain also falsely claimed that it performed an open-incision transpedicular approach for the January 10, 2017 discectomy procedure, when in fact the procedure performed, if at all, was percutaneous and minimally invasive.

337.   None of the procedures billed by Michigan Pain and Advanced Surgery relating to treatment allegedly rendered to R.A. on January 10, 2017 were actually performed.

338.   Michigan Pain and Advanced Surgery submitted claims for payment and medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to R.A. to Allstate through interstate wires and the U.S. Mail, upon which Allstate relied in adjusting the claims.

339.   Allstate is not required to compensate defendants Michigan Pain and Advanced Surgery for services that were not actually rendered to R.A., or that were fraudulently billed or medically unnecessary.

**4.   Patient R.C. (Claim No. 0466646130)**

340.   Patient R.C. was involved in an alleged motor vehicle accident on October 27, 2016.

341.   R.C. presented to Dearborn Pain on February 13, 2017, where Trotter prescribed physical therapy and multiple MRIs, and disabled R.C. from driving pursuant to Dearborn Pain's predetermined protocol.

342.   R.C. was immediately referred to Precise MRI by Trotter for four (4) MRIs: his cervical, thoracic, and lumbar spine in addition to his right wrist.

343.   On March 27, 2017, Trotter allegedly performed fluoroscopic epidural steroid injections in Dearborn Pain's office.

344. R.C. allegedly received a second, identical fluoroscopic steroidal pain injection on April 24, 2017 from Bhatti within Dearborn Pain's office.

345. Dearborn Pain was not licensed to operate a fluoroscopy machine within its office in Michigan in 2017.

346. Just two weeks later, on May 8, 2017, R.C. allegedly received a medial branch block bi-laterally across two (2) levels of his spine at L4-L5 and L5-S1.

347. Dearborn Pain fraudulently billed for a third level of the branch block that was not actually performed and inappropriately double-billed for each level.

348. In June 2016, R.C. testified under oath that he had only received two (2) injections from Dearborn Pain up to that point, despite Dearborn Pain having billed for three (3) injection procedures to that point in R.C.'s treatment.

349. R.C. denied having received any injections from Trotter.

350. On July 21, 2017, Dearborn Pain claims to have repeated the same medial branch block, and again fraudulently billed for a third level not performed and inappropriately double-billed for each level.

351. R.C. testified to receiving four (4) total injections from Dearborn Pain during the course of his treatment through July 2018, but Dearborn Pain submitted medical records and bills related to a total of eight (8) injections over that same period.

352.   Dearborn Pain, Precise MRI, and Advanced Surgery submitted claims for payment and medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to R.C. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

353.   Allstate is not required to compensate defendants Dearborn Pain, Precise MRI, and Advanced Surgery for services that were not actually rendered to R.C., for services that were fraudulently billed, or for medically unnecessary treatment.

### 5.      Patient N.S. (Claim No. 0431326032)

354.   Patient N.S. was involved in an alleged motor vehicle accident on October 3, 2016.

355.   N.S. allegedly began her treatment at Southfield Pain on or about October 17, 2016 with Trotter, where N.S. was immediately referred for multiple MRIs, disabled from driving and housework, prescribed physical therapy and attendant care, underwent range of motion and manual muscle testing, and issued a back brace all pursuant to Southfield Pain's predetermined protocol.

356.   Southfield Pain claimed to have performed an epidural steroid injection with fluoroscopic guidance and an epidurogram on November 16, 2016, but there is no indication that fluoroscopic guidance was used and an epidurogram was not performed.

357.   On January 4, 2017, Southfield Pain claimed to have performed two steroid injections on N.S.'s spine with epidurograms that were not rendered, and submitted bills claiming to have performed more injections than were actually performed.

358.   On February 8 and February 22, 2017, Southfield Pain submitted nearly $10,000 in charges for two separate EMGs that were allegedly performed on N.S. by Trotter.

359.   An independent review of the EMG reports written by Trotter found that the findings in the reports were "physiologically impossible" and that the EMGs were not medically necessary.

360.   Southfield Pain submitted charges of $1,523 for an epidurogram allegedly performed during a trochanteric bursa injection rendered by Bhatti on April 4, 2017.

361.   It is not possible to perform an epidurogram to a trochanteric bursa, as an epidurogram is performed for the purpose of imaging the spine, while a trochanteric bursa is an area of the hip.

362.   Thus, it is not possible that the epidurogram billed as part of the trochanteric bursa injection to N.S. was actually performed, and was submitted for the sole purpose of fraudulently increasing the amount of bills submitted to Allstate.

363.   Finally, Southfield Pain fraudulently billed for three (3) levels of bilateral facet block injections allegedly performed on October 10, 2017, when at most only two (2) levels of the injection were rendered.

364.   Additionally, Southfield Pain double billed for every level of the claimed facet injections, billing for a total of six (6) injections when at most only two (2) were actually performed.

365.   All of the treatment allegedly rendered to patient N.S. was performed pursuant to a fraudulent treatment protocol designed to bill Allstate for as much treatment as possible, whether or not it was actually performed.

366.   Southfield Pain submitted claims for payment and medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to N.S. to Allstate through interstate wires and the U.S. Mail, upon which Allstate relied in adjusting the claims.

367.   Allstate is not required to compensate defendant Southfield Pain for services that were not actually rendered to N.S., for services that were fraudulently billed, or for medically unnecessary treatment, and Allstate is entitled to repayment of all amounts it paid in reliance on Southfield Pain's fraudulent submissions.

### 6.    Patient A.C. (Claim No. 0469325617)

368.   Patient A.C. was involved in an alleged motor vehicle accident on July 31, 2017.

369.   A.C. presented for treatment at Dearborn Pain, where she purportedly underwent injections on December 1, 2017, December 15, 2017, and February 7, 2018.

370.   For each date A.C. purportedly received injections from Dearborn Pain, Advanced Surgery also submitted bills to Allstate for facility fees representing that the injections had been performed in one of its surgical rooms.

371.   Advanced Surgery also submitted a bill to Allstate for facility fees related to a radiofrequency ablation procedure performed by defendant Padula.

372.   A.C., who is a healthcare services professional, testified under oath that the only procedure she had that was actually performed at Advanced Surgery was the radiofrequency ablation.

373.   A.C. testified that the series of injections by Dearborn Pain were performed "[i]n a regular medical room that you into to see the doctor."

374.   A.C. expressly stated that this "regular medical room" was different than the separate surgical area in which she had her radiofrequency ablation.

375.   Thus, the facility fee claims submitted by Advanced Surgery for these three injections – which totaled $39,484 – were for alleged procedures for which Advanced Surgery did not actually provide any services or facilities.

376.   Advanced Surgery submitted bills for payment and medical records relative to the services allegedly rendered to A.C. to Allstate through the U.S. Mail, and Allstate relied on such records in adjusting the claims.

377.   Allstate is not required to compensate defendant Advanced Surgery for facility fees for services that were not actually rendered to A.C.

## VII.   FALSIFIED MEDICAL RECORDS

378.   As part of their scheme to defraud Allstate, and to disguise their actions to prevent discovery of Allstate's injuries, the defendants produced fraudulently prepared medical records purporting to document treatment, patient complaints, procedure notes, and examination findings that exaggerated patient injuries or invented treatment for the purpose of justifying charges submitted to Allstate.

379.   Many of the services purportedly provided by the defendants required a doctor to sign a prescription or a disability certificate in order to create the appearance of medical necessity.

380.   As of January 1, 2015, Michigan law requires physical therapy treatment that extends beyond twenty-one days (21) or ten (10) visits to be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery.  Mich. Comp. Laws § 333.17820(1).

381.   Transportation services are not compensable unless they are medically necessary due to a patient's inability to drive as a result of his or her injuries.

382.   Therefore, North Shore could not provide its standard physical therapy predetermined treatment and Medi Transit could not properly bill for alleged medical transportation services without a prescription by a physician.

383.   The pain management clinics and North Shore routinely created prescriptions and disability certificates regardless of patients' complaints and their actual examination findings (or lack thereof), as described in further detail below.

384.   Allstate's investigation also revealed that the defendants created and submitted medical records that were altered, forged, or otherwise fabricated in an effort to justify treatment allegedly rendered.

385.   For example, Dearborn Pain created falsified medical records purportedly documenting vital signs and subjective complaints of patient R.C. (Claim No. 0466646130) for a planned January 11, 2018 treatment date, but also submitted a copy of an office note indicating that R.C. did not actually present for treatment on January 11, 2018. *See* Exhibit 11.

386.   Dearborn Pain also submitted bills relative to treatment allegedly rendered to patient R.C. that Trotter purportedly signed, despite the fact that Trotter was incarcerated at that time.  *See* Exhibit 12.

387.   The forged, altered, and falsified documents created by the defendants were submitted to deceive Allstate into paying for treatment and services that were illegal and medically unnecessary (and many of which were not actually provided).

388.   Allstate is not required to pay any of the defendants for treatment and services that were performed pursuant to forged, altered, or falsified records, and it is entitled to restitution for monies paid in reliance on such forged, altered, and falsified records.

A.   **SPECIFIC EXAMPLES OF FALSIFIED RECORDS**

1.   **Patient S.W. (Claim No. 0368276507)**

389.   Patient S.W. was involved in an alleged motor vehicle accident on May 10, 2015.

390.   S.W. presented for treatment at defendant North Shore on or about June 22, 2015.

391.   According to S.W., he began treating at North Shore at the direction of his attorney.

392.   S.W. was provided with a disability certificate for housework and transportation services at his initial evaluation, pursuant to North Shore's predetermined treatment protocol.

393.   Throughout his lengthy alleged treatment at North Shore, S.W. was always given updated disability certificates that were purportedly signed on the 22nd day of each month.

394.   S.W. was allegedly transported to North Shore by defendant Medi Transit throughout the duration of his treatment, including allegedly being transported to North Shore by Medi Transit to his initial evaluation on June 22, 2015.

395.   Despite S.W. not having been disabled from driving prior to June 22, 2015, S.W. allegedly signed documents on that date provided by Medi Transit claiming that the transportation services were justified based "on my doctor's authorization due to physical limitation of driving. . . ."

396.   It was not possible for Medi Transit to have determined that S.W. was disabled from driving prior to the evaluation on June 22, 2015, but Medi Transit provided transportation because it knew that S.W. would be provided a disability certificate by North Shore, regardless of whether or not S.W.'s transportation services were medically necessary, pursuant to North Shore's predetermined protocol.

397.   Subsequent disability certificates provided by North Shore to S.W. were fraudulently made, as evidenced by the fact that North Shore dated the certificates on the 22nd of every month from June to November 22, 2015, even when S.W. was not actually evaluated by North Shore on these dates.

398.   In fact, the only disability certificate that coincides with an alleged evaluation by North Shore of S.W. is for the initial evaluation on June 22, 2015.

399.   The last disability certificate dated November 22, 2015 was allegedly signed *after* S.W.'s last treatment date at North Shore.

400.   August 22, 2015 and November 22, 2015 fell on a Saturday and Sunday, respectively, dates on which North Shore was not open for business.

401.   North Shore and Medi Transit submitted claims for payment and false medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to S.W. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

402.   Allstate is not required to compensate defendants North Shore and Medi Transit for services that were fraudulently billed, or for medically unnecessary treatment that was documented by falsified records and performed pursuant to a predetermined treatment protocol, and Allstate is entitled to repayment of all amounts it paid in reliance on defendants' fraudulent submissions.

### 2.   Patient G.R. (Claim No. 0357449073)

403.   Patient G.R. was allegedly injured in a motor vehicle accident on or about February 7, 2015.

404.   Following the accident, G.R. was illegally solicited by a physical therapy clinic.

405.   The physical therapy clinic first directed G.R. for evaluation with Muhammad Awaisi, M.D. ("Awaisi") who saw her at Advanced Surgery.

406.   At Advanced Surgery, G.R. allegedly received multiple applications of clinically useless P-Stim devices.

407.   According to G.R., the P-Stim devices she received were applied with adhesive tape, which she described were "like band-aids" and took about five (5) minutes to perform.

408.   Advanced Surgery initially sent a bill to Allstate for a P-Stim application to G.R. allegedly performed on August 7, 2015 for approximately $73,000.

409.   In October 2015, G.R. was referred to Michigan Pain by the physical therapy clinic, and G.R. testified that the referral from the physical therapy clinic was the cause of her initiating treatment with Michigan Pain.

410.   As a result, all of the treatment rendered by the defendants to patient G.R. was the product of illegal solicitation and is not compensable by Allstate.

411.   G.R. was given an extremely aggressive course of interventional treatment by Michigan Pain, which ran the full spectrum of Michigan Pain's fraudulent treatment protocol.

412.   On G.R.'s initial evaluation performed by Madden, many of G.R.'s subjective complaints of pain were not related to the accident, but attributed to unrelated and pre-existing arthritis, "probable carpal tunnel," and a jaw issue that Madden stated would be best addressed by a dentist.

413.   Nevertheless, G.R. was given a back brace, a prescription for the opioid Norco, and was recommended a course of treatment and testing including physical therapy, nerve blocks, steroid injections, and EMGs.

414.   G.R. testified that she stopped receiving physical therapy in the summer of 2015, but that she continued to receive physical therapy prescriptions from Michigan Pain on a regular basis.

415.   Michigan Pain provided these prescriptions for physical therapy as a matter of course in order to maintain its referral relationships with physical therapy providers, and did not monitor patient progress through physical therapy.

416.   G.R. was also regularly given disability certificates by Michigan Pain without any discussion of how or why G.R. was physically disabled in the records. In fact, Madden dictated an evaluation on January 15, 2016 that stated G.R. should be able to perform most activities on her own at that point in her treatment.

417.   G.R. testified that she underwent one EMG test at Michigan Pain, but Michigan Pain submitted two (2) separate bills for two (2) separate EMGs allegedly performed only weeks apart on November 2, 2015, and November 16, 2015, by George Petryk ("Petryk") and Padula.

418.   Michigan Pain also submitted bills for a C5-C6 right-sided facet block injection by Padula allegedly performed on November 2, 2015.

419.   Padula initially reported only having discussed an injection and EMG with G.R., not that they were performed, and the original bills sent to Allstate in 2015 did not include any charges for the alleged EMG.

420.   No treatment notes regarding the alleged facet block or EMG reports were produced by Michigan Pain until July 20, 2016, more than eight (8) months later, when notes were submitted along with a new version of HICFs for the November 2, 2015 date of service, which altered the injection charge and included, for the first time, an EMG charge.

421.   The EMG record provided eight (8) months after November 2, 2015 describes an upper extremity EMG, while the original note created by Padula and Michigan Pain for this date discusses a lower extremity EMG only.

422.   Michigan Pain also claimed to have performed a completely separate EMG test on November 16, 2015, but again did not document such a test in the evaluation records.

423.   Both of these EMGs were allegedly performed by Petryk, which were performed in violation of Michigan Law as discussed *infra*.

424.   Per G.R.'s testimony, only one EMG was performed by Michigan Pain during this period, meaning that at least one of the records produced by Michigan Pain was fabricated.

425.   G.R. also testified that the injections she received were not actually helping her pain, but she was told by Madden that the injections being recommended to her were part of a three-injection process.

426.   This "three injection" protocol is further evidence that Michigan Pain utilized a predetermined treatment protocol that included multiple injections for the sole purpose of inflating charges submitted to Allstate, as it is not proper to order multiple injections before evaluating the efficacy of each prior injection.

427.   Padula also allegedly performed a cervical discogram and discectomy on July 12, 2016, which was also performed at Advanced Surgery.

428.   According to G.R.'s deposition testimony, on two (2) separate occasions, Padula told her that this procedure would reduce her pain by as much as 80%.

429.   A discogram is a diagnostic procedure meant to confirm whether or not a patient's pain is discogenic in nature.

430.   Discograms have no role in reducing a patient's pain, meaning that Padula either mislead G.R. regarding the nature and purpose of the procedure in order to obtain her consent, or Padula had already decided that he was going to perform a cervical discectomy on G.R., rendering the discogram that was allegedly performed a futile exercise that was performed for the sole purpose of fraudulently inflating bills submitted to Allstate.

431.   G.R. also testified that evaluation notes, allegedly authored by Madden, that stated Madden discussed the discogram procedure with G.R. in March 2016 were not true, and that G.R. never discussed the discogram procedure with Madden.

432.   In addition to the discogram, which cannot possibly have been properly performed at Advanced Surgery as it did not have a CT machine, G.R. also allegedly underwent a six (6) level stem cell injection procedure on or about February 21, 2017.

433.   As explained in further detail *infra,* the stem cell injections allegedly performed by Michigan Pain at Advanced Surgery are not medically necessary, entirely experimental, and are performed outside of any recognized methodology.

434.   Padula's evaluation records preceding the stem cell procedure state that in addition to the stem cell injections, he also discussed another discogram and discectomy procedure to G.R.'s lumbar spine.   G.R. denied that these discussions regarding a second discogram procedure ever took place.

435.   On March 20, 2017, G.R. allegedly underwent muscle testing performed by an assistant at Michigan Pain, although G.R. stated that she was still in pain from the stem cell injections she had received in February at this time.

436.   Despite G.R. not being seen by Madden on March 20, 2017, the medical record regarding the muscle testing report states that Madden ordered the testing.

437.   An April 17, 2017 re-evaluation note authored by Padula describes discussions Padula allegedly had with G.R., stating that he had discussed further steroid injections with G.R., that she had agreed to undergo the procedure, and that she would consider a lumbar discogram and discectomy pending the results of the injection.

438.   G.R. denied any such discussions with Padula, stating at that time she would not have considered further injections due to the pain caused by the stem cell injection procedure.

439.   Finally, G.R. testified that the last treatment note authored by Padula, on May 15, 2017, referenced therapy that she was not receiving and again described discussions regarding further treatment that never actually occurred.

440.   Michigan Pain produced falsified medical records regarding patient G.R. for the purpose of justifying medically unnecessary treatment that had no evidence of efficacy and to bolster the medical record to disguise its fraudulent scheme.

441.   Michigan Pain billed Allstate over $120,000 for fraudulent and medically unnecessary treatment allegedly rendered to patient G.R.

442.   Advanced Surgery billed Allstate more than $137,000 for fraudulent and medically unnecessary treatment allegedly rendered to patient G.R.

443.   Padula, Madden, Michigan Pain, and Advanced Surgery submitted claims for payment and medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to G.R. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

444.   Allstate is not required to compensate defendants Padula, Madden, Michigan Pain, and Advanced Surgery for services that were not actually rendered to G.R., for services that were fraudulently billed based on falsified medical records, or for medically unnecessary treatment that was performed as a result of unlawful solicitation.

### 3.   Patient R.H. (Claim No. 0150229401)

445.   Patient R.H. was involved in an alleged motor vehicle accident on September 30, 2015.

446.   Southfield Pain claimed that R.H. received treatment from Southfield Pain, Gonte, and Trotter from May 19, 2016 through July 28, 2016.

447.   According to R.H.'s deposition testimony, he never treated with either defendants Gonte or Trotter, and did not receive any treatment from Southfield Pain.

448.   Despite R.H.'s testimony denying treatment from either Gonte or Trotter, Southfield Pain submitted records for treatment allegedly ordered for and rendered to R.H., including epidural steroid injections, evaluations, urine drug tests, disability certificates, and prescriptions for DME and opioid medications.

449.   All of the records submitted to Allstate by Southfield Pain regarding R.H. were fabricated in order to justify payment for treatment that was not actually rendered.

450.   Southfield Pain submitted claims for payment and medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to R.H. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

451.   Allstate is not required to compensate defendant Southfield Pain for services that were not actually rendered to R.H., for services that were fraudulently billed based upon falsified medical records, or for medically unnecessary treatment.

### 4.   **Patient V.I. (Claim No. 0393864673)**

452.   Patient V.I. was involved in an alleged motor vehicle accident on December 4, 2015.

453.   V.I. began treating with Michigan Pain on January 5, 2016, when she first allegedly saw Madden.

454.   At the initial evaluation, Madden prescribed opioid pain medication, three (3) MRIs, physical therapy, EMGs to her upper and lower extremities, a back brace, and attendant care and disabled V.I. from housework pursuant to Michigan Pain's predetermined treatment protocol.

455.   On or about June 4, 2016, Madden dictated a re-evaluation note regarding a June 3, 2016 evaluation and claimed that V.I. underwent a right shoulder MRI that revealed rotator cuff changes and AC joint arthritis.

456.   According to the MRI facility, Madden did not prescribe the MRI until June 3, and the MRI itself did not occur until June 11, 2016, one whole week after Madden dictated the evaluation note that accurately predicted the results of the MRI that had not yet taken place.

457.   This re-evaluation note contained falsified information, and evidences the close relationship between the defendant pain management clinics and the MRI companies to which they refer patients, knowing that the MRIs will be over-read to find injuries that the pain management clinics can use to justify fraudulent treatment.

458.   Michigan Pain submitted claims for payment and medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to V.I. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

459.   Allstate is not required to compensate defendants Madden or Michigan Pain for services to V.I. that were fraudulently billed, based upon falsified medical records, or for medically unnecessary treatment.

## 5.   Patient R.L. (Claim No. TXA-0197188)

460.   Patient R.L. was in an alleged motor vehicle accident on December 12, 2017.

461.   Following the accident, North Shore contacted Allstate to report the claim and indicated that Elia & Ponto was representing R.L.

462.   R.L. testified that he was given a list of providers by Sam Elia of Elia & Ponto for treatment related to the accident, and that defendant North Shore was on the list of providers.

463.   Subsequent to receiving information regarding treatment at North Shore from his attorney's office, R.L. allegedly began treatment at North Shore on or about December 19, 2017.

464.   R.L. testified that he had not been given a prescription by a physician for physical therapy prior to initiating treatment at North Shore.

465.   R.L.'s treatment at defendant North Shore was initiated upon the recommendation of a non-medical professional and thus was not medically necessary and was unlawful.

466.   R.L. testified that he was picked up from his home and driven to his first appointment at North Shore by a transportation company, which was defendant Medi Transit.

467.   R.L. testified that following the accident he was physically capable of driving himself and did not actually require transportation services.

468.   Despite this fact, R.L. was given a form to sign by Medi Transit stating that his transportation services were deemed medically necessary by his doctor.

469.   R.L. was allegedly evaluated by a physical therapist at his first treatment date at North Shore and was not evaluated by a chiropractor.

470.   R.L. was allegedly given a disability certificate for transportation services from North Shore allegedly signed on December 19, 2017 by one of North Shore's chiropractors, but R.L. was not evaluated by a chiropractor until at least December 22, 2017.

471.   This disability certificate was fraudulently produced by North Shore for the purpose of justifying medically unnecessary transportation services for the sole purpose of inflating charges to be submitted to Allstate for reimbursement by Medi Transit and R.L.'s representatives.

472.   R.L.'s treatment at North Shore consisted of its predetermined treatment protocol, which included x-rays, chiropractic manipulations, and physical therapy services, including massage, exercises, hot packs, and electric muscle stimulation.

473.   R.L. testified that North Shore arranged his transportation services to and from its facility and to his doctor's appointments.

84

474.   All of the medical transportation services rendered by defendant Medi Transit to R.L. were medically unnecessary, and Medi Transit submitted fabricated medical records and disability certificates to Allstate in order to fraudulently justify the services allegedly rendered to R.L. by Medi Transit.

475.   All of R.L.'s treatment rendered by defendants North Shore and Medi Transit was medically unnecessary, performed pursuant to a predetermined treatment protocol, and the result of unlawful treatment recommendations by a non-medical professional.

476.   North Shore and Medi Transit submitted claims for payment and accompanying medical records relative to fraudulent and medically unnecessary treatment allegedly rendered to R.L. to Allstate through the U.S. Mail and interstate wires, and Allstate relied upon the same in adjusting the claims.

477.   Allstate is not required to compensate defendants Medi Transit and North Shore for treatment that was medically unnecessary, based upon falsified medical records, or rendered pursuant to a fraudulent predetermined treatment protocol.

## VIII.  UNLAWFUL SOLICITATION

### A.  MICHIGAN'S ANTI-SOLICITATION LAWS

478.  Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" to "employ any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

479.  Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

480.  It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, or use police reports to solicit any person identified in the report, Mich. Comp. Laws § 750.429.

481.  Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157.

482.  As set forth more fully below, the defendants participated in, and willingly benefited from, schemes to solicit patients through conduct prohibited under Michigan law.

B.   **I**MPROPER AND **U**NLAWFUL **M**ETHODS **U**SED TO **S**OLICIT **P**ATIENTS

483.   Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

484.   Multiple patients at issue in this Complaint have reported that they received unsolicited phone calls within hours or days of their alleged motor vehicle accident.

485.   The individuals who made calls applied high pressure tactics to the targets of their unlawful solicitation, including by offering to immediately pick up the patients at their homes so they could begin a course of treatment with the defendants.

486.   The defendants also used tow truck companies and auto body shops to obtain personal information of patients and direct them to their clinics.

487.   Several patients at issue herein reported that they were approached by tow truck drivers and collision centers and were referred to treatment with the defendants by these tow companies and collision centers.

488.   The owner of an auto body shop in Detroit also reported to Allstate that an individual named Mark Maiuri came to his shop and offered him $500 for every person the auto body shop owner referred that presented for treatment at North Shore.

489.   He further reported that all of the auto body shops in the area have Maiuri's business cards and refer accident victims to him.

490.   Treatment directed by tow truck drivers, auto body shops, and other laypersons rather than by licensed medical professionals is unlawful, unreasonable, and unnecessary, and Allstate has no obligation to pay any charges associated therewith.

491.   Unlawful solicitation and unqualified referrals by laypersons to the defendants negate the validity of the medical treatment purportedly provided by the defendants.

492.   Referrals of solicited patients to the defendant clinics and physicians bore no relation to actual medical necessity, as the patients at issue in this Complaint would not have sought treatment but for the unlawful solicitation.

493.   By steering patients to the defendant clinics and physicians, the defendants knew that the patients would receive excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges for medical treatment.

494.   Accordingly, the defendants' treatment of the solicited patients was unlawful and led directly to unreasonable and unnecessary care.

C.    SPECIFIC EXAMPLES OF PATIENT SOLICITATION

495.   The following representative patients exemplify the fact and extent of the defendants' illegal solicitation efforts.

1.    Patient E.F. (Claim No. TXA-0111556)

496.   Patient E.F. was allegedly involved in a motor vehicle accident on February 3, 2013.

497.   Following the alleged accident, E.F. received a telephone call from someone named "Charles" who falsely stated that he worked for her insurance company.

498.   Charles informed E.F. that the insurance company had arranged for her to be evaluated at North Shore.

499.   E.F. only agreed to undergo evaluation because she believed Charles to be associated with Allstate.

500.   On April 5, 2013, E.F. was picked up at her home in a van, which then proceed to pick up several additional people in her neighborhood, and drove everyone to North Shore.

501.   E.F. reported that the only pain she ever experienced after the alleged accident was a minor pain in her shins, which resolved itself.

502.   Nevertheless, at North Shore, E.F. was subjected to x-rays, told her spine was "straight," and ordered to undergo treatment three (3) times per week.

503.   E.F. did not have any pain in her spine at the time this treatment was ordered.

504.   North Shore submitted charges for chiropractic adjustments to E.F.'s cervical, thoracic, and lumbar spine, along with charges for various chiropractic and physical therapy treatments and modalities.

505.   E.F. developed pain after several treatments, which she attributed to the treatment performed at North Shore and not the alleged automobile accidents, so she stopped treatment.

506.   All of the treatment rendered to E.F. by the defendants was the direct result of illegal solicitation.

507.   North Shore submitted claims for payment and medical records relative to medically unnecessary treatment allegedly rendered to E.F. to Allstate through the U.S. Mail, upon which Allstate relied in adjusting the claims.

508.   Allstate is not required to compensate North Shore for medically unnecessary treatment rendered as a result of unlawful solicitation.

### 2.   Patient T.W. (Claim No. 0478301740)

509.   Patient T.W. was in an alleged motor vehicle accident on October 8, 2016.

510.   According to T.W.'s sworn testimony, the next day following her accident two solicitors drove to her home to take her to doctors' offices for treatment.

511.   T.W. testified that the solicitors told her they got her information from the police report of the accident.

512.   Following the initial solicitation at her home, the solicitors took T.W. directly to Michigan Pain's office:

> Q.   Okay. So [the solicitor] actually drove you to Dr. Madden's office?
>
> A.   Yes.

513.   T.W. was then taken from her examination with Michigan Pain to a physical therapy clinic.

514.   T.W. continued treating with the physical therapy clinic and Michigan Pain through at least March 1, 2017.

515.   The medically unnecessary examination and treatment prescribed by Madden was a direct result of the illegal solicitation performed for the benefit of Michigan Pain.

516.   Michigan Pain submitted claims for payment and medical records relative to T.W. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

517.   Allstate is not required to compensate Michigan Pain for medically unnecessary treatment rendered as a result of unlawful solicitation.

### 3.   Patients M.D. and T.D. (Claim No. 0410877393)

518.   Patients M.D. and T.D. were in an alleged motor vehicle accident on April 21, 2016.

519.   Within two days of the accident, M.D. received a call from someone claiming to be from the law offices of Elia & Ponto, and the solicitor stated that they had "checked her policy" and that M.D. could receive $2,000 for filing an insurance claim to be handled by their firm.

520.   M.D. was asked who else was with her in the vehicle by the solicitor, and she informed the solicitor that her step-son, T.D., was also in the vehicle.

521.   At the time of the accident, T.D. was 14 years old.

522.   Following the solicitation phone call, a vehicle was sent to M.D.'s place of work to pick her up and bring her to Michigan Pain and Madden.

523.   M.D. was brought directly to Michigan Pain on or about April 25, 2016, where she was greeted by a man claiming to represent Elia & Ponto who signed M.D. up for representation with the firm.

524.   M.D. was allegedly issued a back brace, prescribed physical therapy, and prescribed medication by Michigan Pain.

525.   According to the recorded statement of T.D.'s mother, she also received a phone call from solicitors claiming to represent Elia & Ponto.

526.    The solicitors instructed T.D.'s mother to take T.D. to Michigan Pain for treatment.

527.    T.D. also initiated treatment with Madden at Michigan Pain on or about April 25, 2016 as a result of the solicitation phone calls.

528.    According to T.D.'s mother, they were also met at Michigan Pain by a representative of the firm Elia & Ponto, who signed them up with the firm.

529.    The representative of Elia & Ponto then referred T.D.'s mother to a man who paid her $300 and informed her that there was no paperwork to sign and described the money as a loan on her claim.

530.    T.D.'s mother stated that she was told she would receive approximately $25,000 in about a year for T.D.'s injuries.

531.    At the initial evaluation, Madden prescribed T.D. medication, physical therapy, and an MRI of his right shoulder less than one week after the alleged motor vehicle accident pursuant to Michigan Pain's predetermined treatment protocol.

532.    T.D. was referred for three (3) MRIs at defendant Precise MRI by Madden over the course of his treatment, including an MRI of his right shoulder at the initial evaluation.

533.    T.D., a 14-year-old child, was also inappropriately prescribed powerful and dangerous opioid medications for the treatment of soft-tissue injuries by Madden.

534.   The medically unnecessary examination and treatment prescribed by Madden to both M.D. and T.D. was a direct result of the illegal solicitation performed for the benefit of Michigan Pain and its associates.

535.   Madden, Michigan Pain, and Precise MRI submitted claims for payment and medical records relative to T.D. and M.D. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

536.   Allstate is not required to compensate Michigan Pain and Precise MRI for medically unnecessary treatment rendered as a result of unlawful solicitation.

### 4.   Patients M.D. and T.D. (Claim No. 0437651847)

537.   Following the April 21, 2016 accident discussed above, patient M.D. was allegedly involved in another motor vehicle accident on November 27, 2016.

538.   A second person, who coincidentally had the same initials as patient T.D. mentioned above, was also allegedly present in the vehicle.

539.   M.D. allegedly contacted Elia & Ponto as she was aware of them from their solicitation of her related to the prior accident.

540.   According to M.D., Elia & Ponto again directed M.D. and T.D. to seek treatment, this time with defendant North Shore related to the November 27, 2016 claim.

94

541.   All of the treatment rendered to patients M.D. and T.D. by defendant North Shore stems from the initial act of illegal solicitation performed by Elia & Ponto, and from a referral for care from a non-medical professional.

542.   Patients M.D.'s and T.D.'s treatment at North Shore was directed by a non-medical professional at Elia & Ponto, and was not medically necessary.

543.   North Shore submitted claims for payment and medical records relative to T.D. and M.D. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

544.   Allstate is not required to compensate North Shore for medically unnecessary treatment rendered as a result of unlawful solicitation.

### 5.   Patient M.A. (Claim No. 048512000)

545.   Patient M.A. was allegedly involved in a motor vehicle accident on November 21, 2017.

546.   M.A. stated to Allstate that the day after the accident he received a phone call from a solicitor who called himself "Carlos."

547.   Carlos told M.A. that he had M.A.'s information and that he wanted to send M.A. to "our North Shore Clinic" to be treated for his injuries.

548.   Carlos informed M.A. that he could have a car come pick M.A. up.

549.   According to M.A., an unmarked van then came to M.A.'s home and brought him to North Shore's facility in Royal Oak, only one day after the accident.

550. M.A. stated that Elia & Ponto were "working alongside" North Shore, and had a "middle man" inside North Shore's facility that directed M.A. to seek representation with Elia & Ponto.

551. During the course of M.A.'s treatment at North Shore, he was informed by a physical therapist at the facility that he needed to get a prescription for physical therapy from a doctor, and offered to refer him to a doctor for the purpose of obtaining that prescription.

552. M.A.'s treatment referral to North Shore was directed by a non-medical professional.

553. All of the treatment rendered to M.A. by North Shore was the direct result of illegal solicitation.

554. North Shore submitted claims for payment and medical records relative to medically unnecessary treatment to M.A. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

555. Allstate is not required to compensate North Shore for medically unnecessary treatment rendered as a result of unlawful solicitation.

### 6. Patient H.L. (Claim No. 0442588398)

556. Patient H.L. was in an alleged motor vehicle accident on December 5, 2016.

557.   H.L. stated to Allstate that he was solicited by someone from a physical therapy clinic called Lotus Wellness.

558.   H.L. was then picked up from his home by a transportation company and brought to Lotus Wellness for treatment.

559.   Lotus Wellness then referred H.L. to defendant Dearborn Pain, where he initially treated with Trotter.

560.   H.L. was prescribed physical therapy and was disabled from work and driving by Dearborn Pain pursuant to Dearborn Pain's predetermined treatment protocol.

561.   H.L. informed Allstate that he continued to work despite having been deemed disabled by Trotter.

562.   H.L. was also referred for multiple MRIs at defendant Precise MRI pursuant to the defendant pain management clinics' predetermined protocol.

563.   H.L. also informed Allstate that he had been drug tested by Dearborn Pain without reason.

564.   H.L. allegedly received injections from Dearborn Pain, the treatment notes for which suggest that they were performed within Dearborn Pain's office by Trotter.

565.   Defendant Advanced Surgery submitted bills for injections allegedly performed on January 13, 2017, but stated that they were performed by a doctor unaffiliated with Dearborn Pain, not Trotter.

566.   Defendant Michigan Pain also submitted bills and treatment records for an evaluation H.L. allegedly received at Michigan Pain, but the treatment notes are unsigned by any physician.

567.   All of the treatment billed relative to H.L. by the defendants was the direct result of illegal solicitation.

568.   Defendants Michigan Pain, Dearborn Pain, Precise MRI, and Advanced Surgery submitted claims for payment and medical records relative to medically unnecessary treatment allegedly rendered to H.L. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

569.   Allstate is not required to compensate defendants Michigan Pain, Dearborn Pain, Precise MRI, and Advanced Surgery for medically unnecessary treatment resulting from unlawful solicitation.

**7.   Patient P.A. (Claim No. ATL-0136464)**

570.   Patient P.A. was allegedly involved in a motor vehicle accident on February 3, 2016.

571.   P.A. reported to Allstate that his car was towed from the scene of the alleged accident to an autobody shop called Somerset Auto.

572.   P.A. was evaluated at a local emergency room and was discharged with instructions to take Motrin.

573.   The following day, February 4, 2016, P.A. was driven to Somerset Auto to check on the status of the car.

574.   At Somerset Auto, P.A. was told by "someone in charge" that he should seek a second opinion with "their doctor."

575.   P.A. was then driven from Somerset Auto directly to Michigan Pain, where he was allegedly evaluated by Madden and prescribed Michigan Pain's predetermined protocol of excessive and unnecessary treatment.

576.   P.A. continued evaluation and treatment at Michigan Pain, and at providers to which he was referred by Michigan Pain, for at least four (4) months.

577.   The medically unnecessary examination and treatment prescribed and provided by Madden and Michigan Pain was a direct result of the illegal solicitation.

578.   Michigan Pain submitted claims for payment and medical records relative to P.A. to Allstate through the U.S. Mail and interstate wires, upon which Allstate relied in adjusting the claims.

579.   Allstate is not required to compensate Michigan Pain for medically unnecessary treatment rendered as a result of unlawful solicitation.

## IX.   IMPROPER INDUCEMENTS AND KICKBACKS

### A.   IMPROPER INDUCEMENTS TO PATIENTS

580.   The defendants used multiple methods to ensure that patients who were solicited or referred into their network presented for the medically unnecessary treatment and testing used to generate claims to Allstate.

581.   These methods included aggressive solicitation tactics, offers of free medical care, promises of prescriptions for narcotic drugs, *pro forma* disability certificates for attendant care and household services, and offers of cash and in-kind payments in exchange for undergoing treatment.

582.   As mentioned above, Patient T.D.'s mother claims she was paid $300 after presenting her son to Michigan Pain for treatment at the suggestion of a solicitor, and was further told she could expect $25,000 in about one year as a result of filing a claim for benefits through Elia & Ponto.

583.   Another patient, C.A. (Claim No. 0433138302), claimed that he was solicited by an attorney via phone while he was still in the hospital.

584.   Michigan Pain ultimately sent bills for an alleged evaluation of C.A. on July 21, 2016 as a result of C.A.'s solicitation.

585.   As discussed above, an owner of an auto body shop also reported to Allstate that he was offered $500 per patient referral to defendant North Shore.

586.    The auto body shop owner reported that many of the patients just sign in at North Shore and leave without actually undergoing treatment.

587.    The use of *pro forma* disability certificates for attendant care and household services also operated as a form of indirect cash payment to patients.

588.    Patients were instructed by their attorneys that they could "hire" friends and family members to perform household services, and that the insurance companies would reimburse them for these services for every day they were in treatment.

589.    For example, patient R.C. (Claim No. 0466646130) testified that he was told by his attorney that he could hire someone to perform household services prescribed by Dearborn Pain and that this person would be paid $20 a day by the insurance company.

590.    The overwhelming majority of patients at issue in this complaint were disabled from household services and/or attendant care during their treatment with the defendants, with these disability certificates being repeatedly reissued without any basis.

591.    In addition to cash payments, free medical care, and disability certificates, the defendant pain management clinics promised patients opioid drugs, which are easily abused and which have a street value of thousands of dollars, in exchange for undergoing treatment that was billed to Allstate.

592.   As noted above, the former Michigan Pain office manager testified under oath that Michigan Pain's patients appeared more concerned with receiving narcotic medication than with receiving actual treatment from Michigan Pain.

593.   According to the former office manager's testimony, at least one patient stated that she only agreed to undergo a procedure because she was "promised" a prescription for Dilaudid, a powerful narcotic, after surgery.

594.   The auto body shop owner who was offered $500 to refer patients to North Shore also stated that he was told that if he knew anyone who wants pills, that they should also be sent to North Shore.

595.   Patient medical records and testimony further reveal this practice of inducing patients with narcotic pain killers to undergo medically unnecessary invasive treatments as part of the defendant pain management clinics' predetermined treatment protocol.

596.   For example, patient M.D. (Claim No. 0487935702) testified under oath that Michigan Pain physicians told him that in order to receive pain medication he had to first agree to undergo injections.

597.   Patient K.L. (Claim No. 0390106060) was repeatedly and inappropriately prescribed powerful narcotic drugs throughout her treatment at Michigan Pain in addition to simultaneously being prescribed benzodiazepines, such

as Ativan, a dangerous combination that increases the chance of patient overdose and are common drugs of abuse.

598.   K.L.'s opioid prescriptions were habitually refilled throughout her treatment with Michigan Pain, but for one significant instance where Madden withheld K.L.'s medications due to K.L.'s failure to follow up with Padula for a medically unnecessary discogram and discectomy procedure:

HISTORY OF PRESENT INJURY:      The patient returns for followup due to neck and low back pain from cervical and lumbar disc herniations. She has had epidural steroid injections and facet injections, which she states were helpful for a small amount of time. She was supposed to see Dr. Padula concerning discogram and discectomy procedure. She has not done so as of yet. She continues therapy. She continues to use Norco for pain. She has multiple other medicines that have been given including Neurontin, Flexeril and Lidoderm patches but she states none of those were helpful. Ibuprofen is not helpful either.

* * *

PLAN: At this time, the patient is going to followup with Dr. Padula in two weeks and again discussed discogram and discectomy for her discogenic type pain in the lower back and legs. No medication given today and medication can be given when she sees Dr. Padula.

599.   K.L. had resisted further suggestions of interventional treatment prior to having her opioids cut-off, as revealed by Michigan Pain's own medical records, because she reported that the injections she had received from Michigan Pain were making her pain worse.

600.   Subsequent to her medication being withdrawn, K.L. became compliant with Michigan Pain's protocol, and her medication was refilled repeatedly by Michigan Pain thereafter.

601.   Similarly, patient B.S. (Claim No. 0357772888) was prescribed opioids and benzodiazepines by Michigan Pain physicians Madden and Padula regularly

throughout his treatment, with the only significant breaks in the prescriptions occurring during periods when B.S. indicated a reluctance in going forward with further procedures recommended by Madden and Padula.

602. For example, on November 4, 2015 Madden refused to fill B.S.'s prescriptions for Xanax or Percocet and referred B.S. to Padula to consider a discogram.

603. On November 16, 2015 B.S. allegedly met with Padula, agreed to undergo a medically unnecessary cervical discogram procedure, and had his prescriptions for Percocet and Xanax refilled as a result.

604. This practice was repeated when Madden again refused to refill B.S.'s prescriptions for Xanax and Percocet in February 2016, instead directing B.S. to follow up with Padula to consider a lumbar discogram while stating in the record that "[a]ny other medicines he will have to get from Dr. Padula."

605. B.S. allegedly met with Padula on March 7, 2016, agreed to undergo a series of lumbar injections under anesthesia, and received refills to his prescriptions for both Xanax and Percocet as a result.

606. The use of dangerous narcotics as a *quid pro quo* for undergoing other unnecessary treatment has also been confirmed by unrelated medical providers.

607.   For example, patient T.B. (Claim No. TXA-0176966) transferred her care to a new pain management clinic, where it was noted that T.B.'s medication had been cut off by Michigan Pain physicians after she refused to have an injection.

608.   Michigan Pain also used opioids to reward patients for going through with their surgeries.

609.   For example, on April 3, 2017, Padula remarked that he was going to refill K.L.'s opioid prescription nearly two weeks early without any reasoning, but for the fact that K.L. had recently undergone another medically unnecessary surgery:

PLAN: I have renewed the patient's medication although is not due till April 15th. The prescription was re-written today for her Percocet and filled at that time. I renewed her cyclobenzaprine and capsaicin as well as her docusate. She will follow up in one month and she will resume physical therapy.

610.   Patients who require monetary or other inducement in order to undergo evaluation and treatment do not actually require medical treatment, and all charges submitted by the defendants related to such patients are fraudulent.

## B.   ADDITIONAL KICKBACKS AND REFERRAL AGREEMENTS

611.   The pain management clinics and North Shore maintained close relationships with personal injury attorneys, as evidenced by the numerous patients described above who informed Allstate that they were solicited by attorneys.

612.   Michigan Pain advertised its close relationship with personal injury attorneys, including posting photos of personal injury attorneys at its clinic on its Facebook page.

613.   The former Michigan Pain office manager testified that Maffia met with patients who were not represented and set them up with attorneys.

614.   Patient M.D. (Claim No. 0487935702) testified that Michigan Pain refused to treat patients unless they were represented by an attorney:

> Q.   When did you go back to Star Pain Management?
>
> A.   In April or so… And in Michigan Pain Management if you don't have an attorney, they don't receive you.
>
> Q.   Is this something that a doctor there told you?
>
> A.   Yes.  He told my aunt, the one that was with me.  They saw her for one month and after that they told her if you don't have an attorney, we cannot receive you.

615.   Michigan Pain also cultivated close ties with other providers, who referred patients to Michigan Pain and Michigan Pain provided unnecessary reciprocal referrals and prescriptions in return.

616.   For example, according to the testimony of Michael Daneshvar ("Daneshvar"), owner of a physical therapy clinic, defendants Michigan Pain and Madden treated his patients within his clinic.

617.   This arrangement resulted in patients being referred by Daneshvar to Michigan Pain and *vice versa*.

618.   Daneshvar has also admitted to employing runners to identify patients and has paid for patient referrals.

106

619.   A witness reported to Allstate that defendant Precise MRI offered to pay a set amount of money per MRI referral, and provided an upfront payment of $2,000 in anticipation of the arrangement.

620.   Precise MRI memorialized such kickback agreements with contracts disguised as "marketing services agreements."

621.   According to the witness, these agreements were negotiated by and on behalf of defendants Maffia and Karrumi, and involved defendants Southfield Pain, Dearborn Pain, and Precise MRI.

622.   As discussed herein, the vast majority of Precise MRI scans were referred to Precise MRI by physicians associated with the defendant pain management clinics, a predictable result of the incentives of the kickback scheme.

623.   As discussed above, defendant Advanced Surgery also induced the defendant pain management clinics to perform medically unnecessary procedures within its facility by imposing lease terms with Dearborn Pain that it could not perform fluoroscopic procedures except at Advanced Surgery.

624.   According to Advanced Surgery's own biller, this intentional direction of Dearborn Pain patients into Advanced Surgery's own suite would be improper:

Q.   [] Dr. Padula specifically testified in another case involving [patient R.C.] that not only was the performance of the injections that were performed in this – on [patient R.C.] within his offices using fluoroscope a violation of his lease, he was further told he had to perform them in Advanced Surgery Center's operative suite.

A.   He wouldn't have been told that.

Q.   How do you know that?

A.   He wouldn't have been told that by me or anybody else I've counseled with respect to what we can and cannot say in surgery center world.  I would never say something like that or allow anybody associated with this entity to say something like that.

Q.   Why?

A.   Because I believe it may be a violation of the Stark Law.  We can't tell anybody where to bring their cases or where not to bring their cases.  I would never instruct anybody to do that…

625.   The defendants' improper inducements, kickbacks, and coercive lease terms resulted in millions of dollars in medically unnecessary treatment and facility fees billed to Allstate.

## X.   UNREASONABLE AND UNNECESSARY MEDICAL TREATMENT

626.   The defendants' willingness to bill Allstate for services that were (1) never rendered and (2) not lawfully provided demonstrates their willingness to also bill for treatment that was unnecessary and unreasonable.

627.   Moreover, but for the defendants' illicit solicitation and payments of kickbacks in exchange for treatment, as discussed *supra*, the patients at issue herein would not have sought treatment with or by the defendants.

628.   The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably

necessary to the patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills submitted to Allstate.

629.   As set out below, the defendants grossly overutilized physical therapy, P-Stim devices, MRI scans, urine drug testing, medications, injections, and other forms of testing and treatment in wanton disregard for standards of care.

630.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, referrals, and treatment were not indicated, redundant, excessive, and repeated without any objective documented benefit to patients.

631.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

632.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 8.

633.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable treatment are fraudulent.

A.   PREDETERMINED TREATMENT PROTOCOL

634.   Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar diagnoses regardless of each patient's reported injuries; (2) providing mirrored treatment plans further indicating that patients were subjected to a predetermined treatment protocol; and (3) failing to indicate short- and/or long-term goals for patients.

635.   Each patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

1.   **Pain Management Entities Predetermined Treatment Protocol**

636.   The records of Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the defendant pain management clinics are remarkably similar in all relevant respects.

637.   Patients of these clinics were routinely documented to have severe pain across multiple body parts despite alleged involvement in only minor motor vehicle accidents.

638.   Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the defendant pain

management clinics never performed any analysis to evaluate whether the patients were malingering or exaggerating these remarkable pain complaints.

639.   Instead, Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the pain management entities immediately ordered extensive diagnostic testing to every area for which patients complained of pain, including MRIs, electrodiagnostic testing, EEG testing, and diagnostic injections.

640.   These extensive diagnostic procedures, each of which is addressed below, were not actually ordered to inform and influence patients' treatment plans.

641.   Rather, patients were placed on nearly identical courses of treatment before the results of such testing were obtained, so as to not waste any time during which bills to Allstate could be generated.

642.   Nearly every patient of the defendant pain management entities received identical, nonspecific initial diagnoses of their alleged injuries, including "cervicalgia," "radicular pain," "disc strains," and undefined "muscle spasms" in various extremities and joints.

643.   Despite these boilerplate diagnoses that are so generic as to be rendered meaningless, Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the pain management

entities almost invariably prescribed the same exact unnecessary and extensive treatment, including:

- Medications;

- Physical therapy two (2) to three (3) times per week for four (4) weeks;

- Disability from work;

- Replacement household services;

- Driving restriction;

- DME;

- Application of P-Stim devices; and

- Urine drug testing.

644. Madden has confirmed the existence of a predetermined protocol in testimony, explaining that urine drug testing is ordered for all patients because "almost everybody does get medicine . . . There are probably very few people that don't get some type of medicine, so I usually order [urine drug screening] on every person their first visit."

645. Defendant Goldstein admitted to Allstate that it was the policy of the defendant pain management clinics to order urine drug testing at every patient visit.

646. The defendants routinely ordered and performed urine drug tests on patients even when the patient was not prescribed any medications, or was

prescribed only non-controlled substances, which has no medical basis, as exemplified by the following patients:

- Patient B.K. (Claim No. 0454414953) was allegedly evaluated by Bhatti at Sterling Heights Pain on May 4, 2017. Bhatti did not prescribe any medications, but nevertheless ordered extensive drug testing to be performed. B.K.'s urine specimen tested negative for all substances except for acetaminophen, an over-the-counter analgesic that is medically unnecessary to test in nearly every circumstance.

- Patient E.C. (Claim No. 0444334346) was allegedly evaluated by Trotter at Dearborn Pain on February 3, 2017. Trotter prescribed only non-controlled substances, including lidocaine cream, a muscle relaxant, and Motrin. Trotter nevertheless obtained a urine specimen which was sent by Dearborn Pain to a laboratory to be tested for more than 70 drugs and analytes. On March 6, 2017, E.C. was prescribed the same non-controlled substances that are not a risk for abuse or diversion, but defendant Padula ordered similarly extensive testing on a second urine specimen.

- Patient N.J. (Claim No. 0471077859) was allegedly evaluated at Sterling Heights Pain on August 24, 2017. N.J. was never directed to take any medications other than an over-the-counter pain reliever and a mild muscle relaxer. Sterling Heights Pain nevertheless obtained at least two (2) urine specimens that were sent to laboratories for unnecessary definitive testing for dozens of substances.

647. The defendants also routinely re-ordered and re-performed definitive urine drug testing at every patient evaluation despite the lack of any unexpected test results or change in medication prescribed.

648. The tests that were included in the defendants' protocol were ordered only to generate charges to Allstate; they rarely, if ever, were used to influence the treatment plan, which was also predetermined.

649.    For example, patient N.S. (Claim No. 0431326032) allegedly provided urine specimens at the direction of Southfield Pain on at least eleven (11) separate occasions, all of which were subjected to unnecessary extensive testing for dozens of substances.

650.    N.S. was also prescribed the narcotic drug Norco on at least eight (8) separate occasions at Southfield Pain.

651.    None of the urine drug tests performed on urine specimens collected from N.S. ever tested positive for the presence of opioids.

652.    Southfield Pain never addressed the inconsistent results from the extensive drug tests it ordered and continued to prescribe Norco to N.S. in the face of clear evidence that she was diverting these dangerous prescriptions.

653.    The failure to actually use test results to inform treatment plans is evidence that the defendants ordered such testing as a matter of course to increase charges submitted to Allstate, and not out of medical necessity for the treatment of the patients at issue herein.

654.    The defendants' failure to use urine drug test results to guide prescriptions is also reflective of their practice of recklessly prescribing medications to entice patients to return to the clinic, regardless of the potential danger to their patients and to the public.

655.  The inclusion of prescription medications in the defendant pain management clinics' predetermined treatment protocol further also evidences the defendants' lack of regard for cost-effective and conservative care.

656.  In many cases, the medications were not indicated at all for the treatment of the patient's purported condition.

657.  The defendants' default frequent prescription of opioid pain medication is particularly egregious, as it contributed to a significant public health crisis in Michigan.

658.  On October 26, 2015, a bipartisan task force formed by then Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

659.  The task force reported:

Prescription drug abuse has reached epidemic proportions.  The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers.  In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

660.  It has been estimated that the risk of addiction for patients receiving long-term prescriptions for opioid painkillers is as high as 56% of all such patients. Bridget A. Martell, *et al.*, *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-127 (2007).

115

661.   The defendants' reckless prescriptions of drugs, especially narcotics, is

exemplified by the following patients:

- Patient R.P. (Claim No. 0449849776) presented to Michigan Pain and was allegedly evaluated by Madden on July 19, 2017, which was two (2) days after R.P. had completed a hospitalization related to kidney stones.  R.P. was seeking pain medication seemingly to treat her unrelated condition.  Madden prescribed R.P. with four (4) different substances, including the opioid Norco.  In doing so, Madden expressly stated that she was not sure if the prescribed medications were appropriate for a patient who had just undergone a procedure to remove kidney stones.  Rather than attempting to coordinate care with R.P.'s other physicians, Madden wrote an extensive prescription and left it up to her layperson patient to determine if she should take the drugs.

- Patient T.D. (Claim No. 0410877393) was fourteen (14) years old when he underwent a course of treatment with Madden at Michigan Pain.  Despite narcotic drugs being contraindicated for children in all but extenuating circumstances not relevant to T.D., who reported very mild pain complaints, Madden repeatedly prescribed the opioid drug Tramadol to this 14 year old.

- Patient G.R. (Claim No. 0357449073) was allegedly evaluated by Madden at Michigan Pain on January 15, 2016, who informed G.R. that narcotic pain medications were not appropriate for her because they would lead to dependency.  Madden nevertheless wrote a prescription for the narcotic drug Norco.  G.R. continued to receive regular narcotic prescriptions from Madden, Padula, and Michigan Pain throughout her lengthy treatment, despite Madden's expressed concerns.  On March 9, 2017, Madden again warned G.R. against taking narcotics, stating that they could increase her headaches.  Madden nevertheless prescribed 90 Percocet 5mg pills.  Also on March 9, 2017, G.R. was required to provide a urine specimen, which again failed to test positive for the prescribed narcotic drugs.  G.R. inexplicably returned to Michigan Pain just five (5) days later, on March 14, 2017, seeking additional pain medications.  Madden made no mention of G.R.'s failed drug test and wrote her an additional prescription for a higher dosage of Norco pills.  Just six (6) days later, G.R. returned to Michigan Pain again, where Padula wrote her a prescription for an additional 90 Percocet pills, this time doubling the dosage to 10mg.  Over the course of just eleven (11) days, Madden, Padula, and Michigan Pain prescribed G.R. with more than 200 narcotic pills despite clear evidence of misuse or diversion of the same.

116

662.   Another key component of the defendants' protocol was to issue disability certificates, both to bolster the appearance of a legitimate claim and also as an incentive to keep patients treating with them.

663.   Because the defendants issued the same restrictions and replacement services for every patient, regardless of their injury or status, such restrictions were rarely, if ever, appropriate.   For example, the defendants issued the following restrictions and orders for replacement services:

- B.M. (Claim No. 0390496980) was initially evaluated by Madden on November 20, 2015, and was prescribed household services and attendant care.  Madden continued to prescribe these replacement services through at least May 2, 2016, despite noting that B.M. was actually responsible for and able to take care of both her mother and her grandchildren.

- Y.Y. (Claim No. 0485144620) was allegedly evaluated by Madden on January 18, 2018, who issued a disability certificate on that date claiming that Y.Y. was totally disabled from working and required attendant care.  Y.Y. was observed by Allstate investigators reporting for work as a chef for at least six (6) hours per day on January 17, 18, and 22, 2018, confirming that Madden's disability certificate was issued on a *pro forma* basis without medical justification.

- R.M. (Claim No. 0391112521) was disabled by the defendants from working her second job, consisting of waitressing one day per week, but was permitted to continue working her full-time job as an office manager by North Shore. Despite being able to perform a full-time job, household services were ordered for six (6) months.

664.   Michigan Pain, Dearborn Pain, Southfield Pain, and Sterling Heights Pain also issued DME to many of the patients at issue herein despite no clinical

indication for doing so, and without possessing the licensure required by the State of Michigan.

665.  A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** . . . ."  Mich. Comp. Laws § 333.17722 (emphasis added).

666.  None of the defendant pain management clinics have obtained the required license from the Michigan Board of Pharmacy.

667.  Further, despite purporting to evaluate and treat patients who presented with pain complaints throughout their spine and extremities, Padula, Madden, Gonte, and the pain management clinics almost always issued one type of DME: a Velcro lumbar brace called "The Weave" for which they invariably charged Allstate $1,400.

668.  These braces were nearly always ordered and issued at the outset of treatment, often within days of an alleged motor vehicle accident, without any evidence of medical need or structural injury to the spine.

669.  Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the pain management clinics also directed patients to return to the clinic as often as possible, usually every two (2) weeks, so that they could apply pressure to undergo additional testing and procedures.

670.    It is rarely necessary to conduct re-evaluations at this frequency, especially when the defendants almost always prescribed courses of therapy designed to be performed over four (4) weeks.

671.    The boilerplate and template medical records created by Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Madden, Gonte, and other physicians employed by the defendant pain management entities were used to prescribe and perform the medically unnecessary treatment and testing by the defendants and their associates described throughout this Complaint: application of the medically useless acupuncture device P-Stim, urine drug testing, MRI imaging, prescription medications, injection therapy, and surgical procedures, each of which is discussed further below.

### 2.    North Shore Predetermined Treatment Protocol

672.    Nearly every patient of the pain management clinics was directed to undergo physical therapy three (3) times per week for four (4) weeks, at every appointment.

673.    Physicians at the pain management entities rarely evaluated the efficacy of physical therapy, and almost never altered or discontinued their predetermined physical therapy prescriptions.

674.    The protocol prescription of physical therapy for nearly every patient was designed to, and did in fact, financially benefit associates of Maffia, Goldstein,

Jerome, Padula, and the pain management entities, including defendants North Shore and Deweese.

675.   Patients of North Shore almost always underwent simultaneous courses of physical therapy and chiropractic treatment, each of which began with a purported initial evaluation.

676.   The initial evaluations performed by North Shore chiropractors almost always resulted in vague recordings of "pain" rather than specific test results against which progress during the excessive courses of therapy prescribed could be measured.

677.   For example, and as illustrated below, patient E.J. (Claim No. 0483737482) underwent a purported evaluation at North Shore on August 9, 2017, and was noted to have "decreased range of motion" and "pain" in every possible plane of motion, but no actual measurements were recorded:

678.   Without documenting accurate baseline deficiencies at initial patient evaluations, it was impossible for North Shore to actually evaluate the efficacy of the extensive courses of treatment that were invariably prescribed.

679.   Chiropractic evaluations performed at North Shore nearly always resulted in treatment plans consisting of application of hot/cold packs, massage, traction, and chiropractic adjustments to be performed three (3) times per week for twelve (12) weeks.

680.   Chiropractic evaluations at North Shore rarely, if ever, resulted in the establishment of patient-specific treatment goals.

681.   Prescribing courses of treatment to last for twelve (12) weeks is improper; the standard of care for chiropractic treatment is to conduct re-evaluations every four (4) weeks to confirm that treatment is beneficial.

682.   The No-Fault Act provides that benefits for chiropractic treatment are only payable if the service(s) allegedly provided were "included in the definition of practice of chiropractic under section 16401 of the public health code, 1978 PA 368, MCL 333.16401, as of January 1, 2009." Mich. Comp. Laws § 500.3107b(b).

683.   Excluded from the practice of chiropractic in the applicable definition are hot/cold packs, ultrasound, and traction, among other treatments.

684.   Because North Shore could not compel insurers to pay for such treatments when they were prescribed by a chiropractor, patients underwent alleged

physical therapy evaluations within days or weeks of initiating chiropractic treatment.

685.   Because physical therapy exceeding twenty-one (21) days or ten (10) visits must be prescribed by a licensed medical or osteopathic doctor pursuant to Mich. Comp. Laws § 333.17820(1), North Shore regularly referred patients for evaluation by outside physicians (frequently with the defendant pain management clinics), usually after the course of therapy had already been determined, to obtain the required prescription.

686.   Obtaining a physician prescription after the length and type of physical therapy has already been determined is improper as it results in the physician merely acting as a rubber stamp, not making an independent medical determination of medical necessity.

687.   Physical therapy courses of treatment ordered at North Shore nearly always consisted of hot/cold packs, ultrasound, electrical stimulation, therapeutic exercise, postural education, manual therapy, gait training, and therapeutic activity three (3) times per week for six (6) to eight (8) weeks.

688.   Prior to the performance of a patient's physical therapy evaluation, North Shore submitted bills indicating that all treatments were performed by a chiropractor.

689.   Thereafter, North Shore submitted bills claiming that a physical therapist performed the services for which it could not demand payment if performed by a chiropractor.

690.   As discussed further below, this attempt to manipulate claims to maximize reimbursement often resulted in submissions by physical therapists for treatments that were only part of the chiropractic treatment plan, and *vice versa*.

691.   In all cases, it was never necessary for the same patient to undergo simultaneous, nearly identical courses of physical therapy and chiropractic treatments at the same time.

692.   The physical therapy evaluations performed at North Shore are intended to create the appearance that a more detailed examination was performed, but the results were always the same vague statements of pain and limitation and remarkably similar and unlikely test results.

693.   The tests that were most consistently billed by North Shore were range of motion ("ROM") and motor muscle tests ("MMT"), the latter of which are scored using the Oxford Scale, as described in the chart below:

| Grade | Observation |
|:---:|---|
| 0 | No muscle contraction is detected. |
| 1 | A trace contraction is noted in the muscle by palpating the muscle while the patient attempts to contract it. |
| 2 | The patient is able to move the muscle when gravity is eliminated. |
| 3 | The patient may move the muscle against gravity but not against resistance from the examiner. |
| 4 | The patient may move the muscle group against some resistance from the examiner. |
| 5 | The patient moves the muscle group and overcomes the resistance of the examiner.  This is normal muscle strength. |

694.  The MMT scores reported by North Shore reflect patients who allegedly presented with crippling injuries, not the (at most) minor soft-tissue injuries that were reported by other physicians treating the patients and by the patients themselves.

695.  Similarly, ROM test results reported by North Shore purport to have found patients with range of motion measured at just a small fraction of normal movement, which is inconsistent with the injuries documented by other physicians.

696.  Both the ROM and MMT results reported by North Shore include highly unlikely findings of the exact same diminishment of motion and strength across all body parts for nearly all patients.

697.  The purported findings recorded by North Shore were often contradicted by findings recorded by physicians who had made referrals for physical therapy treatment.

698.    For example, patient M.H. (Claim No. 0478554868) was evaluated and prescribed physical therapy by a medical doctor on November 3, 2017.

699.    This doctor noted that M.H. had 5/5 muscle strength in all muscle groups in both his upper and lower extremities and decreased range of motion in his trunk only on rotation.

700.    Five (5) days later, on November 8, 2017, M.H. allegedly underwent an initial physical therapy evaluation at North Shore.

701.    The North Shore evaluation purported to find just 3/5 and 3+/5 muscle strength in all groups tested, and significantly diminished lumbar range of motion in flexion, extension, and bilateral bending, as well as in rotation.

702.    Patient F.P. (Claim No. 0312756349) was examined by both a North Shore physical therapist and defendant Gonte (practicing at a different clinic) on December 27, 2013.

703.    North Shore reported that F.P.'s muscle strength was just 2+/5 in all groups tested, while Gonte reported normal 5/5 muscle strength everywhere.

704.    The significantly diminished muscle strength and range of motion reported by North Shore was used solely to create the appearance of necessity for the excessive course of chiropractic treatment and physical therapy it billed for each patient.

705.   These highly improbable examination results were used to justify the exact same excessive prescription for chiropractic treatment and physical therapy for each patient.

706.   The courses of treatment ordered at North Shore were also excessive in length, with patients continuing for as many as 85 sessions of treatment extending over months without significant documented improvement.

707.   Although all but four (4) of the patients at issue herein underwent chiropractic evaluation (and thus had courses of chiropractic treatment ordered), North Shore never performed a chiropractic re-evaluation of any patient to assess the efficacy of the extensive treatment ordered and performed.

708.   North Shore's disregard for the benefit of the excessive treatment it allegedly rendered is exhibited by the following statement, which is handwritten to create the appearance that an assessment was performed, but which was actually pre-copied onto nearly every chiropractic treatment record:



709.   In approximately 90% of all motor vehicle accident cases, mild injuries will resolve by themselves within a few weeks without any treatment whatsoever.

710.   This fact further supports that immediate resort to physical therapy pursuant to the defendants' predetermined treatment plan was not related to the care,

recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

711. Physical therapy must be objectively indicated for each individual patient.

712. That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

713. As set forth above, the objective findings recorded by North Shore are boilerplate and meaningless, are contradicted by evaluations performed by referring physicians and other healthcare providers, and cannot justify the excessive amounts of treatment allegedly rendered to the patients at issue herein.

714. Under accepted practices, a patient rarely should receive physical therapy for more than four (4) to six (6) weeks.

715. After four (4) to six (6) weeks, the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

716. When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

717. As documented by Exhibit 7, patients at North Shore routinely continued physical therapy for dozens of appointments over a period of many months in order to continue generating claims for submission to Allstate.

718. The full extent and pattern of Deweese and North Shore's misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of North Shore's pattern of predetermined overtreatment.

719. Allstate is not required to compensate Deweese and North Shore for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

## B. UNNECESSARY AND EXCESSIVE APPLICATION OF USELESS P-STIM DEVICES

720. The defendants' scheme included repeated applications of the clinically worthless P-Stim device to patients without any clinical indications or signs of improvement from treatment.

721. Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the defendant pain management entities routinely pressured patients into receiving useless P-Stims at their very first evaluation, and continued to do so throughout treatment.

722. The former Michigan Pain office manager testified that application of P-Stim devices was included in the predetermined treatment protocol developed by

defendants Goldstein, Jerome, and Maffia and applied by defendants Maffia, Padula, and Madden:

> Q:     So what I'm getting at is, were there like predetermined treatment protocols that you were aware of?

> A:     Yes.

> Q:     How do you know that?

> A:     Because I was told by John Maffia and Al Jerome that – I believe Michael Angelo said this too, in a text message that every patient needed a back brace and a P-Stim.

723.   Angelo has testified that he purchases P-Stim devices for approximately $175 per device.

724.   The defendant pain management clinics invariably submitted charges of at least $8,600 for each P-Stim device applied to patients at issue herein, and defendant Advanced Surgery frequently submitted charges that totaled as much as $56,272 in connection with the same device application.

725.   The use of P-Stim by Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Madden, Maffia, Jerome, Goldstein, Gonte, Fatina Masri, Haitham Masri, and Advanced Surgery Center is designed solely to increase the amount of charges submitted to Allstate as there is no acknowledged therapeutic benefit for the use of the devices in this context.

### 1.    P-Stim Is Not Generally Accepted by the Medical Community

726.   As an initial matter, P-Stim is not an accepted treatment in the medical community.

727.   The P-Stim device is a miniaturized, battery-powered, transcutaneous electrical nerve stimulator with pre-programmed frequency, pulse, and duration for the stimulation of auricular acupuncture points.

728.   The P-Stim device provides a form of acupuncture combined with electrical stimulation where all of the acupuncture points are located behind a patient's ear.

729.   The P-Stim device is held behind the patient's ear by an adhesive dressing.

730.   The P-Stim device connects via three (3) stainless steel wires to acupuncture needles applied to three (3) points behind a patient's ear, as illustrated by the photograph below:



731.    The P-Stim operates until its battery runs out of power, typically three (3) days after application, at which point patients remove the device themselves and throw it away.

732.    P-Stim treatment has not been shown to be beneficial or more beneficial than traditional forms of treatment modalities.

733.    P-Stim is not considered reimbursable by the Centers for Medicare & Medicaid Services ("CMS") under any Medicare Benefit Category.

734.    The defendants rarely, if ever, disclosed the manufacturer of the P-Stim devices allegedly applied to the patients at issue herein.

735.    All P-Stim devices marketed in the United States were reviewed by the U.S. Food and Drug Administration ("FDA") through its "Premarket Notification" 510(k) review program.

736.    Under the 510(k) program, a device manufacturer submits a premarket notification submission to the FDA at least 90 days before a device is introduced into interstate commerce for commercial distribution.  21 U.S.C. § 360(k).

737.    The FDA determines whether devices meet the criteria for market clearance within 90 days, on the basis of whether the device is "substantially equivalent" to a legally marketed "predicate" device.  21 U.S.C. §§ 360(n), 360c(i).

738.   The FDA reviews whether the new device has the same technological characteristics as the predicate device, or whether despite any technological differences the new device is as safe and effective as the predicate device.

739.   All currently marketed P-Stim devices were compared to a predicate device called the Acu-Stim.

740.   The FDA's determinations were not based on any clinical or scientific data submitted in relation to the P-Stim device.

741.   Further, the FDA's 510(k) determination in relation to Acu-Stim makes clear that the P-Stim's predicate device was not reviewed for treatment of pain at all. *See* Exhibit 13.

742.   Instead, the "Acu-Stim" identified by the FDA as a predicate device to the P-Stim is in fact the "Acuslim" electro-acupuncture device, which is intended for weight loss.  Id.

743.   Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Gonte, Madden, and other physicians employed by the pain management entities applied P-Stim devices to the patients at issue herein despite a dearth of reputable studies supporting the use of P-Stim solely as a means to increase the amounts charged to Allstate.

## 2.   Unnecessary Use of Surgical Centers

744.   As discussed above, P-Stim devices are designed and approved for use only as an acupuncture treatment.

745.   The FDA approval documents for the devices by the pain management entities state that each device is approved "for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states."  *See* Exhibit 13.

746.   In other words, the FDA has determined that P-Stim devices can be safely applied by individuals who have no surgical training whatsoever.

747.   Defendant Padula has testified on multiple occasions that it is not necessary to apply P-Stim devices in operative suites or surgical centers.

748.   At least one manufacturer of P-Stim devices has represented to CMS that "[t]he device is best suited to be used in a physician's office" and that the "device can be placed on the patient in a patient's home."  *See* Exhibit 14.

749.   A routine shot administered in a physician's office penetrates a patient's skin further than a P-Stim device.

750.   P-Stim application is also less intrusive than regular blood sugar tests and insulin injections performed at home and without supervision by millions of diabetic patients every day.

751.   In fact, despite the defendant pain management clinics referring to application of P-Stim devices as a "operative care" in their records, many of the P-Stims applied to the patients at issue herein were actually applied by a nurse.

752.   Patient G.R. (Claim No. 0357449073) reported that while defendant Padula discussed the P-Stim device with her, it was actually applied by a nurse or assistant.

753.   In all cases, patients are instructed to remove the P-stim devices on their own and do not need the direction or supervision of any medical professional to do so.

754.   Despite the minor, non-surgical nature of P-Stim device application, defendant Advanced Surgery routinely submitted facility fee charges related to application of these acupuncture devices in its surgical facility.

755.   The surgical suites at Advanced Surgery were used only to provide the opportunity for Advanced Surgery to submit additional facility fee charges to Allstate.

756.   The unnecessary application of P-Stim devices in surgical suites was also designed to make P-Stim appear as a much more serious medical procedure than the acupuncture device that it actually is.

757. Similar unreasonable and grossly excessive charges are present with respect to each of the patients at issue herein who received P-Stim devices from the defendants.  *See* Exhibits 1, 2, 3, 4, and 6.

## C.    EXCESSIVE AND MEDICALLY UNNECESSARY MRIs

758. Another component of the predetermined treatment protocol used by the defendants was to immediately order MRI imaging.

759. The defendants ordered these MRIs because it allowed their associates, including defendants Karrumi and Precise MRI, to submit tens of thousands of dollars of additional charges to Allstate for imaging studies that cost very little to perform.

760. The former Michigan Pain office manager testified that when defendant Maffia attempted to induce her to fake injuries after her own motor vehicle accident, getting "a couple MRIs" was among the treatment and testing she was instructed to undergo.

761. In one outrageous example, Precise MRI performed six (6) separate MRIs on patient A.H. (Claim No. TXA-0193978) on December 7, 2016 and January 3, 2017 that were purportedly ordered by convicted felon and Dearborn Pain physician Trotter.

762. Trotter never actually evaluated A.H., whose initial evaluation at Michigan Pain was not performed until a year later, on December 20, 2017.

763.   For these excessive and unnecessary MRIs that were not ordered based on a physician evaluation and did not inform any aspect of A.H.'s treatment, Precise MRI submitted charges to Allstate totaling $29,400.

764.   After A.H. actually began treatment with Michigan Pain, repeat MRIs of his left shoulder and lumbar spine were ordered, with both Michigan Pain and Precise MRI disregarding the fact that prior imaging had already been taken of these body parts.

765.   In another example, a physician treating patient W.H. (Claim No. 0470157116) reported:

> The patient states that on his last visit he was ordered to get an MRI on his left knee done when he was supposed to get it done on his left shoulder.  His left knee does not have any issues.  When the patient went to Precise MRI in shouthfield [sic] they still proceeded to do the left ankle [sic] MRI, so that is what he has a disc of today.

766.   The medically unnecessary MRI of W.H.'s left knee was performed by Precise MRI on February 6, 2018.

767.   The radiology report submitted to Allstate documenting the purported results of the February 6, 2018 MRI contains the false statement that W.H. had left knee pain, despite W.H. clearly stating that his left knee had no problems.

768.   The pain management clinic defendants routinely sent patients to the same MRI facilities, including Precise MRI, where they knew the images would be

(mis)interpreted and over-read to "find" injuries used to justify the excessive treatment for which they billed.

769. Defendant Madden and other physicians associated with the defendant pain management clinics are the most prolific referrers of MRIs in the entire State of Michigan.

770. The State of Michigan requires all MRI facilities to submit certain information regarding MRI scans performed on a quarterly basis, including the license number of the physician who made each referral and the number of scans performed on each patient at each appointment.

771. In 2017, Madden made 333 patient referrals for MRIs, of which more than 71% were for MRIs of multiple body parts.

772. 218 of the 333 patients referred for MRIs by Madden in 2017 were sent to Precise MRI.

773. Madden's practice of referring the majority of patients for MRIs of more than one body part means that she alone accounted for a total of 766 MRI scans performed in Michigan in 2017.

774. In 2017, a total of 826,502 patients underwent MRIs in Michigan, of which only 12.3% underwent MRIs of multiple body parts during the same visit.

775. Madden, who almost exclusively treats soft-tissue injuries and always provides treatment on a non-emergent basis, referred patients for MRIs of multiple body parts at nearly six (6) times the statewide average in 2017.

776. Madden has testified that she sometimes does not even know why she ordered multiple MRIs.

777. Madden ordered both brain and orbital MRIs for patient C.A. (Claim No. 0433138302) and explained: "I don't even know why I marked orbits per se because any time they do a brain MRI it includes, it includes the orbits."

778. Madden prescribed patient A.A. (Claim No. 0442746953) multiple MRIs at his second evaluation on February 13, 2017, just a month after the date of A.A.'s alleged motor vehicle accident.

779. A.A. had a heart condition and pacemaker, a serious contraindication that could have been fatal if the MRIs had actually been performed as prescribed by Madden, but Madden prescribed these clearly medically contraindicated MRIs pursuant to Michigan Pain's predetermined protocol.

780. As discussed below, there was rarely, if ever, a medical justification for the MRI referrals made by Madden or any physician at the pain management clinics.

### 1.   Performance of Medically Unnecessary MRIs

#### a.   Standard of Care for MRI Testing

781.   Precise MRI and its owner Karrumi had a responsibility to ensure that MRIs were properly ordered, but they intentionally chose not to do so in order to maximize the amount of charges submitted to Allstate.

782.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

783.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

784.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

785.   The ACR's practice parameters also state that a basic neurological examination should be done and recorded prior to an MRI of the brain or spinal region.

786.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

787.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

788.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

789.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistent pain following failure of conservative management only in select cases."

790.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

791.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

792.   MRIs should not be ordered in violation of the ACR Practice Parameters unless there is an overriding clinical reason in the specific case and that reason must be documented in the patient's medical record.

793.   The physicians who made referrals to Precise MRI never documented an overriding clinical reason for the MRIs ordered outside of the ACR Practice Parameters.

794.   When asked whether she requires clinical findings in accordance with ACR Practice Parameters before ordering MRIs, Madden testified:

> Q:   Don't you usually have to have some clinical finding like some nerve symptoms or something that justifies a more significant study like an MRI, more than "I'm in pain"?
>
> A:   Yeah.  You know, any type of trauma you can order an MRI study.  I mean, it's good if you do have radicular symptoms.  Well, I mean bad, but then you think, oh, I really need to order an MRI.

795.   This is precisely the type of early resort to MRIs without clinical justification that the ACR Appropriateness Criteria are designed to remove.

796.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

797.  If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinic problem or question) to obtain the missing information.

798.  Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

799.  MRI findings may be misleading if not closely correlated with the patient's clinical history, clinical examination, or physiologic tests.

800.  The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

801.  Nevertheless, the MRIs at issue in this Complaint routinely lack any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

802.  Pursuant to the ACR guidelines, it is the responsibility of Precise MRI to assure that all MRIs are proper.

803.   As set forth below, rather than perform the duties required by the ACR, Precise MRI and Karrumi routinely performed (and the other defendants prescribed) excessive and medically unnecessary MRIs in order to increase the amount of reimbursement sought from Allstate.

### b.   MRIs Performed During Initial Stages of Treatment

804.   MRIs at issue herein were also routinely ordered at the onset of the patient's treatment, thus evidencing that MRIs were resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

805.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."  Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

806.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

807.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are

objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

808.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

809.   Precise MRI routinely performed MRIs of patients who had only just initiated treatment.

810.   Nearly half of the patients at issue herein who allegedly underwent MRI imaging at Precise MRI had such imaging performed within two (2) months of their alleged motor vehicle accidents.

811.   Patients of Precise MRI had multiple MRIs performed as soon as seven (7) days after their alleged motor vehicle accidents.

812.   For example, patients S.M. and Y.D. (Claim No. 0476540513) were allegedly involved in a motor vehicle accident on September 26, 2017 and were purportedly evaluated by Bhatti at Sterling Heights Pain just two (2) days later, on September 28, 2017.

813.   Bhatti reported that both patients were "[n]ot in apparent distress," had negative straight leg raise tests bilaterally, and had neurological examinations that were almost entirely normal.

814.   In other words, Bhatti found that there was no suspicion of fracture or emergent neurologic abnormality.

815.   Nevertheless, Bhatti ordered each patient to undergo cervical, lumbar, and shoulder MRIs.

816.   Precise MRI performed these medically unnecessary MRIs ordered in clear disregard of applicable standards of care on October 3, 2017, just seven (7) days after the occurrence of the alleged motor vehicle accident.

817.   It is not possible that patients who underwent MRIs just days or weeks after their alleged motor vehicle accidents attempted conservative treatment as required by the ACR before resorting to MRI imaging.

818.   The patients at issue herein who received MRIs at Precise MRI within the first days and weeks after their alleged motor vehicle injuries had non-emergent medical conditions, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

### c.   Excessive MRI Scans

819.   In addition to performing MRIs as soon as possible after an alleged accident in violation of the standard of care, Precise MRI also sought to maximize the amount of the charges submitted to Allstate by performing far more MRIs than were medically necessary.

820.   MRIs should be limited to the body part for which fracture or neurologic injury is suspected, and it is uncommon to order MRIs on more than one region.

821.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2017, which documents that just 12.3% (101,714 of 826,502) of all patients underwent MRIs of multiple body parts during the same visit.

822.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

823.   Precise MRI never provided MRIs to patients seeking emergent diagnosis and treatment.

824.   By comparison, in 2017, Precise MRI performed multiple MRIs at more than five (5) times the statewide average, with 67.4% of patients receiving multiple MRIs.

825.   Because the defendants intentionally targeted automobile insurers for excessive and medically unnecessary MRIs, the patients at issue in this Complaint received multiple MRIs at an even higher rate; more than 80% of the patients insured by Allstate received MRIs of more than one body part at Precise MRI. *See* Exhibit 5.

826.   The extreme number of MRIs per patient performed by Precise MRI is illustrated on the chart below:



827.   Of the 157 patients at issue herein who purportedly underwent MRIs at Precise MRI, 85 patients had MRIs of three (3) or more body parts.  *See* Exhibit 5.

828.   Moreover, Precise MRI often performed MRIs of the same patient that were just days or weeks apart, which obscures the true number of MRIs performed per patient by Precise MRI in the data reported to the State of Michigan.

829.   Patients at issue herein underwent as many eight (8) separate MRIs at Precise MRI, with at least seventeen (17) patients who underwent five (5) or more MRIs and an additional thirty (30) patients who underwent four (4) MRIs at Precise MRI.  *See* Exhibit 5.

830.   Precise MRI was able to perform this excessive number of MRIs because it relied on the pain management clinic defendants for referrals.

831.   Precise MRI reported that it performed MRIs of 870 patients in 2017, of which at least 500 were referred by physicians associated with the pain management clinic defendants, including Madden, Gonte, and Padula.

832.   Precise MRI has also reported scores of MRI referrals made using the license number of Trotter's father, who died in 2008.

833.   In 2016 (the first year in which Precise MRI was in operation), Precise MRI reported that the deceased physician referred 65 patients for MRIs; in 2017, Precise MRI reported thirty-two (32) such referrals.

834.   As discussed above, in addition to the unnecessary MRI referrals ordered by Padula, Madden, Gonte, and the pain management clinics, Precise MRI and Karrumi intentionally cultivated relationships with unscrupulous providers whom they knew would refer patients for multiple medically unnecessary MRIs.

## D.   FRAUDULENT AND UNNECESSARY USE OF OTHER DIAGNOSTIC TESTING

835.   Padula, Madden, Gonte, and the pain management clinics also ordered numerous other types of diagnostic testing that was medically unnecessary and never used to develop treatment plans for the patients at issue herein.

### 1.   Fraudulent Comparative Muscle and Range of Motion Testing

836.   Beginning in or about September 2016, each of the defendant pain management clinics began submitting separate charges to Allstate for purported

comparative muscle testing and range of motion testing performed in addition to the office evaluations that were already billed at the highest levels available under the AMA's coding guidelines.

837.   The separate charges submitted by the defendants were billed using CPT Codes 95831 (for muscle testing) and 95851 (for range of motion testing), which were nearly always billed at the same time and were always billed in conjunction with an ordinary evaluation and management CPT Code.

838.   As an initial matter, muscle and range of motion testing should be part of any comprehensive evaluation of alleged orthopedic and soft tissue injuries, and the separate billing by the defendants for these routine tests is simply another improper method to multiply the already excessive amounts charged to Allstate for examinations.

839.   Indeed, CPT Code 95851 cannot be billed in conjunction with routine patient evaluation CPT Codes because the testing it describes should be part of regular examinations.

840.   CPT Code 95831 also cannot properly be billed at the same time as CPT Code 95851, because muscle testing should be included with range of motion testing.

841.   Even if the muscle testing and range of motion testing used by Padula, Madden, Gonte, and the pain management clinics were properly performed as a

separate and independent procedures, which they were not, the defendants still failed to make findings to support the performance of such testing.

842.   In order for separately-performed muscle strength and range of motion testing to be medically necessary, there must be specific examination findings of weakness.

843.   Not only did the defendants fail to make examination findings establishing necessity for the muscle strength and range of motion testing performed, they ordered the testing to be performed even when they found that patients had normal muscle strength and range of motion.

844.   For example, patients S.M. and Y.D. (Claim No. 0476540513) presented to Sterling Heights Pain on September 28, 2017, and both were found to have normal and full 5/5 strength bilaterally in their upper and lower extremities.

845.   Despite this entirely normal finding, Sterling Heights Pain purportedly performed both muscle strength and range of motion testing on both S.M. and Y.D., resulting in additional $895 in charges for both patients.

846.   The purported results of the testing allegedly performed by the defendants were also extraordinary and inconsistent with examination findings made by other physicians, rendering them clinically useless.

847.   For example, patient K.H. (Claim No. 0477211155) was allegedly evaluated by Madden at Michigan Pain on October 4, 2017, and was found to have

cervical range of motion "within functional limits" and was not noted to have any diminishment in lumbar range of motion.

848.   Nevertheless, range of motion testing purportedly ordered by Madden but performed on October 2, 2017, two (2) days before Madden's initial visit, purported to find that K.H. had range of motion in both his cervical and lumbar spine that was less than 10% of normal in multiple planes of movement.

849.   The degree of restriction represented by the testing allegedly performed on K.H. are wholly inconsistent with Madden's findings, and are inconsistent with a patient able to ambulate and present for evaluation at an outpatient clinic.

850.   Defendant Padula has testified that this testing is performed by assistants and measurements taken are relayed to a company in Florida called ISO-Diagnostics Testing, Inc. ("ISO-Diagnostics"), which is owned by an associate of Padula.

851.   Padula chose ISO-Diagnostics because he believes they have successfully "fought the insurance companies."

852.   Padula claimed that the measurements taken by assistants at the defendant pain management clinics are "placed in some type of intricate computer program that [ISO-Diagnostics] developed . . . to determine range of motion and disability for the patient."

853.   Both the defendants and ISO-Diagnostics attempt to create the appearance that the comparative muscle and range of motion testing performed is somehow unique because the assistants use dynamometers and goniometers to take measurements.

854.   These devices are standard medical equipment that should be used during any evaluation of a patient reporting orthopedic or soft-tissue injury, and their use does not justify the submission of separate and additional charges.

855.   The comparative muscle and range of motion testing was purportedly used to evaluate impairment pursuant to the AMA Guides to the Evaluation of Permanent Impairment.

856.   The AMA Guides to the Evaluation of Permanent Impairment are expressly designed to evaluate patients who have reached maximal medical improvement; they have no valid use for patients who are undergoing initial evaluation in the days and weeks following an alleged injury.

857.   Moreover, as with MRIs, urine drug testing, and other tests routinely ordered by Padula, Madden, Gonte, and the pain management clinics, there is no indication that the results of the comparative muscle and range of motion tests were used to inform patient treatment plans, which, as discussed above, were predetermined, thereby rendering the muscle and range of motion testing unnecessary.

## 2.   **Fraudulent Ambulatory Electroencephalograms**

858.   Among the most brazen of the tests and services routinely billed by the defendants without any indication of medical need were 72-hour ambulatory EEGs.

859.   The pain management clinics arbitrarily began prescribing this unreasonable and unnecessary testing in or about December 2017, despite no change to the types of injuries claimed by their patients.

860.   Ambulatory EEGs are tests that are used to detect seizures and to confirm diagnoses of epilepsy.

861.   Indeed, the defendants included reference to three (3) articles that purport to support the use of ambulatory EEGs with all of their claims for the tests, and each of the three (3) articles refers only to use in connection with diagnosing seizures and epilepsy.

862.   None of the patients at issue herein were seeking treatment from the defendants for seizures or epilepsy causally related to motor vehicle accidents.

863.   Patients for whom ambulatory EEGs were ordered were often not reported to have even experienced headaches or suspicion of concussion except a conclusory statement or diagnosis added to the record by the defendants on the date that the ambulatory EEG was ordered.

864.   For example, patient N.K. (Claim No. TXA-0198116) underwent multiple purported evaluations at Dearborn Pain before an ambulatory EEG was

ordered on February 5, 2018, but had not reported experiencing headaches for months beforehand.

865.    On February 5, 2018, N.K. again did not report experiencing headaches and an examination found his "[h]ead is normocephalic and atraumatic," but an additional diagnosis of "[t]raumatic headache post accident" was added by Dearborn Pain solely in an attempt to justify an order of an ambulatory EEG.

866.    Dearborn Pain claimed to have performed N.K.'s 72-hour ambulatory EEG from February 12, 2018 to February 15, 2018, a period of four (4) days (or 96 hours).

867.    The bill for N.K.'s 72-hour ambulatory EEG was signed by a Dearborn Pain physician, but the unsigned record claims that the test was actually performed by a physician named Tessy Jenkins, M.D.

868.    The record submitted by Dearborn Pain falsely states that N.K. had experienced chronic headaches and cognitive difficulties since the occurrence of the alleged accident.

869.    The performance of an ambulatory EEG on patient N.K. was never indicated by any symptom reported by N.K.

870.    Patient M.A. (Claim No. 0491733226) reported to Allstate that the defendants attempted to perform an EEG test on him, but he refused because he did not have any injury to his head.

871.   The defendants' use of ambulatory EEGs was not only medically unnecessary for the types of symptoms reported by patients, they were performed in disregard for the appropriate course of care, which calls for a traditional, in-office EEG to be performed before subjecting a patient to a 3-day-long procedure.

872.   The methodology allegedly used by the pain management clinics was to attach the equipment to a patient's head and direct him or her to keep the equipment on for three (3) days while performing normal activities.

873.   The defendants never submitted records documenting the actual application or removal of the EEG test equipment, nor the instructions provided to patients regarding its use.

874.   The dates of the ambulatory EEG tests allegedly performed by the defendants rarely, if ever, corresponded with dates that patients were at the pain management clinics.

875.   The pain management clinics invariably charged Allstate $9,500 per day, or $28,500 per ambulatory EEG test allegedly performed.

876.   The ambulatory EEGs for which the pain management clinics billed Allstate, if performed at all, were never medically necessary.

### 3.   Fraudulent Electrodiagnostic Testing

877.   Padula, Madden, Gonte, and the defendant pain management clinics routinely referred patients at issue herein for medically unnecessary

electrodiagnostic testing that was not indicated when ordered and was not used to inform patients' courses of treatment.

878.   Electrodiagnostic testing includes electromyography (EMG) and nerve conduction studies (NCS).

879.   EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

880.   A needle EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

881.   To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

882.   NCS involve non-invasive tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

883.   The records of the patients who purportedly underwent EMG and NCS testing at the defendant pain management clinics reflect that the testing was predominantly unjustified and was not indicated by the patients' complaints and neurological examination findings.

884.   The defendants also did not use the electrodiagnostic testing allegedly performed to inform or influence patients' treatment plans, which were predetermined.

885.   For example, Padula ordered EMG testing to be performed on patient D.S. (Claim No. TXA-0150324) on April 4, 2016, but on the same date, prior to the performance of the test, Padula scheduled D.S. for a discogram and possible discectomy.

886.   Michigan Pain also allegedly ordered and performed an EMG on Patient A.A. (Claim No. 0442746953), discussed above, which would have been contraindicated by A.A.'s pacemaker if actually rendered.

887.   Despite the clear contraindication of an EMG being performed on a patient with a pacemaker, Michigan Pain failed to note any precautions taken to limit the potential danger, or any other concerns of such a procedure being performed on A.A.

888.   The electrodiagnostic testing was only ordered for patients D.S., A.A., and the other patients at issue in this Complaint to justify additional testing and treatment by the defendants and to generate higher claims for payment against Allstate.

### a. Unlawful EMG and NCS Testing by Unlicensed Personnel

889.   As an initial matter, much of the EMG and NCS testing ordered and allegedly performed by the defendant pain management clinics was rendered by Petryk, a chiropractor who is not licensed to provide any type of medical services in Michigan.

890.   Mich. Comp. Laws. § 333.17518(1) directs:

> only an individual who is licensed as a physician shall perform needle electromyography or interpret nerve conduction tests. A physician shall not delegate the interpretation of nerve conduction studies to another individual unless that individual is licensed under this article to engage in the practice of medicine or osteopathic medicine and surgery. A physician shall not designate the performance of needle electromyography to another individual unless that individual is licensed under this article to engage in the practice of medicine or osteopathic medicine and surgery or that individual is otherwise authorized under this section.

891.   The only applicable exception to this provision is that a physician may delegate the performance of nerve conduction tests to an unlicensed individual who is "qualified by education, training, or experience if those tests are conducted under the direct supervision of a physician." Mich. Comp. Laws. § 333.17518(2).

892.   There is no provision allowing delegation of performance of needle electromyography testing to unlicensed individuals nor interpretation of any results of EMG or NCS testing.

893.   Thus, it was unlawful for Petryk to perform any EMG testing or to interpret any EMG or NCS test results.

894.   Further, when Petryk performed NCS testing, he was not under the required direct supervision of the delegating physician.

895.   Furthermore, the defendant pain management clinics billed tens of thousands of dollars for needle EMG intraoperative monitoring performed during surgical procedures at Advanced Surgery.

896.   In virtually every case, Petryk is indicated as having performed this intraoperative monitoring, which was invariably performed in violation of Michigan law.

897.   All EMG and NCS testing performed by Petryk in Michigan was therefore unlawful and Allstate is not required to remit payment to the defendants for any of the EMG and NCS testing performed by him.

### b.   Unnecessary and Unjustified EMG and NCS Testing

898.   For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy.

899.   Radiculopathy is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

900.   The patient's subjective symptoms alone cannot properly support the performance of an electrodiagnostic study absent objective findings by the practitioner because such studies are an extension of the clinical exam.

901.   EMG and NCS studies are reserved for cases of actual neurologic abnormalities.

902.   EMG and NCS are not indicated where, as is the case with nearly all patients of the pain management clinics, neurologic deficits are not detected in the patients.

903.   Padula, Madden, Gonte, and the defendant pain management clinics displayed a troubling pattern of ordering EMG and NCS testing without first making objective findings of abnormal neurology.

904.   Instead, Padula, Madden, Gonte, and the defendant pain management clinics' examinations almost always resulted in entirely normal neurological findings.

905.   No reason exists to resort to EMG and NCS when a patient does not present with a neurological deficit.

906.   Therefore, Padula, Madden, Gonte, and the defendant pain management clinics' own findings do not support the electrodiagnostic testing ordered for their patients.

907.   Consequently, Padula, Madden, Gonte, and the pain management clinics subjected patients to unnecessary pain and risk of infection and billed Allstate for unnecessary and unjustified EMG and NCS testing.

### c.    Use of a Predetermined Protocol for Electrodiagnostic Testing

908.    Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

909.    Accordingly, the nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

910.    Likewise, the provision of EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

911.    Use of a protocol-based approach to electrodiagnostic testing can lead to overutilization of such testing.

912.    Overutilization of invasive electrodiagnostic studies also subjects patients to unnecessary pain and exposes them to unnecessary risk for infection.

913.    As discussed above, Padula, Madden, Gonte, and the defendant pain management clinics referred patients for electrodiagnostic testing even if they did not present with any neurological deficits or any other objective symptoms indicating a suspected radiculopathy, and often without any subjective complaints, supporting that such referrals were made on the basis of a predetermined protocol of maximizing referrals for diagnostic testing.

914.    Patients who underwent EMG and NCS testing at the defendant pain management clinics almost always had testing performed on the same nerves and

muscle groups, regardless of the patients' individual complaints and without regard to the results being found by the physician performing the tests.

### E. MEDICALLY UNNECESSARY INJECTIONS AND OTHER PROCEDURES

915.   The defendants subjected their patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services.

916.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

917.   As discussed above, examinations performed by the defendants, if they were performed at all, resulted only in boilerplate findings and treatment plans that were not adequate to support the performance of invasive procedures.

918.   Moreover, the defendants routinely conflated the injection procedures that are intended to be used for diagnostic purposes with procedures that are intended for therapeutic purposes.

919.   The defendants ignored diagnostic information gleaned from previous injections, and instead persisted in recommending that patients undergo additional rounds of injections to generate bills for submission to Allstate.

920.   Consequently, patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

921.   The defendant pain management clinics, Padula, Madden, and Gonte resorted to rendering injections to patients at issue in this Complaint without regard for conservative forms of treatment.

922.   Even in those instances where patients reported improvement from conservative treatment, the pain management clinics, Padula, Madden, and Gonte nonetheless pushed for injections to be administered.

923.   The defendant pain management clinics, Padula, Madden, and Gonte frequently ordered repeat injections without analyzing the efficacy of prior procedures, in derogation of established standards of care.

924.   Indeed, the defendants routinely scheduled patients for multiple injections at once, an improper practice that makes it impossible to evaluate the efficacy of the first (and subsequent) injection.

925.   Applicable standards of care direct that physicians should not perform steroid injections too frequently, usually no more than three (3) times per six (6) month period or four (4) times per year.

926.   Facet injections should not be performed more frequently than once every three (3) months.

927.   The defendant pain management clinics, Padula, Madden, and Gonte disregarded these practice standards, and placed their patients in danger, to maximize the amount of claims submitted to Allstate.

928.   For example, patient M.Y. (Claim No. 0422477315) was given epidural steroid injections by Madden at Michigan Pain on August 12, 2016, August 25, 2016, September 8, 2016, and September 20, 2016.

929.   Performance of four (4) epidural steroid injections in a period of approximately five (5) weeks is unsafe and medically unnecessary.

930.   M.Y. also underwent a facet injection on September 30, 2016, and a fifth steroid injection on December 13, 2016, for a total of six (6) injection procedures in just four (4) months of treatment.

931.   The defendants pressured patients into undergoing injections even in the face of evidence that such injections were hurting, not helping, the patients.

932.   Patient B.M. (Claim No. 0390496980) was given cervical epidural steroid injections by Madden at Michigan Pain on December 1, 2015 and January 14, 2016, with the second improperly performed despite a report of only brief pain relief after the first.

933.   On January 29, 2016, B.M. received a lumbar epidural steroid injection and a right knee injection.

934.   B.M. then returned to Michigan Pain on February 12, 2016 and reported that the lumbar epidural steroid injection had increased her pain.

935.   Although this report by B.M. clearly contraindicates a further injection, Madden scheduled a second lumbar epidural steroid injection to be performed in two (2) weeks, B.M.'s fourth in less than three (3) months.

936.   Also on February 12, 2016, Madden performed a repeat right knee injection that should not have been performed for at least three (3) months after the first knee injection.

937.   A third unsafe and improper knee injection was performed by Madden on April 1, 2016, along with bilateral lumbar facet injections.

938.   The defendant pain management clinics, Padula, Madden, and Gonte also ordered minor injection procedures that should be performed in a physician's office to be performed in surgical settings, including at defendant Advanced Surgery, to further inflate the charges submitted to Allstate.

939.   Indeed, Padula has admitted in sworn testimony that the only reason certain injections are performed at Advanced Surgery Center is that Dearborn Pain's lease prohibits it from maintaining its own fluoroscope, thus forcing it to use the Advanced Surgery surgical facility.

940.   Injections that are performed in surgical settings that should be performed in physicians' offices absent complications are medically unnecessary and non-compensable.

941.   Allstate is not required to reimburse Michigan Pain, Southfield Pain, Dearborn Pain, Sterling Heights Pain, or Advanced Surgery Center for medically unnecessary injections that were only recommended and performed to inflate claims submitted to Allstate.

942.   The defendants also failed to use the injections performed for their intended purpose.

943.   For example, medial branch block injections are used to predict a patient's response to a radiofrequency ablation/rhizotomy procedure.

944.   If a patient has a positive response to a medial branch block injection, the standard of care calls for proceeding to a rhizotomy.

945.   However, in order to maximize the amounts charged to Allstate, the defendants repeated medial branch blocks that were reported to have positive outcomes multiple times before performing rhizotomies.

946.   Similarly, the defendants repeated other injections that were designed to provide months of pain relief within just weeks, even when the first injection had provided the intended benefit.

947.   The defendants also maximized the charges submitted to Allstate at the expense of proper patient care by performing multiple types of injections in the same body part at the same time, making it impossible to determine what, if anything, caused any relief reported by the patient.

948.   For example, on June 8, 2017, Madden performed a right sacroiliac and right L5-S1 facet injection on patient A.A. (Claim No. 0442746953), both of which were intended to relieve the same pain symptoms reported by A.A.

949.   Similarly, on June 22, 2017, Madden performed a facet injection and epidural steroid injection, but at A.A.'s L5-S1 vertebral level, and both to target A.A.'s reported lower back pain.

950.   Use of this type of "shotgun" approach is improper and medically unnecessary, as it deprives the physician of the ability to accurately record which procedure, if either, was beneficial, and therefore cannot be used to inform additional future treatment plans.

951.   The defendants also subjected the patients at issue herein to a litany of procedures that are considered experimental and have no proven medical value.

952.   As discussed above, the discectomy procedures that were actually performed by Padula, Michigan Pain, and Dearborn Pain were percutaneous rather than the traditional surgical procedures billed.

953.   Percutaneous discectomies have not been proven to be an effective treatment and are therefore medically unnecessary to perform.

954.   Moreover, Padula and the defendant pain management clinics attempted to justify the performance of medically unnecessary discectomies using results of discogram tests that were normal.

955.   Discograms are also controversial testing procedures that are not widely accepted by the medical community, and involve using a manometer to take pressure readings of the patient's discs.

956.   Padula has testified that it is his opinion that pressure readings between 20 psi and 50 psi are considered normal.

957.   Multiple patients at issue herein were placed under general anesthesia to undergo discogram tests that resulted in disc pressures between 20 psi and 50 psi, but Padula nevertheless proceeded with performing medically unnecessary percutaneous discectomies while the patients remained under anesthesia.

958.   The medically unnecessary discectomies were frequently combined with stem cell aspirate injections, another experimental procedure Padula routinely performed for the defendant pain management clinics.

959.   The procedure, as performed by Padula, involved harvesting bone marrow material from a patient's iliac crest and injecting the material, without manipulation, into vertebral joint spaces.

960.   According to current relevant medical literature, stem cell aspirate injections are an investigational procedure that, when properly performed, involves manipulation of the harvested bone marrow material in a centrifuge in order to create a concentrate that provides the hypothesized therapeutic benefit.

961.   Padula's failure to process the harvested bone marrow material confirms that there is no possible therapeutic benefit to this already experimental procedure.

962.   At least one patient has testified that the stem cell injection by Padula caused her to be in extreme pain for two (2) months thereafter.

963.   Regardless of the method used, Padula's use of these experimental procedures was never medically necessary to treat the routine orthopedic and soft tissue injuries diagnosed for the patients at issue herein.

### F.   MEDICALLY UNNECESSARY TRANSPORTATION SERVICES

964.   Medi Transit billed Allstate for unnecessary medical transportation services.

965.   To receive medical transportation, a licensed healthcare provider must determine that an individual is disabled and unable to drive.

966.   This determination by the licensed healthcare provider must be documented in the patient's medical record.

967.   The licensed healthcare provider often provides the patient with a disability certificate that identifies the forms of necessary assistance, including medical transportation.

968.   Medi Transit repeatedly provided transportation services prior to any determination by a licensed healthcare provider that the patient required transportation services, as exemplified by the following patients:

- Patient F.P. (Claim No. 0312756349) was allegedly injured on December 19, 2013.  Medi Transit submitted a charge to Allstate claiming to have provided medical transportation to F.P. on the date that he was allegedly injured, starting from his home address.  F.P. was allegedly evaluated at North Shore that day, but the disability certificate issued by North Shore does not include a driving restriction.  Disability certificates issued in January 2014 and February 2014 also omit driving restrictions.  Medi Transit nevertheless submitted charges to Allstate seeking reimbursement for at least eight (8) dates of service for which there was no medical need.

- Patient S.M. (Claim No. 0277939351) was allegedly injured on February 27, 2013.  On February 28, 2013, Medi Transit picked S.M. up at home and transported her to North Shore, where she obtained a disability certificate.  At the time that S.M. was transported by Medi Transit on the day following her alleged motor vehicle accident it had not been determined by a physician that she was unable to drive.

- Patients A.C. and D.E. (Claim No. 0494436710) were allegedly injured on March 8, 2018.  On March 9, 2018, Medi Transit allegedly transported both patients to and from initial evaluations at North Shore, where they obtained disability certificates.  At the time A.C. and D.E. were transported by Medi Transit on the day following their alleged motor vehicle accident it had not been determined by a physician that they were unable to drive.

969. As discussed above, in other cases, Medi Transit provided transportation services for patients whose disability certificates were clearly forged, as they were purportedly signed on dates that the alleged issuing clinic was not open or on dates that the patient did not undergo treatment or evaluation.

970.   Further, and as discussed above, Padula, Madden, Gonte, and other physicians at the defendant pain management clinics and North Shore issued disability certificates restricting patients from driving as part of their predetermined protocol rather than on the basis of an independent determination of medical necessity.

971.   Because the defendants' predetermined protocol was to issue restrictions for periods of four (4) weeks, so as to induce patients to continue returning to the clinic, the driving restrictions used to justify medical transportation services by Medi Transit often expired during treatment.

972.   The issuance of disability certificates as a matter of course rather than a matter of medical necessity resulted in patients being transported by Medi Transit who were able to drive, and were in fact driving, during the same time period they were allegedly disabled from doing so.

973.   In addition to being medically unnecessary, Medi Transit illegally transported patients in unregistered motor vehicles.

974.   Michigan law requires transportation companies and each vehicle used by a transportation company to be registered.

975.   In 2011, Medi Transit obtained a limousine carrier certificate of authority and registered a 2003 Chevrolet Venture.

976.  On February 26, 2016, defendant Faraj requested a voluntary revocation of Medi Transit's certificate of authority because it "will not be providing services in 2016."

977.  Medi Transit did not re-apply to act as a limousine carrier until February 26, 2018, and did not receive approval until April 19, 2018.

978.  Medi Transit submitted dozens of charges for alleged transportation services on dates for which it was not licensed.  *See* Exhibit 8.

979.  Medi Transit has never obtained an updated registration of the vehicles it purportedly uses.

980.  Allstate has no obligation to pay for transportation services that were medically unnecessary or that were provided illegally by using unregistered vehicles.

**G.**  **SPECIFIC EXAMPLES OF UNREASONABLE AND UNNECESSARY EVALUATION, TREATMENT, AND TESTING**

981.  The defendants' use of boilerplate examination findings and a predetermined treatment protocol to order and perform medically unnecessary physical therapy, injections, P-Stim devices, MRIs, urine drug testing, medical transportation, and other services is exemplified by the following representative patients.

### 1.   Patient R.M. (Claim No. 0391112521)

982.   Patient R.M. was involved in an alleged motor vehicle accident on November 10, 2015.

983.   R.M. presented to North Shore on November 13, 2015, where she was allegedly evaluated by chiropractor John Dimitriou, D.C. ("Dimitriou").

984.   Dimitriou's alleged evaluation found "decreased" range of motion and "pain" in all planes of movement of R.M.'s spine, but did not record specific results of any test purportedly performed.

985.    Dimitriou checked every generic pre-printed goal listed on North Shore's pre-printed record, and ordered a course of chiropractic treatment consisting of hot/cold packs, massage, traction, and adjustments to be performed three (3) times per week for twelve (12) weeks.

986.   Dimitriou also ordered full spine x-rays for which the record was not created until a week later, and which thus did not inform the treatment plan ordered for R.M.

987.   Dimitriou never adhered to his own treatment plan, including on the day it was created, as North Shore submitted bills claiming that he performed only chiropractic manipulations and traction on R.M.

988.   On November 18, 2015, R.M. allegedly underwent a physical therapy evaluation at North Shore to increase the number of treatments and modalities that could be billed on each date of service.

989.   The physical therapy evaluation allegedly found that R.M. had 3/5 and 3-/5 muscle strength in her left shoulder, cervical, and lumbar spine, and range of motion that was profoundly diminished.

990.   The physical therapy treatment plan created based upon this purported evaluation called for hot/cold packs, ultrasound, electrical stimulation, therapeutic exercises, home exercises (with written instructions), postural education, lumbar stabilization, manual therapy, balance training, and therapeutic activity to be performed three (3) times per week for six (6) to eight (8) weeks.

991.   Like Dimitriou's disregard of his own chiropractic treatment plan, the physical therapist failed to ever follow the plan developed, and performed just hot/cold packs, electrical stimulation, massage, and therapeutic exercises on most dates of service.

992.   On November 19, 2015, the day after North Shore ordered a specific course of therapy to last for up to eight (8) weeks, R.M. underwent her first evaluation with a medical doctor.

993.   The medical doctor did not include physical therapy in his treatment plan and directed R.M. to return in four (4) weeks.

994.   R.M. continued receiving the exact same treatments at nearly every appointment at North Shore until February 8, 2016, when manual therapy was improperly added to her treatment regimen.

995.   As discussed further below, billing for massage and manual therapy on the same date of service constitutes the fraudulent practice of unbundling.

996.   On February 11, 2016, North Shore chiropractor Pasquale Papalia, D.C., who never performed an evaluation of R.M., inexplicably signed a disability certificate for household services despite the fact that R.M. continued to work a full-time job and was reporting improving pain scores.

997.   This disability certificate was reissued by Papalia and Dimitriou through June 16, 2016, despite only continued improvement in R.M.'s reported functional status.

998.   R.M. ultimately underwent forty-three (43) chiropractic treatments on separate dates of service without any evaluation of efficacy, and 54 physical therapy treatments on separate dates.

999.   All of the treatment billed by North Shore was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient R.M.

1000. North Shore submitted claims for payment and accompanying medical records relative to R.M. to Allstate through the U.S. Mail and interstate wires for

unreasonable and unnecessary treatment rendered pursuant to a predetermined protocol, and Allstate relied upon the same in adjusting the claims.

1001. Allstate is not required to pay North Shore for the fraudulent, unnecessary, and unreasonable treatment rendered to R.M., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### 2.   Patient E.C. (Claim No. 0444334346)

1002. Patient E.C. was involved in an alleged motor vehicle accident on January 23, 2017.

1003. E.C. presented to Dearborn Pain on February 3, 2017, where he was purportedly evaluated by Trotter.

1004. Trotter's purported examination resulted in non-specific findings and vague diagnoses in multiple body parts.

1005. Despite a lack of concern for fracture or any significant neurological examination findings, and less than two (2) weeks after the occurrence of the alleged accident, Trotter ordered seven (7) MRIs to be performed, of E.C.'s cervical spine, thoracic spine, lumbar spine, bilateral shoulders, left hip, and left femur.

1006. E.C. underwent six (6) of the excessive and medically unnecessary MRIs ordered by Trotter at Precise MRI on February 8, 2017 and February 22, 2017.

1007. The MRI of E.C.'s right shoulder ordered by Trotter was never performed, and never addressed by Trotter, evidencing that it, and the other MRIs, were never actually medically necessary or used to develop E.C.'s treatment plan.

1008. Trotter performed an alleged re-evaluation of E.C. on February 20, 2017, just seventeen (17) days after his initial visit, which is not long enough to determine whether treatment that had been prescribed was having an effect.

1009. Trotter performed another re-evaluation on March 6, 2017, just two (2) weeks after E.C.'s prior appointment, and again without sufficient time to evaluate the efficacy of treatments that had been prescribed previously.

1010. Trotter then performed yet another re-evaluation just one (1) week later, on March 13, 2017.

1011. The pattern of Dearborn Pain performing excessive alleged re-evaluations continued throughout E.C.'s treatment, including evaluations performed by Bhatti just three (3) days apart on April 7, 2017 and April 10, 2017.

1012. On March 13, 2017, Trotter allegedly performed an epidural steroid injection, which included improper billing submitted by Dearborn Pain for hot packs, improper billing submitted by Advanced Surgery for an epidurogram, and unreasonable charges submitted by both Dearborn Pain and Advanced Surgery, all of which are addressed *infra*.

1013. On April 10, 2017, Bhatti performed a repeat epidural steroid injection despite failing to evaluate the efficacy of the injection that was performed the previous month.

1014. The April 10, 2017 injection included the same improper and fraudulent charges as the March 13, 2017 injection.

1015. On at least three (3) of the dates on which alleged evaluations were performed, Dearborn Pain also ordered extensive urine drug testing to be performed to detect the presence or absence of dozens of drugs and analytes, despite no controlled substances being prescribed to E.C.

1016. All of the treatment and testing ordered and performed by Dearborn Pain, Precise MRI, and Advanced Surgery was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient E.C., and was medically unnecessary and performed in disregard for the applicable standards of care.

1017. Dearborn Pain, Precise MRI, and Advanced Surgery submitted claims for payment and accompanying medical records relative to E.C. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

1018. Allstate is not required to pay Dearborn Pain, Precise MRI, and Advanced Surgery for the fraudulent, unnecessary, and unreasonable treatment and

testing rendered to E.C., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### 3.    Patient M.Y. (Claim No. 0422477315)

1019. Patient M.Y. was involved in an alleged motor vehicle accident on July 25, 2016.

1020. M.Y. presented to Michigan Pain on July 29, 2016, where he was allegedly evaluated by defendant Madden.

1021. Madden reported that M.Y. had 10/10 pain throughout his entire spine and shoulder, but did not perform any assessment for symptom magnification or malingering despite also finding normal ranges of motion, sensation, and strength in the same areas.

1022. Madden diagnosed M.Y. with vague strains, sprains, and pain complaints.

1023. Madden prescribed the same lumbar brace that was unlawfully issued by Michigan Pain to many of the patients at issue herein for an unreasonable cost of $1,400, but did not prescribe any DME to address M.Y.'s equally severe pain complaints and diagnoses in other body parts.

1024. Despite evaluating M.Y. just four (4) days after his alleged accident, and despite a lack of any suspicion of fracture or significant neurological

examination findings, Madden ordered four (4) separate MRIs to be performed of M.Y.'s cervical spine, lumbar spine, left shoulder, and right hip.

1025. Indeed, Madden expressly reported that she believed that most of M.Y.'s pain symptoms were soft tissue in nature, which confirms that early resort to MRIs was unnecessary and improper.

1026. M.Y. underwent three (3) MRIs purportedly ordered by Madden on August 10, 2016 at Precise MRI; the cervical and lumbar spine MRIs Madden addressed and, inexplicably, a *right* shoulder MRI that was not addressed by Madden or any other doctor.

1027. On August 16, 2016, M.Y. underwent bilateral hip MRIs at Precise MRI, despite Madden only ordering an MRI of his right hip.

1028. Madden allegedly performed a follow-up examination on August 12, 2016, just two (2) weeks after her initial evaluation and before it was possible to properly evaluate the efficacy of the treatment she had prescribed.

1029. M.Y. exhibited clear drug-seeking behavior, including a report that he believed the only medication that helped was the narcotic prescribed and that he was taking more of the narcotic drug than instructed by Madden.

1030. Madden did not address this admitted improper use of a dangerous narcotic drug and increased M.Y.'s prescription to a more potent drug.

1031. Madden also did not evaluate the results of the MRIs that had been performed two (2) days prior, but nevertheless proceeded with performing a lumbar epidural steroid injection.

1032. The bill for this injection was submitted with improperly unbundled charges for fluoroscopy, an improper additional charge for application of hot packs, and an improper additional charge for a surgical tray, all of which are addressed *infra*.

1033. Michigan Pain then submitted a charge for a purported second initial evaluation performed on August 16, 2016, using CPT Code 99204 and billed at an outrageous rate of $1,918 for this office visit.

1034. Madden performed yet another evaluation on August 25, 2016, for a total of four (4) examinations within M.Y.'s first month of care.

1035. On August 25, 2016, Madden performed a second steroid injection and noted that she was already planning a third, despite not knowing what, if any, relief M.Y. would get from the injection to be performed that day.

1036. Without explanation, M.Y. also allegedly underwent electrodiagnostic testing at Michigan Pain on August 25, 2016.

1037. The third steroid injection was performed on September 8, 2016, again without analysis of the efficacy of the previous injections, and again with improper unbundled charges for fluoroscopy, hot packs, and a surgical tray.

1038. A fourth steroid injection within two (2) months of the alleged accident was then performed on September 20, 2016, despite the standard of care calling for no more than three (3) such injections to be performed within any six-month period.

1039. Madden then performed a lumbar facet injection on September 30, 2016, which was, like the steroid injections, billed to Allstate using improper additional charges for fluoroscopy, hot packs, and a surgical tray.

1040. Excessive and unnecessary evaluation and treatment continued at Michigan Pain on October 17, 2016, November 14, 2016, December 13, 2016, and December 28, 2016, February 3, 2017, and March 9, 2017.

1041. The treatments and testing ordered and performed during this period by Madden, Padula, and Michigan Pain included an additional MRI performed at Precise MRI on November 16, 2016, and additional unnecessary and improper steroid injections.

1042. All of the treatment and testing ordered and performed by Michigan Pain and Precise MRI was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient M.Y., and was medically unnecessary and performed in disregard of the applicable standards of care.

1043. Michigan Pain and Precise MRI submitted claims for payment and accompanying medical records relative to M.Y. to Allstate through the U.S. Mail

and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

1044. Allstate is not required to pay Michigan Pain and Precise MRI for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to M.Y., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### 4.   Patient B.K. (Claim No. 0454414953)

1045. Patient B.K. was involved in an alleged motor vehicle accident on April 26, 2017.

1046. On May 4, 2017, B.K. presented to Sterling Heights Pain where she was allegedly evaluated by Bhatti.

1047. Bhatti made nonspecific findings of tenderness and decreased range of motion in all body parts examined, and gave vague diagnoses of pain in various body parts.

1048. Bhatti's alleged evaluation included separately-billed comparative muscle and range of motion testing, neither of which were used in any way to guide treatment and were medically unnecessary.

1049. There was no suspicion of fracture nor significant findings on neurological examination, but Bhatti nevertheless ordered five (5) MRIs to be performed just a week after the occurrence of the alleged accident, in addition to the

standard predetermined protocol of urine drug testing, physical therapy, a back brace, and an extensive disability certificate.

1050. Bhatti did not perform any specific orthopedic tests before ordering the MRIs, nor did he make a differential diagnosis as to what problems might exist or what to look for on the MRIs.

1051. B.K. returned to Sterling Heights Pain on May 24, 2017, June 7, 2017, and July 5, 2017, and at each appointment a non-specific examination was allegedly conducted by a nurse practitioner.

1052. On July 26, 2017, B.K. was allegedly evaluated by Michael Roberts, M.D. at Sterling Heights Pain, an office visit that was billed to Allstate at the unreasonable amount of $1,254 despite lacking analysis of past medical history, social history, a review of systems, or a detailed examination.

1053. Sterling Heights Pain allegedly performed electrodiagnostic testing on B.K., which included an improper and outrageous $276 charge for tape allegedly used during the test, and which was not used to guide any medical decision making.

1054. All of the treatment and testing ordered and performed by Sterling Heights Pain was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient B.K., and was medically unnecessary and performed in disregard for the applicable standards of care.

1055. Sterling Heights Pain submitted claims for payment and accompanying medical records relative to B.K. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

1056. Allstate is not required to pay Sterling Heights Pain for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to B.K., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### 5.      Patient E.L. (Claim No. 0397904939)

1057. Patient E.L. was involved in an alleged motor vehicle accident on January 11, 2016.

1058. E.L. was 61-years-old at the time of the alleged accident with a history of arthritis, diabetes, and ambulation with a cane.

1059. E.L. underwent conservative treatment with various providers, including defendant Gonte through a separate pain management clinic, for over a year.

1060. On February 10, 2017, Gonte noted that E.L. may benefit from an epidural steroid injection and referred her to Southfield Pain.

1061. E.L. presented to Southfield Pain on February 16, 2017 and was allegedly evaluated by Trotter.

1062. Trotter did not review the more than thirteen (13) months of prior treatment, immediately ordered five (5) MRIs, indiscriminately issued disability certificates, and ordered urine drug testing despite not prescribing any controlled substances.

1063. The medically unnecessary spinal MRIs ordered by Trotter were allegedly performed at Precise MRI on March 1, 2017 and the images were read by Precise MRI's radiologist on March 3, 2017.

1064. E.L. returned to Southfield Pain on March 2, 2017, where Trotter performed a lumbar epidural steroid injection, issued a $1,400 lumbar brace, and performed unnecessary comparative muscle and range of motion testing, all without the benefit of the MRIs that were ordered at E.L.'s prior appointment and which were represented by Southfield Pain and Precise MRI to be medically necessary for E.L.'s care.

1065. A follow-up evaluation was allegedly performed by Trotter just thirteen (13) days later, on March 15, 2017, at which he inexplicably failed to inquire as to whether the injection performed at the previous appointment was beneficial.

1066. On March 29, 2017, Trotter again failed to evaluate the efficacy of the injection previously performed, but nevertheless proceeded with a repeat injection procedure.

1067. The medically unnecessary bilateral shoulder MRIs ordered by Trotter in February were performed at Precise MRI on April 5, 2017.

1068. E.L.'s treatment was transferred to Bhatti after Trotter's conviction on multiple healthcare fraud charges, and he performed evaluations on April 12, 2017, May 24, 2017, and June 7, 2017, and another repeat steroid injection on May 10, 2017.

1069. Southfield Pain physician Roberts also allegedly performed evaluations on April 25, 2017, May 23, 2017, and June 20, 2017, for a total of six (6) allegedly high-level examinations in a period of approximately two (2) months, including on back-to-back days.

1070. Bhatti referred E.L. for evaluation by defendant Padula, who immediately ordered electrodiagnostic testing that was performed on June 14, 2017, and proposed to perform a discogram and stem cell injections before seeing the results of such testing.

1071. Padula allegedly examined E.L. again on June 28, 2017, but the only apparent topic of conversation was E.L.'s attorney's concern that insurance may not cover the discogram Padula wanted to perform.

1072. On July 11, 2017, Bhatti reported that E.L.'s pain levels had decreased to 2/10 in her cervical spine and 3/10 in her thoracic and lumbar spine, but

nevertheless renewed a disability certificate for household services, attendant care, and driving.

1073. Despite her near recovery, E.L. was allegedly re-evaluated an additional eight (8) times at Southfield Pain, allegedly improperly received two (2) rounds of diagnostic medial branch block injections within less than a month, and was recommended to undergo a radiofrequency ablation procedure that she declined.

1074. All of the treatment and testing ordered and performed by Southfield Pain and Precise MRI was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient E.L., and was medically unnecessary and performed in disregard for the applicable standards of care.

1075. Southfield Pain and Precise MRI submitted claims for payment and accompanying medical records relative to E.L. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

1076. Allstate is not required to pay Southfield Pain and Precise MRI for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to E.L., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### 6.    Patient D.S. (Claim No. 0355492943)

1077. Patient D.S. was involved in an alleged motor vehicle accident on October 31, 2014.

1078. D.S. did not seek any medical treatment at all until January 13, 2015, when he first went to both Michigan Pain and North Shore.

1079. At Michigan Pain, D.S. was purportedly evaluated by Padula, who immediately prescribed narcotic drugs, issued a lumbar brace without any indication of structural damage, and ordered an MRI without any suspicion of fracture or significant abnormal neurological findings.

1080. North Shore allegedly performed an examination that resulted in the normal non-specific findings of decreased and painful range of motion in all spinal planes of movement and a treatment plan of passive modalities including hot packs, traction, massage, and adjustment, three (3) times per week for twelve (12) weeks.

1081. A physical therapy evaluation was allegedly performed on D.S. at North Shore on January 20, 2015, which resulted in the addition of ultrasound, electrical stimulation, therapeutic exercise, postural education, dynamic lumbar stabilization, manual therapy, gait training, and therapeutic activity to his treatment plan.

1082. North Shore never actually performed the majority of the treatments and modalities that were part of D.S.'s treatment plan, as with most patients at issue

189

herein, D.S.'s actual treatment was limited on nearly all dates to chiropractic manipulation, multiple units of therapeutic exercise, traction, hot packs, and electrical stimulation.

1083. D.S.'s alleged concurrent chiropractic and physical therapy treatment at North Shore continued for forty-nine (49) visits over more than five (5) months despite little indication that treatment was improving D.S.'s symptoms.

1084. Defendant Medi Transit allegedly provided medically unnecessary transportation services to D.S. for forty-two (42) of his forty-nine (49) dates of service at North Shore.

1085. Disability certificates that purportedly restricted D.S. from driving were issued by North Shore chiropractors on January 13, 2015, and again on February 13, 2015, March 13, 2015, April 13, 2015, May 13, 2015, and June 13, 2015.

1086. After the initial evaluation, the only date on which a disability certificate was issued that corresponds with an actual date of service (and thus, any possible evaluation) was April 13, 2015.

1087. Each of the other disability certificates was issued on, at best, a *pro forma* basis without any actual evaluation of D.S.'s condition or functional capacity.

1088. June 13, 2015 was a Saturday, a day on which North Shore was not open.

1089. Both MRIs of D.S.'s spine were interpreted as normal, which caused Padula to order additional imaging and re-reads in an attempt to justify the extensive amount of treatment that he planned to perform.

1090. The treatment and testing billed by Padula included an epidural injection, application of two (2) medically unnecessary P-Stim devices, electrodiagnostic testing, a facet injection, and a discography, the last of which was allegedly performed in a surgical suite at Advanced Surgery.

1091. All of the treatment and testing ordered and billed by Michigan Pain, North Shore, Advanced Surgery, and Medi Transit was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient D.S., and was medically unnecessary and performed in disregard for the applicable standards of care.

1092. Michigan Pain, North Shore, Advanced Surgery, and Medi Transit submitted claims for payment and accompanying medical records relative to D.S. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

1093. Allstate is not required to pay Michigan Pain, North Shore, Advanced Surgery, and Medi Transit for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to D.S., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

### 7.   Patient M.A. (Claim No. TXA-0192872)

1094. Patient M.A. was involved in an alleged motor vehicle accident on August 25, 2017.

1095. M.A. presented to Dearborn Pain on September 22, 2017.

1096. The evaluating physician did not obtain a pain score for headaches and did not evaluate how, if at all, headaches interfered with daily activities, despite doing so for other alleged pain complaints reported by M.A.

1097. The neurological examination of M.A. was entirely normal, and his musculoskeletal examination found primarily just "mild" tenderness.

1098. Dearborn Pain diagnosed M.A. with non-specific injuries including strains, spasm, and headache.

1099. Dearborn Pain's treatment recommendations were based on the defendants' predetermined protocol and not the almost entirely normal examination he performed, and included three (3) MRIs and a 72-hour ambulatory EEG.

1100. There was nothing in the examination to justify ordering these tests following an initial evaluation and before any attempt at conservative treatment.

1101. M.A. returned to Dearborn Pain on October 6, 2017 for a re-evaluation, although he had not undergone any of the tests previously ordered, rendering this re-evaluation after just two (2) weeks pointless.

1102. This examination was again almost entirely normal, and is most notable for an apparent resolution of M.A.'s headaches.

1103. Dearborn Pain nevertheless added a narcotic drug to M.A.'s medication regimen.

1104. M.A. was again re-evaluated after another two (2) weeks on October 20, 2017, which was again medically unnecessary as he had not undergone any of the tests ordered, and which again confirmed a mostly normal presentation without headaches.

1105. Dearborn Pain then submitted a charge for $28,500 claiming to have performed a 72-hour ambulatory EEG on M.A. from October 30, 2017 to November 1, 2017.

1106. There is no indication that M.A. ever experienced headaches after his initial evaluation before the alleged performance of this test.

1107. There is no documentation as to how, when, or who applied or removed the equipment used to perform the alleged ambulatory EEG, nor is there any indication as to what instructions were provided to M.A.

1108. M.A. returned to Dearborn Pain again on November 3, 2017, at which point his complaints and examination were materially unchanged, but this examination resulted in the application of a clinically-useless P-Stim device and the performance of a medically unnecessary bursa injection.

1109. Dearborn Pain also submitted a charge to Allstate for $1,400 for allegedly issuing a back brace to M.A., which was not documented at all in M.A.'s record.

1110. Indeed, the physician reported on November 3, 2017 that M.A.'s lumbar MRI had returned negative, meaning that even if the back brace was actually issued, which it does not appear it was, there was no medical reason for doing so.

1111. Dearborn Pain continued to provide medically unreasonable and unnecessary treatment to M.A. through at least March 19, 2018, including additional rounds of unnecessary injections.

1112. All of the treatment and testing ordered and performed by Dearborn Pain and Advanced Surgery was based on predetermined and boilerplate findings that did not have any relation to the individual needs of patient M.A., and was medically unnecessary and performed in disregard for the applicable standards of care.

1113. Dearborn Pain and Advanced Surgery submitted claims for payment and accompanying medical records relative to M.A. to Allstate through the U.S. Mail and interstate wires for unreasonable and unnecessary treatment and testing, and Allstate relied upon the same in adjusting the claims.

1114. Allstate is not required to pay Dearborn Pain and Advanced Surgery for the fraudulent, unnecessary, and unreasonable treatment and testing rendered to

M.A., and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

## XI.   <u>FRAUDULENT BILLING PRACTICES</u>

1115. Providers like Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, North Shore, Medi Transit, Padula, Gonte, Madden, Fatina Masri, Haitham Masri, and Karrumi have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

1116. Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, North Shore, Medi Transit, Padula, Gonte, Madden, Fatina Masri, Haitham Masri, and Karrumi failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

1117. All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes.

1118. The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

1119. The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1120. Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

A.   IMPROPER BILLING FOR EVALUATIONS

1.   **Fraudulently Upcoded Office Visits**

1121. Physician examinations of patients are billed using CPT Codes that reflect the level of complexity involved in the examination.

1122. It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

1123. As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and/or (3) were wholly unwarranted and unnecessary.

1124. Moreover, the billing codes submitted to Allstate by, and on behalf of, Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula,

Madden, and Gonte consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

1125. Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Madden, and Gonte routinely submitted bills to Allstate seeking reimbursement for high-level office visits and office consultations that did not occur as billed.

1126. The former Michigan Pain office manager reported to Allstate that patients were scheduled for appointments at the clinic every fifteen (15) minutes, and often were scheduled for the same time slot.

1127. It is not possible to perform examinations of the complexity and comprehensiveness represented by the defendants in fifteen (15) minutes or less.

1128. Southfield Pain submitted a charge for a purported level three initial evaluation of patient M.Y. (Claim No. 0438737264) by Michael Roberts, D.O, charged at an unreasonable amount of $959, on February 28, 2017, and submitted a charge for a purported level four re-evaluation performed on the same date by Trotter.

1129. It is medically unnecessary to undergo both an initial evaluation and a re-evaluation on the same date, and neither of the evaluations met the complexity requirements to be billed as either level three or level four encounters.

1130. Dearborn Pain submitted a charge for a purported level four evaluation of patient R.J. (Claim No. 0476016084) on May 16, 2018 that consisted of nothing more than changing the dressing on an incision from a procedure that had been performed the previous day; it did not include any patient history or complex medical decision making (this visit was also improperly billed during a global post-surgery period, discussed further below).

1131. All bills submitted by Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Madden, and Gonte using complexity-based CPT Codes as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

1132. Despite not providing treatment that warranted level four or five evaluations, the defendants charged excessive amounts for their purported evaluations.

1133. The defendant pain management clinics submitted bills to Allstate for level four and five initial evaluations that were as high as $1,918, and for level four and five re-evaluations as high as $1,207.  *See* Exhibits 1 through 4.

1134. The excessive rates charged by the defendants further demonstrate that the purpose of their scheme was to maximize the amount they billed to auto insurers like Allstate.

2.      **Fraudulent Billing for Evaluations During Global Post-Surgery Periods**

1135. The CPT Codes used by the defendants for certain surgical procedures are for "global surgical packages," which include all necessary services normally furnished by a surgeon before, during, and after a procedure.

1136. The amount of post-surgical treatment covered by the CPT Code for the surgery varies between procedures, but is either ten (10) days or ninety (90) days.

1137. It is improper to submit charges for follow-up visits related to recovery from surgeries during the applicable global period thereafter.

1138. The prohibition against billing for follow-up visits within the global period includes for post-surgical pain management, and is applicable to different physicians within the same practice group as the physician who performed the surgery.

1139. Surgeries performed by the defendants that are subject to global surgical packages with periods of post-surgical follow-up visits include:

| CPT Code | Description | Global Period |
|---|---|---|
| 23020 | Release shoulder joint | 90 days |
| 23130 | Acromioplasty | 90 days |
| 23410 | Repair of rotator cuff | 90 days |
| 29823 | Arthroscopy of the shoulder | 90 days |
| 29870 | Diagnostic knee arthroscpy | 90 days |
| 29873 | Arthroscopy of the knee | 90 days |
| 29875 | Arthroscopy of the knee | 90 days |
| 29876 | Arthroscopy of the knee | 90 days |

| CPT Code | Description | Global Period |
|---|---|---|
| 29877 | Arthroscopy of the knee | 90 days |
| 29879 | Arthroscopy of the knee | 90 days |
| 29880 | Arthroscopy of the knee | 90 days |
| 29881 | Arthroscopy of the knee | 90 days |
| 29895 | Arthroscopy of the ankle | 90 days |
| 29897 | Arthroscopy of the ankle | 90 days |
| 63050 | Cervical laminoplasty | 90 days |
| 63056 | Spinal cord decompression | 90 days |
| 63075 | Cervical disc surgery | 90 days |
| 63650 | Neuroelectrode implantation | 10 days |
| 64555 | Neuroelectrode implantation | 10 days |
| 64633 | Radiofrequency ablation | 10 days |
| 64635 | Radiofrequency ablation | 10 days |

1140. Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Padula, Madden, and Gonte routinely disregarded the post-surgical global period, and repeatedly submitted charges to Allstate for surgical follow-up visits that were included in the bill for the surgery itself.

1141. Notably, on at least some occasions, the defendant pain management clinics properly submitted claim documents to Allstate using CPT Code 99024 but charging $0, indicating that a postoperative follow-up visit was conducted but no charge was incurred.  Thus, the defendants are indisputably aware of the post-surgical global period, yet nonetheless improperly submitted charges to Allstate on several occasions.

1142.  The following patients exemplify the defendants' fraudulent practice of submitting charges for follow-up visits that are included in the charge for the surgery performed:

- Patient D.S. (Claim No. TXA-0150324) allegedly underwent a lumbar decompression on August 9, 2016 by defendant Padula that was billed by Michigan Pain using CPT Code 63056.  On August 23, 2016, D.S. was allegedly evaluated by defendant Madden, and Michigan Pain correctly submitted a bill with no charge using CPT Code 99024.  However, D.S. was then allegedly evaluated by September 20, 2016 by Madden, on October 3, 2016 by Padula, on October 14, 2016 by Trotter, and on October 31, 2016 by Padula, all of which were billed to Allstate despite being within the 90-day global period following the procedure performed on August 9, 2016.  On each date it was expressly noted that D.S. was status post-surgery, and Padula's and Trotter's evaluations included only post-surgical assessments.

- Patient R.J. (Claim No. 0476016084) allegedly underwent a discectomy on May 15, 2018 by defendant Padula that was billed by Dearborn Pain using CPT Code 63056.  The following day, May 16, 2018, R.J. underwent a clear post-surgical evaluation by a Dearborn Pain physician named Pavan Tankha, D.O., who reported that the only action at the appointment was an observation of R.J.'s incision and a dressing change.  Dearborn Pain submitted a charge to Allstate claiming this was a level 4 evaluation. Dearborn Pain then properly submitted a bill without a charge using CPT Code 99024 in relation to a post-surgical evaluation performed by Padula on May 30, 2018, evidencing that it was aware that evaluations within the 90-day global period were not billable.  Nevertheless, Dearborn Pain improperly submitted additional charges for evaluations purportedly performed on June 13, 2018 and June 29, 2018.

- Patient R.T. (Claim No. 0393986864) allegedly underwent a discectomy on May 17, 2016 by defendant Padula, a left knee arthroscopy on June 22, 2016 by Frank McCormick, M.D. ("McCormick"), and a left shoulder arthroscopy on August 3, 2016 by McCormick, all of which were billed by Michigan Pain using CPT Codes with 90-day global periods.  R.T. was allegedly evaluated by Michigan Pain physicians on at least thirteen (13) separate occasions during the global periods applicable to these

procedures, including the majority of which were within two (2) applicable periods. Michigan Pain only properly submitted claims with no charge using CPT Code 99024 for five (5) of the visits. For the other eight (8) visits, Michigan Pain improperly billed Allstate for examinations that were used to evaluate and control post-surgical pain, including the examinations immediately following the June 22, 2016 and August 3, 2016 procedures.

### 3.   Fraudulent Billing for Evaluations During Planned Procedures

1143. The defendant pain management clinics often submitted charges to Allstate for alleged high-level patient evaluations that were performed in conjunction with planned procedures.

1144. When a patient presented to a pain management clinic for a scheduled injection or other procedure, it is not appropriate to submit a charge for the examination that must be conducted in order to perform the planned procedure.

1145. If examinations were performed at all on these dates, they did not meet the criteria to be billed as the high-complexity evaluations represented by the defendants, as discussed further above.

1146. Further, many of the procedures performed by the defendants specifically include an examination performed on the same date.

1147. For example, patient S.W. (Claim No. 0445001357) was scheduled for an injection by defendant Gonte on May 8, 2017, which was performed by Bhatti at Dearborn Pain on May 12, 2017.

1148.  The injection performed was billed to Allstate using CPT Codes 64490, 64491, and 64492, each of which has a global period encompassing the day of the procedure.

1149.  Dearborn Pain nevertheless submitted a charge for a level four evaluation purportedly performed by Bhatti on the same date.

1150.  Not only was this bill improper pursuant to coding guidelines, Bhatti did not perform any evaluation apart from standard preparation for the injection performed, including explaining risks and benefits and obtaining a signed consent form.

1151.  Adding a bill for a purported office evaluation is a fraudulent practice used by the defendants for nearly every planned procedure at issue in this Complaint.

## B.  FRAUDULENT BILLING FOR P-STIM APPLICATION

1152.  Each time a physician at Michigan Pain, Dearborn Pain, Southfield Pain, and Sterling Heights Pain allegedly applied a medically unnecessary and clinically useless P-Stim device, Allstate received a raft of improper charges totaling more than $8,600.

1153.  Similarly, each time a physician unnecessarily applied a P-Stim device in a surgical suite at Advanced Surgery, Allstate received improper and fraudulent charges totaling as much as $56,272.

1154. As detailed above, both the application of P-Stim devices and the use of surgical suites for the application of P-Stim was medically unnecessary and therefore non-compensable under the No-Fault Act.

1155. The billing practices used in relation to the P-Stim devices were also independently fraudulent.

1156. Michigan Pain, Dearborn Pain, Southfield Pain, and Sterling Heights Pain routinely used four (4) separate CPT and HCPCS Codes to bill Allstate for P-Stim devices:

- **63650** – "Percutaneous implantation of neurostimulator electrode array, epidural";

- **64555** – "Percutaneous implantation of neurostimulator, peripheral nerve";

- **95972** – "Electronic analysis of implanted complex spinal cord or peripheral neurostimulator pulse generator system with intraoperative or subsequent programming"; and

- **A6237** – "Hydrocolloid dressing."

1157. On each occasion, the pain management clinics charged Allstate for three (3) units of CPT Codes 63650 and 64555, one (1) for each of the wires of the P-Stim device.

1158. CPT Code 63650 describes the implantation of a spinal cord stimulator and CPT Code 64555 describes the implantation of a neuromuscular stimulator.

1159. When describing the same alleged application, CPT Codes 63650 and 64555 are mutually exclusive, as they describe application of a device to different parts of the body.

1160. Neither CPT Code 63650 nor 64555 describes P-Stim devices, which are transcutaneous, not percutaneous, and are affixed, not implanted.

1161. As discussed above, P-Stim devices are simply acupuncture devices affixed to an area behind a patient's ear.

1162. CPT Code 94972 describes a procedure that was not performed at all by the pain management clinics, as the P-Stim devices affixed to patients came pre-programmed by the manufacturer.

1163. HCPCS Code A6237 for wound dressing is also an improper charge, again because P-Stim application is transcutaneous.

1164. In addition to the fraudulent and improper codes for P-Stim application discussed above, Advanced Surgery added additional fraudulent and improper codes to its bills when physicians applied P-Stims at its facility.

1165. As discussed above, it is never medically necessary to apply a P-Stim device in a surgical suite.

1166. Indeed, the majority of the P-Stim devices applied by the pain management clinics were performed in office settings, confirming that surgical suites are unnecessary.

1167. When Advanced Surgery convinced patients to undergo P-Stim application in its surgical suites, it added the following CPT and HCPCS Codes to its bills:

- **99217** – "Observation care discharge";

- **93005** – "Electrocardiogram, routine ECG with at least 12 leads; tracing only, without interpretation and report;"

- **A4450** – "Non-waterproof tape";

- **L8680** – "Implantable neurostimulator electrode;" and

- **L8686** – "Implantable neurostimulator pulse generator."

1168. CPT Code 99217 is a wholly improper charge that should be billed only when a patient is placed on "observation status" at a hospital and then evaluated before discharge.

1169. P-Stim applications at Advanced Surgery did not involve any such observation, nor did they result in any discharge report.

1170. Instead, P-Stims were applied at Advanced Surgery as an extension of alleged evaluations performed by its associated physicians solely as a means to add tens of thousands of dollars in facility fee charges to submit to Allstate.

1171. CPT Code 93005 describes a routine cardiology test that has nothing to do with the application of a P-Stim device.

1172. HCPCS Code A4550 describes a supply that is included with the P-Stim device.

1173. HCPCS Codes L8680 and L8686 are both improper because they describe implantable, rather than transcutaneous, devices.

1174. The proper HCPCS Code to describe the application of a P-Stim device is S8930, which is for "electrical stimulation of auricular acupuncture points; each 15 minutes of personal one-on-one contact with the patient."

1175. CMS created HCPCS Code S8930 in April 2011, well before the defendants began submitting their fraudulent bills to Allstate.

1176. The defendants choose not to use HCPCS Code S8930, which precisely describes the P-Stim application, because it would require them to submit a single charge with a description befitting the simple, non-surgical device application that it is.

1177. Instead, the defendants chose a series of codes that they believed would justify their unreasonable charges of between $8,600 and $56,272 for each P-Stim device applied.

1178. Allstate is not obligated to pay any pending bills for alleged P-Stim application fraudulently billed using CPT and HCPCS Codes that do not properly describe the treatment performed, and it is entitled to reimbursement for payment already tendered.

### C.   FRAUDULENT BILLING FOR PROCEDURES

1179. The defendants used esoteric and complex coding to submit charges for surgical and injection procedures, often involving multiple billing, in order to inflate charges submitted to Allstate to the maximum extent possible.

### 1.   Fraudulent Billing for Fluoroscopy

1180. One frequent method of improperly unbundling charges used by the defendants was to submit charges for fluoroscopic guidance for procedures that have such guidance built into their descriptions.

1181. The majority of the injection procedures used by the defendant pain management clinics have fluoroscopic guidance expressly included in their definitions.

1182. As one representative example, defendant Michigan Pain submitted charges for fluoroscopic guidance for the following procedures allegedly rendered to patient K.S. (Claim No. 0390106060):

- On January 14, 2016, CPT Code 62311 – "Injection, single, of diagnostic or therapeutic substance(s) not including neurolytic substances, <u>including needle or catheter placement</u> . . . lumbar, sacral";

- On September 7, 2016, CPT Code 64635 – "Destruction by neurolytic agent, paravertebral facet joint nerve(s), <u>with imaging guidance (fluoroscopy or CT);</u> lumbar or sacral";

- On November 28, 2016, February 7, 2017, and March 21, 2017, CPT Codes 64493, 64494, and 64495 – "Injection(s), diagnostic or therapeutic agent, paravertebral facet joint <u>with image guidance (fluoroscopy or CT),</u> lumbar or sacral";

- On June 13, 2017, CPT Codes 64490, 64491, and 64492 – "Injection(s), diagnostic or therapeutic agent, paravertebral facet joint <u>with image guidance (fluoroscopy or CT)</u>, cervical or thoracic"; and

- On July 11, 2017, CPT Codes 64633 and 64634 – "Destruction by neurolytic agent, paravertebral facet joint nerve(s), <u>with imaging guidance (fluoroscopy or CT)</u>; cervical or thoracic."

(Emphasis added to all CPT Code descriptions above.)

1183. Each time the defendant pain management clinics submitted charges for separate fluoroscopy guidance for injections and other procedures, they were attempting to fraudulently induce Allstate to make a second payment for services that were already included in the injections and procedures themselves.

1184. Defendant Advanced Surgery also routinely used the same practice of fraudulent unbundling for facility fee charges for procedures with fluoroscopy guidance included.

1185. The pain management clinics used CPT Codes 77002 and 77003 to report purported fluoroscopic guidance during procedures.

1186. The CPT Code Book expressly directs providers "[d]o not report guidance codes 77001, 77002, 77003 for services in which fluoroscopic guidance is listed in the descriptor."

1187. Moreover, and as discussed further above, the pain management clinics submitted additional fraudulent charges for alleged epidurograms in connection with

209

injections for which they claimed to use fluoroscopic guidance, using CPT Code 72275.

1188. The description of CPT Code 72275 expressly states that it includes the fluoroscopic guidance itself.

1189. Thus, the defendants' bills for fluoroscopic guidance are unbundled from both the underlying procedure codes and from the improper and fraudulent epidurogram codes that were charged in nearly every instance.

1190. The defendants also improperly submitted charges for multiple types of fluoroscopic guidance for the same procedure.

1191. For example, patent R.C. (Claim No. 0390496980) allegedly underwent a lumbar epidural steroid injection performed by Madden at Michigan Pain.

1192. Madden described a single instance of localizing the needle using fluoroscopy guidance, an action which, as discussed above, is included in the description of the injection procedure.

1193. Michigan Pain nevertheless improperly submitted a bill to Allstate seeking reimbursement for two (2) instances of fluoroscopic guidance, using both CPT Codes 77002 and 77003.

1194. Dearborn Pain and Advanced Surgery also fraudulently submitted the same charges for fluoroscopic guidance for the same procedures.

1195. For example, patient M.M. (Claim No. 0444997455) allegedly underwent a shoulder injection performed by Dearborn Pain's Bhatti at Advanced Surgery on May 8, 2017.

1196. Both Dearborn Pain and Advanced Surgery submitted charges to Allstate for the unnecessary fluoroscopic guidance purportedly used during this procedure.

## 2.     Other Fraudulent Billing in Connection with Procedures

1197.  In addition to improper unbundled fluoroscopy charges, and charges for epidurograms not properly or actually performed, the defendant pain management clinics, Padula, Madden, and Gonte peppered their bills with improper charges for supplies.

1198. When an injection is performed in a physician's office, it is improper to submit charges for certain supplies that are necessarily incident to the procedure.

1199. Among the supplies that cannot be billed by physicians are local anesthesia, which were regularly billed to Allstate by the defendants using HCPCS Codes S0020 and J2001.

1200. The defendants also submitted charges to Allstate for contrast agent used in relation to fluoroscopic guidance using HCPCS Code Q9966.

1201. The contrast agent used in imaging guidance is included in the charge for the imaging itself, and thus the separate bills submitted by the defendants constitute fraudulent unbundling.

1202. As set forth above, the imaging guidance bills submitted by the defendants were themselves fraudulently unbundled from the charges for the underlying procedures.

1203. The defendants also routinely added a charge for use of surgical trays using CPT Code A4550.

1204. To properly bill for surgical trays in relation to procedures performed in an office setting, the medical record must explain the need for and specifically designate the supplies used, which the defendants never did.

1205. The defendants added a charge for hot packs to nearly every bill for injections they performed, using CPT Code 97010.

1206. CPT Code 97010 is a physical therapy code that is not properly billed during an injection procedure.

1207. The defendants also routinely added a charge for surgical trays allegedly used during procedures performed at Advanced Surgery.

1208. When procedures are performed by physicians in other facilities, including ambulatory surgery centers like Advanced Surgery, it is not proper for

physicians to submit charges for any supplies, as they are included in the separately-billed facility fee charge.

1209. Padula, Madden, Gonte, and the defendant pain management clinics regularly submitted charges for supplies allegedly used during injections and other procedures even when they were performed in surgical facilities that submitted separate charges covering such supplies.

1210. The defendants also submitted improper and unnecessary charges using DME HCPCS Codes for supplies allegedly used during discogram procedures.

1211. Michigan Pain, Dearborn Pain, and Padula routinely submitted charges for thousands of dollars for electrodes and lead wires using CPT Codes A4556 and A4557, both of which describe items that are used in connection with sleep apnea monitors or TENS devices.

1212. Allstate is not required to pay the defendants for medically unnecessary supplies that were improperly unbundled from the procedures allegedly performed.

### D. FRAUDULENT BILLING FOR DURABLE MEDICAL EQUIPMENT

1213. As discussed above, the predetermined treatment protocol used by Padula, Madden, Gonte, and the pain management clinics involved the unlicensed issuance of DME, and particularly a Velcro lumbar back brace called "The Weave."

1214. Each time the defendants unlawfully issued this back brace to patients, they submitted a charge of $1,400 and improperly described the brace using HCPCS Code L0631. *See* Exhibits 1 through 4.

1215. HCPCS Code L0631 describes a lumbar-sacral orthosis that has been "trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise."

1216. The pre-fabricated, off-the-shelf "The Weave" brace was never customized by the defendants for the patients at issue herein.

1217. Instead, to the extent the back brace was dispensed at all, it was self-adjustable by the individual patients.

1218. The correct HCPCS Code for such an off-the-shelf lumbar brace is L0628, which was never billed by the defendants relative to the patients at issue herein. *See* Exhibits 1 through 4.

1219. Not only was the back brace improperly billed in almost every instance, but the former Michigan Pain office manager testified that defendants Maffia, a layperson, and Jerome actually dispensed braces to patients, and added the braces to patient bills, even when the patient had not been prescribed a brace by a physician:

> Q. So you would fill out a billing sheet that had like lines where you would check off what treatment was provided?
>
> A. Yes, I would fill those out occasionally, if there was extra things needed. Like if the patient required a -- if John Maffia gave the patient a back brace but it was not indicated by Dr. Padula on the

billing sheet, I would then circle it or check it and submit it to the biller.

Q. So there were times that Dr. Padula or one of the other doctors wouldn't prescribe a back brace on the paperwork, and then Mr. Maffia would add it?

A. Yes, Mr. Maffia or Mr. Jerome…

1220. Allstate is not required to compensate the defendants for DME fraudulently issued pursuant to a predetermined treatment protocol or "prescribed" by laypersons, and is entitled to return of all sums paid due to the fraudulent issuance of DME by the defendants.

## XII.   THE DEFENDANTS' CHARGES ARE UNREASONABLE AND NOT CUSTOMARY

### A.   CHARGES SUBMITTED BY PRECISE MRI

#### 1.   Precise MRI's Representations Regarding Cost and Revenue

1221. On or about September 15, 2015, Precise MRI submitted documents to the Michigan Department of Community Health in support of its application for a Certificate of Need ("CON") to operate a mobile MRI host site.

1222. The letter of intent filed by Precise MRI reported that it would spend $40,000 for renovations, that it had a space lease for $51,000 per year, and that it had a lease for mobile MRI equipment for one (1) day per week for $150,000 per year.  *See* Exhibit 15.

1223. The space lease amount represented by Precise MRI in its letter of intent was false; the actual lease provides for rent in the amount of $2,125 per month, for a total of $25,500 per year. *See* Exhibit 16.

1224. Precise MRI also submitted a "Statement of Revenue and Expense" in which it reiterated the cost representations made in its letter of intent, and further stated that it expected to hire just one employee, a receptionist, who would be paid $10,000 per year in wages and benefits. *See* Exhibit 17.

1225. Additional costs reported by Precise MRI for utilities, insurance, medical supplies, office supplies, and radiologic services totaled $87,500 per year. Id.

1226. Specifically, Precise MRI reported that each scan performed would incur a cost of $60 for a radiologist to interpret the images, $10 for medical supplies, and $3 for office supplies. Id.

1227. Based on these detailed projections, Precise MRI estimated that its average cost per MRI would be $301 in its first year of operation, and $280 thereafter. Id.

1228. Precise MRI represented to the State of Michigan to acquire its CON that its average charge per MRI would be $1,100 in its first year, and $1,000 in its second and third year. Id.

1229.  Based on the representations made by Precise MRI, its CON application was approved and it began performing MRIs on March 29, 2016.

1230. Precise MRI then used this CON approval to obtain non-substantive reviews and approvals of applications to add additional mobile MRI route stops to its host site.

## 2.    Precise MRI's Charges to Allstate

1231. Precise MRI began submitting charges to Allstate on March 29, 2016, the date it commenced operation.

1232. For the three (3) MRIs allegedly performed on March 29, 2016, along with an additional five (5) MRIs allegedly performed in the week thereafter, Precise MRI submitted charges of $4,300 per scan.

1233. For every MRI allegedly performed after April 5, 2016, Precise MRI has submitted charges of at least $4,900 per scan, regardless of the body part purportedly imaged.

1234. Using the highest per-MRI cost of $301 admitted by Precise MRI, its charges to Allstate were between fourteen (14) and sixteen (16) times its cost per MRI.

1235. Because Precise MRI's cost projections decreased after its first year, and because it actually negotiated cheaper leases for its physical space than reported, the unreasonable inflation of its charges compared to its costs is actually higher.

1236. As itemized in the chart annexed hereto at Exhibit 5, Precise MRI has billed Allstate for 454 MRIs since March 29, 2016.

1237. Precise MRI billed Allstate in the amount of $2,221,785 for the 454 MRIs allegedly performed since March 29, 2016.  Id.

1238. By Precise MRI's own admission, the cost to it for these 454 MRIs was no more than $136,654 (454 x $301).

1239. Thus, Precise MRI's costs for the MRIs performed since March 29, 2016 represent, at most, just 6.1% of the total amount it billed to Allstate.

1240. Since increasing its charges the week after it commenced operation, Precise MRI billed Allstate at least $4,599 more than its cost per MRI.

1241. It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

1242. Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

### 3.    Precise MRI's Charges Far Exceeded the Amounts Paid by Other Michigan Payors

1243. In addition to its charges being unreasonable and excessive based on its admitted-to costs, Precise MRI's charges are also grossly excessive when compared to other prominent Michigan payors.

1244. For example, Medicare reimbursed for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts for MRIs performed in 2015 through 2017:

|  | 2015A | 2015B | 2016 | 2017 |
|---|---|---|---|---|
| CPT Code 70551 | $230.15 | $231.30 | $232.01 | $234.22 |
| CPT Code 72141 | $244.06 | $224.52 | $225.73 | $228.00 |
| CPT Code 72146 | $223.40 | $224.52 | $225.73 | $228.35 |
| CPT Code 72148 | $223.33 | $223.44 | $224.66 | $227.29 |
| CPT Code 73221 | $235.81 | $236.99 | $237.80 | $240.78 |
| CPT Code 73718 | $364.47 | $366.29 | $366.28 | $368.59 |
| CPT Code 73721 | $325.45 | $236.63 | $238.16 | $240.42 |

1245. Michigan Medicaid reimbursed for MRIs performed from 2015 through 2017 at the following amounts:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| CPT Code 70551 | $127.77 | $128.37 | $129.16 |
| CPT Code 72141 | $124.01 | $124.80 | $125.60 |
| CPT Code 72146 | $124.01 | $124.80 | $125.79 |
| CPT Code 72148 | $123.22 | $124.21 | $125.20 |
| CPT Code 73221 | $130.75 | $131.54 | $132.73 |
| CPT Code 73718 | $202.46 | $203.05 | $203.84 |
| CPT Code 73721 | $130.75 | $131.74 | $132.53 |

1246. The Michigan workers' compensation program reimbursed MRIs performed from 2015 through 2017 at the following amounts:

|  | 2015 | 2016 | 2017 |
|---|---|---|---|
| CPT Code 70551 | $230.15 | $232.01 | $234.22 |
| CPT Code 72141 | $324.04 | $225.73 | $228.00 |
| CPT Code 72146 | $223.40 | $225.73 | $228.35 |
| CPT Code 72148 | $222.33 | $224.66 | $227.29 |
| CPT Code 73221 | $235.81 | $237.80 | $240.78 |
| CPT Code  73718 | $364.47 | $366.28 | $368.59 |
| CPT Code 73721 | $235.45 | $238.16 | $240.42 |

1247. Allstate is not suggesting that it should pay only what other Michigan payors pay for MRIs.

1248. However, the reimbursement amounts from other payors are indicative of the range for what a reasonable charge and reimbursement is per MRI.

1249. Precise MRI's charges are well outside this range and the spectrum of reasonableness and the defendants cannot sustain their burden of proving otherwise.

**4.     Precise MRI Charges Allstate More Than Other Payors**

1250. Michigan law is clear that a provider's charge "shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance."  Mich. Comp. Laws § 500.3157.

1251. "[A] no-fault insurer is not liable for the amount of any charge that exceeds the health-care provider's customary charge for a like product, service, or accommodation in a case not involving insurance."  Hofmann v. Auto Club Ins. Ass'n, 211 Mich. App. 55, 103 (1995).

1252. In its CON application, Precise MRI stated that its "average charges" per MRI would be $1,100 in its first year and $1,000 thereafter.  See Exhibit 17.

1253. In stark contrast to the defendants' represented average charge of $1,100 or $1,000 per MRI, Allstate has never been charged an amount less than $4,300 per MRI and the vast majority of the charges at issue herein were submitted at $4,900 per MRI.  See Exhibit 5.

1254. Accordingly, for Precise MRI's average charges of $1,100 or $1,000 per MRI to be valid, Precise MRI must be charging a significantly lower amount to the other payor sources it lists in its application than it does to Allstate.

1255. Indeed, Precise MRI has admitted in discovery responses submitted to Allstate that it charges different payors different amounts for the same MRIs for which it almost always charged Allstate $4,900.

1256. Precise MRI further admitted that it charges Medicaid less than $4,900 per MRI.

1257. Precise MRI's use of differing charge amounts is evidence that $4,900 is not its "customary charge," but rather is the amount it uses to victimize Allstate by attempting to exploit the benefits available under the No-Fault Act.

## B. CHARGES SUBMITTED BY THE PAIN MANAGEMENT CLINICS

1258. As discussed above, the defendants aggressively pressured patients to undergo unnecessary testing and procedures, including comparative muscle testing, range of motion testing, EEGs, injections, and discograms.

1259. When the defendants were successful in coercing patients to undergo medically unnecessary testing and procedures, the bills that resulted from such testing and treatment were staggering.

1260. For example, defendant Michigan Pain routinely submitted charges to Allstate of $24,000 for injections performed during discography procedures using CPT Code 62290.

1261. The average Medicare reimbursement for CPT Code 62290 in the Detroit area is $338.16.

1262. Michigan Pain and Dearborn Pain each submitted charges of $9,500 per day for purported ambulatory EEG monitoring using CPT Code 95951.

1263. The average Medicare reimbursement for CPT Code 95951 in the Detroit area is $335.52.

1264. Allstate is not suggesting that a reasonable price under the No-Fault Act is necessarily equivalent to Medicare reimbursement rates, but charges that are up to 70 times higher than the amounts paid by other payors are *per se* unreasonable.

1265. The defendant pain management clinics also submitted charges for the DME that they were not licensed to issue at rates that were many times higher than amounts that identical items could be obtained through numerous retailers.

1266. The lumbar support issued to nearly every patient called "The Weave" retails for less than $100 at numerous stores, including availability at Wal-Mart for $62.99, but was invariably charged to Allstate by the defendants at $1,400.

1267. The lead wires and electrodes that were improperly billed by the defendants in relation to procedures can both be obtained for less than $10, but were billed at rates of $6,500 and $1,800, respectively.

1268. Allstate is not obligated to pay any pending bills for testing, equipment, or procedures billed at excessive amounts, and it is entitled to reimbursement for those procedures for which it has already tendered payment.

## C. CHARGES SUBMITTED BY ADVANCED SURGERY

1269. As discussed above, Advanced Surgery was primarily used as a venue for procedures that could normally be performed in-office, and were in fact regularly performed in-office by the defendants, in order to generate additional facility fee charges for procedures.

1270. The facility fees charged by Advanced Surgery for the unnecessary use of its surgical suites were unreasonable.

1271. Most egregiously, Advanced Surgery charged Allstate as much as $72,989 for application of medically useless P-Stim devices in its facility, a process that defendant Padula has testified takes no longer than fifteen (15) minutes.

1272. Advanced Surgery obtained P-Stim devices for no more than $280.

1273. Advanced Surgery also routinely submitted charges of more than $14,000 for injections that take only minutes to perform and are regularly performed

in physician offices without any facility fee charges, including by the pain management clinic defendants.

1274. Advanced Surgery also charged unconscionable amounts when surgeries were actually performed.

1275. For example, patient P.S. (Claim No. 0461166407) allegedly underwent a laminotomy on April 26, 2018 at Advanced Surgery.

1276. The surgeon who performed the surgery submitted charges totaling $153,670 for this procedure that lasted no longer than 90 minutes, including $33,750 submitted through an entity owned by defendant Gonte.

1277. Defendants Padula and Dearborn Pain submitted additional charges of $28,400 for "intraoperative monitoring," allegedly performed by Padula and unlicensed physician Petryk, including codes that describe electrodiagnostic testing and TENS device supplies.

1278. A nurse practitioner from a fourth separate pain management clinic submitted charges totaling $19,775 in relation to the procedure.

1279. Despite at least four (4) other entities submitting charges for the staff and supplies used during the surgery, Advanced Surgery submitted charges totaling $207,766.16 for this outpatient procedure.

1280. In total, the defendants and their associates submitted charges to Allstate totaling at least $409,611.16 for this one procedure.

1281. An article published in August 2017 surveyed the costs of lumbar laminotomies for 181,267 patients throughout the country, and found that the average cost in the most recent year studied (2013) was $11,405.  Corinna C. Zygourakis, M.D., *et al*., *Geographic and Hospital Variation in Cost of Lumbar Laminectomy and Lumbar Fusion for Degenerative Conditions*, 81 NEUROSURG 331-340 (2017).

1282. The amount charged by the defendants was nearly thirty-six (36) times this average cost.

### D.   CHARGES FOR TRANSPORTATION SERVICES

1283. The transportation charges submitted by defendant Medi Transit to Allstate are unreasonable and excessive.

1284. For most patients, Medi Transit submitted bills to Allstate charging flat fees of $55 for each leg of transportation allegedly provided.

1285. These rates far exceed the amount of a taxicab or application-based ride-hailing services, such as Uber or Lyft.

1286. For example, patient F.P. (Claim No. 0312756349) lives just under seven (7) miles from North Shore.

1287. The $55 amount ($110 round-trip) invariably charged by Medi Transit for allegedly transporting F.P. to North Shore was more than three (3) times the amount of a taxicab and approximately five (5) times the most expensive amount

that it would cost to take an application-based ride-hailing service, such as Uber or Lyft.

1288. F.P. could have obtained transportation to North Shore in a taxi, with a 15% tip, for $17.19.

1289. If F.P. were to ride as a single passenger using Uber, his estimated fare would be $11.74 in each direction.

1290. If F.P. were to ride as a single passenger using Lyft, his estimated fare would be $12-$15 in each direction.

1291. The excessive amounts charged relative to F.P. were not unique; many of the patients at issue herein live within ten (10) miles of North Shore but incurred the same unreasonable charges for alleged transportation services, including:

- S.M. (Claim No. 0277939351) – 8.9 miles from North Shore

- D.S. (Claim No. 0355492943) – 7.8 miles from North Shore

- M.D. (Claim No. 0266797785) – 5.3 miles from North Shore

1292. In all cases, records submitted to Allstate by Medi Transit lack recordings of both the time transportation services were allegedly provided and the distances of the alleged ride, both of which would reveal the absurdity of the amounts charged.

## XIII. MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A. MISREPRESENTATIONS BY THE DEFENDANTS

1293. To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

1294. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

1295. Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157.

1296. Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

1297. There are no less than seventeen (17) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

    a.    Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Advanced Surgery, Padula, Madden, Gonte, Maffia, Jerome, Goldstein, Fatina Masri, and Haitham Masri billed Allstate for treatment and services that were not actually provided.  Multiple patients at issue in this Complaint denied receiving the treatment or services that these defendants purported to provide.

    b.    The defendants falsified and altered records to justify performance of medically unnecessary services, including physical therapy and medical transportation, and to create the appearance of injuries that were more severe than they actually were.

    c.    The defendants offered improper inducements to patients to undergo medically unnecessary treatments, including cash payments, in-kind compensation, and promises of disability certificates and prescriptions for narcotic drugs.

    d.    The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other.  The defendants utilized runners to recruit patients to receive unnecessary treatment and personally sought out patients who did not require medical care.  The defendants' methods of obtaining patients did not include considerations of medical necessity.  The defendants participated in *quid pro quo* relationships with each other that derived profit for themselves without regard for the necessity and lawfulness of medical treatment.

    e.    The defendants used an unlawful predetermined treatment protocol, implemented by the ordering of excessive physical therapy, disability, diagnostic testing, DME, medically useless P-Stim devices, medication, injection therapy, invasive procedures, and MRI imaging. This predetermined protocol is confirmed by the nearly identical purported findings and treatment plans ordered for patients at issue in

this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

f.     Padula, Madden, Gonte, Maffia, Jerome, Goldstein, the defendant pain management clinics, Advanced Surgery, Fatina Masri, and Haitham Masri subjected patients to unnecessary and clinically useless P-Stim devices. The defendants further fraudulently required patients to have this acupuncture device applied in operating rooms and surgical centers, despite the fact that it is a transcutaneous adhesive application that has no surgical aspect whatsoever.

g.     Padula, Madden, Gonte, Maffia, Jerome, Goldstein, and the defendant pain management clinics indiscriminately referred patients for physical therapy (frequently to defendant North Shore) without any individual determination of medical necessity, and without any evaluation of the efficacy of such treatment. The predetermined nature of these referrals is illustrated by the defendants' purported examination findings, which frequently ordered physical therapy without reference to whether or not the patient was already attending physical therapy, or whether it was effective.

h.     Padula, Madden, Gonte, Maffia, Jerome, Goldstein, and the defendant pain management clinics referred patients for MRIs, and Precise MRI billed for MRIs, that were medically unnecessary and performed only in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

i.     Precise MRI and Karrumi submitted bills to Allstate seeking payment for medically unnecessary MRIs that were ordered as a matter of course at the outset of treatment and were excessive in number.

j.     Precise MRI and Karrumi submitted bills to Allstate for MRIs that were medically unnecessary and failed to adhere to applicable standards of care, including ACR guidelines. Precise MRI and Karrumi routinely performed MRIs that lacked any supporting examination or neurologic test findings. It was these defendants' responsibility to confirm the need for MRIs pursuant to ACR guidelines before performing the same.

k.     Precise MRI and Karrumi submitted bills to Allstate seeking payment for MRI charges that, by their own admissions in documents submitted

to the State of Michigan, were many times their cost for each MRI purportedly performed.  These defendants' charges to Allstate were not reasonable and therefore non-compensable under the Michigan No-Fault Act.

l.      Padula, Madden, Gonte, Maffia, Jerome, Goldstein, and the defendant pain management clinics prescribed medications, including narcotics, on a *pro forma* basis in an attempt to incentivize patients to continue to return to them for medically unnecessary treatment.  The predetermined nature of the prescriptions written by the defendants is evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

m.     Padula, Madden, Gonte, Maffia, Jerome, Goldstein, and the defendant pain management clinics ordered and performed medically unnecessary injections and surgical procedures in violation of applicable standards of care.

n.      Padula, Madden, Gonte, Maffia, Jerome, Goldstein, and the defendant pain management clinics fraudulently upcoded office visits, submitted charges for office visits that were included in global post-surgery periods, and improperly submitted charges for office visits when patients presented to the pain management clinics for pre-planned procedures.

o.      The defendant pain management clinics, Padula, Gonte, Madden, Maffia, Jerome, and Goldstein submitted claims using CPT Codes to separately describe aspects of the same procedure allegedly performed, which constitutes a fraudulent billing practice known as unbundling.

p.      Michigan Pain, Dearborn Pain, Southfield Pain, Advanced Surgery, Padula, Madden, Gonte, Maffia, Jerome, Goldstein, Fatina Masri, and Haitham Masri submitted charges to Allstate for clinically-useless P-Stim acupuncture devices using CPT Codes that they knew described procedures that were far more complex and invasive than P-Stim, which merely involves placing an adhesive behind patients' ears.

q.      The pain management clinics, North Shore, Medi Transit, Advanced Surgery, Padula, Madden, Gonte, Karrumi, Faraj, Fatina Masri, and

Haitham Masri submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services at issue herein, including office evaluations, P-Stim, surgical procedures, transportation, MRI imaging, medications, and facility fees.

1298. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

1299. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

1300. The foregoing facts – billing for services not rendered, unlawfully soliciting patients, offering inducements and kickbacks, falsifying documents to justify excessive treatment, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of procedures performed on submitted bills – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

1301. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing allegedly provided by the defendants unnecessary and unlawful.

1302. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 8.

1303. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

1304. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

1305. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, screenings, testing, procedures, and ancillary services for which they billed Allstate.

1306. As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

1307. As licensed medical professionals, defendants Padula, Madden, Gonte, Karrumi, Haitham Masri, and Fatina Masri were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

1308. Each misrepresentation made by Padula, Madden, Gonte, Karrumi, Haitham Masri, and Fatina Masri was in violation of their legal and ethical obligations as healthcare professionals.

**B.    ALLSTATE'S JUSTIFIABLE RELIANCE**

1309. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

1310. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

1311. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek reimbursement under Michigan's No-Fault Act.

1312. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

1313. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

1314. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

1315. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

1316. As a result, Allstate has paid in excess of $3,501,685 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XIV.  MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

1317. As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

1318. The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 to 8, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

1319. This objective necessarily required the submission of claims for reimbursement to Allstate.

1320. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

1321. All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

1322. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

1323. Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

1324. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, benefits payment checks, and the return of the cancelled check drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of check draft duplicates to Allstate for filing.

1325. It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

1326. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

1327. The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

1328. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 18.

1329. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

1330. It was within the ordinary course of business for Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, North Shore, and Medi Transit to submit claims for No-Fault reimbursement to insurance carriers like Allstate through faxes and the U.S. Mail.

1331. Moreover, the business of providing medical services by each of the defendant clinics at issue herein is regularly conducted by fraudulently seeking reimbursement to which each defendant clinic is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

1332. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendant clinics.

1333. The defendant clinics, at the direction and with the knowledge of their owners and managers, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

1334. Thus, the defendants' commission of mail and wire fraud continues.

1335. As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

1336. As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

1337. Allstate reasonably relied on the submissions it received from Michigan Pain, Dearborn Pain, Southfield Pain, Sterling Heights Pain, Precise MRI, Advanced Surgery, North Shore, and Medi Transit, including the representative submissions set out in Exhibit 18 annexed hereto and identified in the exemplar claims above.

1338. As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XV.  **DAMAGES**

1339. The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

1340. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $3,501,685.

1341. Exhibits 19 through 26 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

1342. Exhibit 19 details payments made by Allstate to Michigan Pain since 2014.

1343. Exhibit 20 details payments made by Allstate to Dearborn Pain since 2017.

1344. Exhibit 21 details payments made by Allstate to Southfield Pain since 2016.

1345. Exhibit 22 details payments made by Allstate to Sterling Heights Pain since 2017.

1346. Exhibit 23 details payments made by Allstate to Precise MRI since 2016.

1347. Exhibit 24 details payments made by Allstate to Advanced Surgery since 2015.

1348. Exhibit 25 details payments made by Allstate to North Shore since 2012.

1349. Exhibit 26 details payments made by Allstate to Medi Transit since 2013.

1350. Every claim identified in Exhibits 19 through 26 derives from an Allstate insurance policy.

1351. Allstate's claim for compensatory damages, as set out in Exhibits 19 through 26, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

1352. Every payment identified in Exhibits 19 through 26 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 19 through 26.

1353. Moreover, every payment identified in Exhibits 19 through 26 derives from a check sent by Allstate to the defendants through the U.S. Mail.

1354. As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

1355. Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

1356. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XVI. CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan Pain Enterprise)
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; James Deweese; and Natham Karrumi, D.C.**

1357. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1358. Michigan Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1359. In connection with each of the claims identified in the within Complaint, Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; James Deweese; and Natham Karrumi, D.C. ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Michigan Pain, or knew that such false medical documentation would be faxed and mailed in the ordinary course of

Michigan Pain's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Michigan Pain would occur, in furtherance of the Count I defendants' scheme to defraud.

1360. The Count I defendants employed, knew, or should have foreseen that, two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1361. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

1362. Policies of insurance were delivered to insureds through the U.S. Mail.

1363. Payments to Michigan Pain from Allstate were transmitted through the U.S. Mail.

1364. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Michigan Pain, which they knew would be billed by Michigan Pain, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1365. Padula, Maffia, Goldstein, and Jerome owned and managed Michigan Pain and were responsible for all actions taken by Michigan Pain and its physicians.

1366. Padula, Madden, and Gonte rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Michigan Pain.

1367. Precise MRI, Advanced Surgery, North Shore – including their owners Karrumi, Fatina Masri, Haitham Masri, and James Deweese – submitted records for testing and other procedures that created the appearance of injury and permitted Michigan Pain to continue providing unlawful and medically unnecessary treatment, if provided at all.

1368. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Michigan Pain for the benefit of the Count I defendants that would not otherwise have been paid.

1369. The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

1370. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1371. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Michigan Pain for the benefit of the Count I defendants.

1372. The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1373. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

1374. The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1375. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1376. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1377. By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by them,
and others acting in concert with them, together with the costs of suit, including
reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Michigan Pain Enterprise)**
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced**
**Surgery Center, LLC; North Shore Injury Center, Inc.; James Padula, D.O.;**
**Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome,**
**D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.;**
**James Deweese; and Natham Karrumi, D.C.**

1378. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs
1 to 1356 set forth above as if fully set forth herein.

1379. Defendants Precision MRI of Michigan LLC d/b/a Precise MRI;
Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; James Padula,
D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome,
D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; James
Deweese; and Natham Karrumi, D.C. ("Count II defendants") conspired with each
other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of
Michigan Pain.

1380. The Count II defendants each agreed to further, facilitate, support, and
operate the Michigan Pain enterprise.

1381. As such, the Count II defendants conspired to violate 18 U.S.C. §
1962(c).

1382. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Michigan Pain even though Michigan Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1383. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1384. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

1385. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Dearborn Pain Enterprise)
### Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.

1386. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1387. Dearborn Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1388. In connection with each of the claims identified in the within Complaint, Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C. ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Dearborn Pain, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Dearborn Pain's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Dearborn Pain would occur, in furtherance of the Count III defendants' scheme to defraud.

1389. The Count III defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on

247

certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1390. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1391. Policies of insurance were delivered to insureds through the U.S. Mail.

1392. Payments to Dearborn Pain from Allstate were transmitted through the U.S. Mail.

1393. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Dearborn Pain, which they knew would be billed by Dearborn Pain, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1394. Padula, Maffia, Goldstein, and Jerome owned and managed Dearborn Pain and were responsible for all actions taken by Dearborn Pain and its physicians.

1395. Padula and Gonte rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Dearborn Pain.

1396. Precise MRI and Advanced Surgery – by and through their owners Karrumi, Fatina Masri, and Haitham Masri – submitted records for testing and other

procedures that created the appearance of injury and permitted Dearborn Pain to continue providing unlawful and medically unnecessary treatment, if provided at all.

1397. Fatina Masri, Haitham Masri, and Advanced Surgery forced Dearborn Pain to perform medically unnecessary treatments in Advanced Surgery's facility.

1398. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Dearborn Pain for the benefit of the Count III defendants that would not otherwise have been paid.

1399. The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

1400. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1401. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Dearborn Pain for the benefit of the Count III defendants.

1402. The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1403. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

1404. The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1405. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1406. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1407. By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Dearborn Pain Enterprise)
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

1408. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1409. Defendants Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Dearborn Pain.

1410. The Count IV defendants each agreed to further, facilitate, support, and operate the Dearborn Pain enterprise.

1411. As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

1412. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Dearborn Pain even though Dearborn Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1413. The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1414. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

1415. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Southfield Pain Enterprise)
**Against Michigan Pain Management PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

1416. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1417. Southfield Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1418. In connection with each of the claims identified in the within Complaint, Michigan Pain Management PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C. ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Southfield Pain, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Southfield Pain's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Southfield Pain would occur, in furtherance of the Count V defendants' scheme to defraud.

1419. The Count V defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1420. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1421. Policies of insurance were delivered to insureds through the U.S. Mail.

1422. Payments to Southfield Pain from Allstate were transmitted through the U.S. Mail.

1423. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Southfield Pain, which they knew would be billed by Southfield Pain, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1424. Michigan Pain, Gonte, Padula, Maffia, Goldstein, and Jerome owned and managed Southfield Pain and were responsible for all actions taken by Southfield Pain and its physicians.

1425. Padula and Gonte rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Southfield Pain.

1426. Precise MRI and Advanced Surgery – by and through their owners Karrumi, Fatina Masri, and Haitham Masri – submitted records for testing and other procedures that created the appearance of injury and permitted Southfield Pain to continue providing unlawful and medically unnecessary treatment, if provided at all.

1427. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Southfield Pain for the benefit of the Count V defendants that would not otherwise have been paid.

1428. The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

1429. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1430. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Southfield Pain for the benefit of the Count V defendants.

1431. The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1432. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

1433. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1434. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1435. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1436. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Southfield Pain Enterprise)
**Against Michigan Pain Management PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

1437. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1438. Defendants Michigan Pain Management PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.

("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Southfield Pain.

1439. The Count VI defendants each agreed to further, facilitate, support, and operate the Southfield Pain enterprise.

1440. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

1441. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Southfield Pain even though Southfield Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1442. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1443. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

1444. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Sterling Heights Pain Enterprise)
### Against Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.

1445.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1446.  Sterling Heights Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1447.  In connection with each of the claims identified in the within Complaint, Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C. ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Sterling Heights Pain, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Sterling Heights Pain's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Sterling Heights Pain would occur, in furtherance of the Count VII defendants' scheme to defraud.

1448. The Count VII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1449. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1450. Policies of insurance were delivered to insureds through the U.S. Mail.

1451. Payments to Sterling Heights Pain from Allstate were transmitted through the U.S. Mail.

1452. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Sterling Heights Pain, which they knew would be billed by Sterling Heights Pain, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1453. Padula, Maffia, Goldstein, and Jerome owned and managed Sterling Heights Pain and were responsible for all actions taken by Sterling Heights Pain and its physicians.

259

1454. Padula and Madden rendered and facilitated the unlawful and medically unnecessary treatment, when treatment was in fact rendered, by Sterling Heights Pain.

1455. Precise MRI – by and through its owner Karrumi – submitted records for MRIs that created the appearance of injury and permitted Sterling Heights Pain to continue providing unlawful and medically unnecessary treatment, if provided at all.

1456. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Sterling Heights Pain for the benefit of the Count VII defendants that would not otherwise have been paid.

1457. The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

1458. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1459. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Sterling Heights Pain for the benefit of the Count VII defendants.

1460. The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1461. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

1462. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1463. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1464. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1465. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Sterling Heights Pain Enterprise)**
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula,**
**D.O.; Jonathan Maffia;  Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances**
**Madden, M.D.; and Natham Karrumi, D.C.**

1466. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1467. Defendants Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C. ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Sterling Heights Pain.

1468. The Count VIII defendants each agreed to further, facilitate, support, and operate the Sterling Heights Pain enterprise.

1469. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1470. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Sterling Heights Pain even though Sterling Heights Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1471. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

1472. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

1473. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Precise MRI Enterprise)
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.**

1474. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1475. Precise MRI constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1476.  In connection with each of the claims identified in the within Complaint Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C. ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Precise MRI, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Precise MRI's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Precise MRI would occur, in furtherance of the Count IX defendants' scheme to defraud.

1477.  The Count IX defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1478.  Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1479.  Policies of insurance were delivered to insureds through the U.S. Mail.

1480.  Payments to Precise MRI from Allstate were transmitted through the U.S. Mail.

1481. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Precise MRI, which they knew would be billed by Precise MRI, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1482. Karrumi is the owner of Precise MRI and is responsible for all actions taken by Precise MRI and its representatives.

1483. Michigan Pain, Southfield Pain, Sterling Heights Pain, Dearborn Pain, Padula, Gonte, Maffia, Goldstein, Jerome, and Madden were responsible for the improper referrals that resulted in imaging billed by Precise MRI.

1484. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Precise MRI for the benefit of the Count IX defendants that would not otherwise have been paid.

1485. The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

1486. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1487. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Precise MRI for the benefit of the Count IX defendants.

1488. The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1489. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

1490. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1491. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1492. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1493. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Precise MRI Enterprise)**
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.**

1494. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1495. Defendants Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C. ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Precise MRI.

1496. The Count X defendants each agreed to further, facilitate, support, and operate the Precise MRI enterprise.

1497. As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

267

1498. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Precise MRI even though Precise MRI was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1499. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1500. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

1501. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Advanced Surgery Enterprise)
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

1502. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1503. Advanced Surgery constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1504. In connection with each of the claims identified in the within Complaint, Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C. ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Advanced Surgery, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Advanced Surgery's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Advanced Surgery would occur, in furtherance of the Count XI defendants' scheme to defraud.

1505.  The Count XI defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1506.  Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1507.  Policies of insurance were delivered to insureds through the U.S. Mail.

1508.  Payments to Advanced Surgery from Allstate were transmitted through the U.S. Mail.

1509.  As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Advanced Surgery, which they knew would be billed by Advanced Surgery, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1510.  Haitham and Fatina Masri are the owners of Advanced Surgery and are responsible for all actions taken by Advanced Surgery and its representatives.

1511. Michigan Pain, Dearborn Pain, Southfield Pain, Padula, Maffia, Gonte, Goldstein, Jerome, and Madden were responsible for the referrals and procedures that allowed Advanced Surgery to submit facility fee charges to Allstate.

1512. Precise MRI and Karrumi were responsible for MRI records that created the appearance of injury and permitted Advanced Surgery to continue billing for unlawful and medically unnecessary treatment.

1513. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Advanced Surgery for the benefit of the Count XI defendants that would not otherwise have been paid.

1514. The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

1515. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1516. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Advanced Surgery for the benefit of the Count XI defendants.

1517. The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1518. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XI defendants' fraudulent acts.

1519. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1520. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1521. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1522. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Advanced Surgery Enterprise)
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

1523. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1524. Defendants Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C. ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Advanced Surgery.

1525. The Count XII defendants each agreed to further, facilitate, support, and operate the Advanced Surgery enterprise.

1526. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1527. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Advanced Surgery even though Advanced Surgery was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1528. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1529. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

1530. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (North Shore Enterprise)
### Against Michigan Pain Management PLLC; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Ali Faraj; and James Deweese

1531. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1532. North Shore constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1533. In connection with each of the claims identified in the within Complaint, Michigan Pain Management PLLC; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Ali Faraj; and James Deweese ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by North Shore, or knew that such false medical documentation would be faxed and mailed in the ordinary course of North Shore's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by North Shore would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1534. The Count XIII defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1535. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1536. Policies of insurance were delivered to insureds through the U.S. Mail.

1537. Payments to North Shore from Allstate were transmitted through the U.S. Mail.

1538. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by North Shore, which they knew would be billed by North Shore, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1539. Deweese and Gonte are owners, officers, and directors of North Shore and are responsible for all actions taken by North Shore and its representatives.

1540. Michigan Pain, Padula, Maffia, Gonte, Goldstein, and Jerome were responsible for the referrals and medically unnecessary physical therapy prescriptions that allowed North Shore to submit bills to Allstate.

1541. Medi Transit and its owner Faraj were responsible for transporting patients to and from their appointments at North Shore, and for ensuring that patients presented to North Shore for medically unnecessary treatment.

1542. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to North Shore for the benefit of the Count XIII defendants that would not otherwise have been paid.

1543. The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face

276

would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

1544. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1545. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to North Shore for the benefit of the Count XIII defendants.

1546. The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1547. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

1548. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1549. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1550. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1551. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (North Shore Enterprise)
### Against Michigan Pain Management PLLC; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Ali Faraj; and James Deweese

1552. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1553. Defendants Michigan Pain Management PLLC; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Ali Faraj; and James Deweese ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of North Shore.

1554. The Count XIV defendants each agreed to further, facilitate, support, and operate the North Shore enterprise.

1555. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1556. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of North Shore even though North Shore was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1557. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1558. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

1559. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Medi Transit Enterprise)
### Against North Shore Injury Center, Inc.; William Gonte, M.D.; Ali Faraj; and James Deweese

1560. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1561. Medi Transit constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1562. In connection with each of the claims identified in the within Complaint, North Shore Injury Center, Inc.; William Gonte, M.D.; Ali Faraj; and James Deweese ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Medi Transit, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Medi Transit's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by Medi Transit would occur, in furtherance of the Count XV defendants' scheme to defraud.

1563. The Count XV defendants employed, knew, or should have foreseen that two (2) or more faxes and mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 18.

1564. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail and/or interstate wires.

1565. Policies of insurance were delivered to insureds through the U.S. Mail.

1566. Payments to Medi Transit from Allstate were transmitted through the U.S. Mail.

1567. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Medi Transit, which they knew would be billed by Medi Transit, in order to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

1568. Faraj is the owner of Medi Transit and is responsible for all actions taken by Medi Transit and its representatives.

1569. North Shore, its owner Deweese, and Gonte were responsible for the medically unnecessary disability certificates that allowed Medi Transit to submit bills to Allstate.

1570. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Medi Transit for the benefit of the Count XV defendants that would not otherwise have been paid.

1571. The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

1572. By faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

1573. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Medi Transit for the benefit of the Count XVII defendants.

1574. The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

1575. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

1576. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1577. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

1578. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

1579. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Medi Transit Enterprise)**
**Against North Shore Injury Center, Inc.; William Gonte, M.D.; Ali Faraj;**
**and James Deweese**

1580. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1581. Defendants North Shore Injury Center, Inc.; William Gonte, M.D.; Ali Faraj; and James Deweese ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Medi Transit.

1582. The Count XVI defendants each agreed to further, facilitate, support, and operate the Medi Transit enterprise.

1583. As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1584. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Medi Transit even though Medi Transit was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

1585. The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1586. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XVI defendants' unlawful conduct described herein.

1587. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## COMMON LAW FRAUD
### Against All Defendants

1588.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1589.  The scheme to defraud perpetrated by Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC;  Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; Ali Faraj; James Deweese; and Natham Karrumi, D.C. ("Count XVII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

1590.  The misrepresentations of fact made by the Count XVII defendants include, but are not limited to, those material misrepresentations discussed in section XIII *supra*.

1591.  The Count XVII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1592. The misrepresentations were intentionally made by the Count XVII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

1593. The Count XVII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1594. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1595. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XVIII**
**CIVIL CONSPIRACY**
**Against All Defendants**

1596. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1597. Defendants Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain

Management, PLC;  Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced

Surgery Center, LLC; North Shore Injury Center, Inc.; Medi Transit Inc.; James

Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert

Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.;

Ali Faraj; James Deweese; and Natham Karrumi, D.C. ("Count XVIII defendants")

combined and concerted to accomplish the unlawful purpose of defrauding Allstate

by submitting claims for reimbursement under the No-Fault Act to which they were

not entitled because (1) the defendants did not actually render the treatment for

which claims were submitted, (2) the defendants did not provide reasonably

necessary medical treatment, (3) the defendants did not lawfully render treatment,

and (4) the defendants did not submit reasonable charges to Allstate.

1598. The Count XVIII defendants worked together to achieve an unlawful

purpose (namely, defrauding Allstate for personal gain).

1599. This purpose was known to all of the Count XVIII defendants and

intentionally pursued.

1600. Despite knowing that the defendants were not entitled to

reimbursement under the No-Fault Act because they billed for services that were not

actually provided, because they billed for services that were not reasonably

necessary, because treatment was not lawfully rendered, and because they charged

outrageous and unreasonable prices, the Count XVIII defendants nonetheless

submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

1601. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1602. All of the Count XVIII defendants directly benefited from the payments made to Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc.

1603. All of the Count XVIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVIII defendants in the commission of acts done for the benefit of all Count XVIII defendants and to the unjustified detriment of Allstate.

1604. Accordingly, all of the Count XVIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XIX
## PAYMENT UNDER MISTAKE OF FACT
### Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC;  Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc.

1605.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1606.  Allstate paid the amounts described herein and itemized in Exhibits 19 through 26 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc. ("Count XIX defendants").

1607.  Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XIX defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1608.  The Count XIX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1609. Allstate is entitled to restitution from each of the Count XIX defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XX
## UNJUST ENRICHMENT
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc.**

1610. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1611. Allstate paid monies, including those amounts set out in Exhibits 19 through 26, in response to the claims submitted, or caused to be submitted, by defendants Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc. ("Count XX defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1612. Allstate's payments constitute a benefit which the Count XX defendants aggressively sought and voluntarily accepted.

1613. The Count XX defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

1614. The Count XX defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

1615. The Count XX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1616. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 1356 set forth above as if fully set forth herein.

1617. Defendants Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; Ali Faraj; James Deweese; and Natham Karrumi, D.C. ("Count XXI defendants") routinely provided unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1618. The Count XXI defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for

the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

1619. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105 and 500.3107.

1620. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

1621. The lack of lawfully-rendered treatment (such as treatment arising from illicit solicitation or from kickbacks) is also a defense to an insurer's obligation to pay No-Fault benefits.

1622. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1623. Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.  Mich. Comp. Laws § 500.3157.

1624. The Count XXI defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1625. The Count XXI defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XXI defendants for any or all of the reasons set out in the within Complaint.

1626. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants provided unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

1627. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants were engaged in a fraudulent scheme whereby they provided unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1628. As such, the Count XXI defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot seek payment from Allstate for

benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1629. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVII. DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan Pain Enterprise)
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; James Deweese; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

294

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## <u>COUNT II</u>
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan Pain Enterprise)
### Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; James Deweese; and Natham Karrumi, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Dearborn Pain Enterprise)
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Dearborn Pain Enterprise)
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Southfield Pain Enterprise)
**Against Michigan Pain Management PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Southfield Pain Enterprise)
**Against Michigan Pain Management PLLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

<u>**COUNT VII**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Sterling Heights Pain Enterprise)**
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
**(Sterling Heights Pain Enterprise)**
**Against Precision MRI of Michigan LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATION OF 18 U.S.C. § 1962(c)
**(Precise MRI Enterprise)**
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Precise MRI Enterprise)
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLLC; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; and Natham Karrumi, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendant from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Advanced Surgery Enterprise)
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Precision MRI of Michigan, LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
#### (Advanced Surgery Enterprise)
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Precision MRI of Michigan, LLC d/b/a Precise MRI; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (North Shore Enterprise)
**Against Michigan Pain Management PLLC; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Ali Faraj; and James Deweese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (North Shore Enterprise)
**Against Michigan Pain Management PLLC; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Ali Faraj; and James Deweese**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Medi Transit Enterprise)
### Against North Shore Injury Center, Inc.; William Gonte, M.D.; Ali Faraj; and James Deweese

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Medi Transit Enterprise)
### Against North Shore Injury Center, Inc.; William Gonte, M.D.; Ali Faraj; and James Deweese

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XVII
### COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

### COUNT XVIII
### CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XIX
## PAYMENT UNDER MISTAKE OF FACT
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC;  Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)   GRANT all other relief this Court deems just.

## COUNT XX
## UNJUST ENRICHMENT
**Against Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC;  Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; and Medi Transit Inc.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)   GRANT all other relief this Court deems just.

## COUNT XXI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
## Against All Defendants

(a)   DECLARE that Allstate has no obligation to pay pending and previously denied No-Fault insurance claims submitted by Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC;  Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.;

305

Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; Ali Faraj; James Deweese; and Natham Karrumi, D.C. for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; Ali Faraj; James Deweese; and Natham Karrumi, D.C., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Michigan Pain Management PLLC; Dearborn Pain Specialists, PLC; Southfield Pain Management, PLLC; Sterling Heights Pain Management, PLC; Precision MRI of Michigan LLC d/b/a Precise MRI; Advanced Surgery Center, LLC; North Shore Injury Center, Inc.; Medi Transit Inc.; James Padula, D.O.; Jonathan Maffia; William Gonte, M.D.; Elias Goldstein, D.C.; Albert

Jerome, D.C.; Frances Madden, M.D.; Fatina Masri, M.D.; Haitham Masri, M.D.; Ali Faraj; James Deweese; and Natham Karrumi, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVIII.     **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*
_____
Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, Allstate Property and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated:  February 26, 2019